**2020-1189**

# United States Court of Appeals for the Federal Circuit

INFINITY COMPUTER PRODUCTS, INC.,

*Plaintiff-Appellant*,

v.

OKI DATA AMERICAS, INC.,

*Defendant-Appellee.*

*Appeals from the United States District Court for the District of Delaware*
*Case No. 1:18-cv-00463-LPS, Judge Leonard P. Stark*

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

ANDREW G. DINOVO
NICOLE E. GLAUSER
DINOVO PRICE LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

*Counsel for Plaintiff-Appellant*
*Infinity Computer Products, Inc.*

APRIL 24, 2020

COUNSEL PRESS, LLC (888) 277-3259 * (202) 783-7288

FORM 9. Certificate of Interest Form 9
Rev. 10/17

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

INFINITY COMPUTER PRODUCTS, INC. v. OKI DATA AMERICAS, INC.

Case No. 20-1189

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ■ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Infinity Computer Products, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Infinity Computer Products, Inc. | Infinity Computer Products, Inc. | n/a |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

DiNovo Price, LLP: Daniel L. Schmid, Gabriel. R. Gervey, Adam G. Price, Christopher V. Goodpastor

Rhodunda Williams & Kondraschow: William J. Rhodunda, Jr., Chandra J. Williams

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

See Attachment A

4/24/2020
Date

/s/ Andrew G. DiNovo
Signature of counsel

Please Note: All questions must be answered

Andrew G. DiNovo
Printed name of counsel

cc: see attached Certificate of Service

Reset Fields

## ATTACHMENT A

## TO APPELLANT'S CERTIFICATE OF INTEREST

The titles and numbers of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are:

| **Case Name** | **Case No.** | **Court** |
|---|---|---|
| *Infinity Computer Products, Inc. v. Canon USA, Inc.* | 2:18-cv-01823 | EDNY |
| *Infinity Computer Products, Inc. v. Dell, Inc.* | 2:12-cv-06808 | EDPA |
| *Infinity Computer Products, Inc. v. Hewlett-Packard Company* | 2:12-cv-06805 | EDPA |
| *Infinity Computer Products, Inc. v. Konica Minolta Business Solutions, USA, Inc.* | 2:12-cv-06802 | EDPA |
| *Infinity Computer Products, Inc. v. Lexmark International, Inc.* | 5:18-cv-00198 | EDKY |
| *Infinity Computer Products, Inc. v. Ricoh USA, Inc.* | 2:12-cv-06807 | EDPA |
| *Infinity Computer Products, Inc. v. Samsung Electronics America, Inc.* | 2:12-cv-06798 | EDPA |
| *Infinity Computer Products, Inc. v. Toshiba America Business Solutions, Inc.* | 2:12-cv-06807 | EDPA |
| *Infinity Computer Products, Inc. v. Xerox Corporation* | 2:12-cv-06804 | EDPA |

# TABLE OF CONTENTS

***Page***


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

TABLE OF ABBREVIATIONS ........ viii

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

STATEMENT OF FACTS ........ 6

I. THE PARTIES ........ 6

II. THE INFINITY PATENTS ........ 8

III. PROSECUTION HISTORY ........ 10

IV. THE ASSERTED CLAIMS ........ 11

V. THE DISTRICT COURT PROCEEDINGS ........ 12

A. Infinity's Lawsuit against Oki Data ........ 12

B. The District Court's Claim Construction Order, Order Denying Reconsideration, and Final Judgment ........ 13

SUMMARY OF ARGUMENT ........ 20

STANDARD OF REVIEW ........ 25

ARGUMENT ........ 26

I. INTRODUCTION ........ 26

II. THE DISTRICT COURT MISINTERPRETED THE "DATA FLOW PASSAGE" ........ 27

III. "PASSIVE LINK" AND "COMPUTER" ARE DEFINITE UNDER A *NAUTILUS* ANALYSIS ....................28

A. The Claims and Specification Inform a Person of Ordinary Skill of the Meaning of "Computer" Reasonable Certainty ....................30

B. The Claims and Specification Inform a Person of Ordinary Skill of the Meaning of "Passive Link" With Reasonable Certainty ....................31

C. The Prosecution History Necessitates Infinity's Proposed Construction of "Passive Link" and "Computer" ....................32

D. The Only Competent Testimony of a Skilled Artisan Confirms Infinity's Proposed Construction of "Passive Link" and "Computer" ....................45

IV. THE DISTRICT COURT'S INDEFINITENESS RULING IMPROPERLY EXPANDS THE HOLDING IN *TEVA* ....................46

A. *Teva* is Inapplicable Because the Claim Language and Specification Provide Reasonable Certainty to a POSITA to Understand the Claims ....................47

B. The District Court's Application of *Teva* is Error Because Undisputed Expert Testimony Confirms the Meaning of the Terms ....................49

C. A Single Inconsistent Statement Does Not Mandate Indefiniteness under Governing Case Law, including *Teva*, or the Patent Act ....................50

D. Because the District Court Misinterpreted the Data Flow Passage, and Subsequent Prosecution History Adopted an Explicit Construction, There Is No Irreconcilable Conflict. ....................53

V. THERE IS NO PROSECUTION HISTORY DISCLAIMER ....................58

CONCLUSION ....................60

ADDENDUM ....................62

CERTIFICATE OF SERVICE ....................63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ...........64

# TABLE OF AUTHORITIES

***Page(s)***

**Cases**

*Ancora Technologies, Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014) ....................31

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) .................... 26, 48

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
783 F.3d 1374 (Fed. Cir. 2015) .................... 26, 29

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) ....................39

*DeMarini Sports, Inc. v. Worth, Inc.*,
239 F.3d 1314 (Fed. Cir. 2001) ....................59

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
845 F.3d 1357 (Fed. Cir. 2017) ....................49

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ....................29

*Implicit Networks, Inc. v. F5 Networks, Inc.*,
2015 WL 2194627 (N.D. Cal. May 6, 2015) ....................39

*Invitrogen Corp. v. Biocrest Mfg*., L.P.,
327 F.3d 1364 (Fed. Cir. 2003) ....................60

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998) ....................39

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ....................31

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ....................29

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*,
215 F.3d 1281 (Fed. Cir. 2000) ....................59

*Northern Telecom, Inc. v. Datapoint Corp.*,
908 F.2d 931 (Fed. Cir. 1990) .......... 34, 58

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 59

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2015) .......... 59

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......... 38

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... passim

*Schindler Elevator Corp. v. Otis Elevator Co.*,
593 F.3d 1275 (Fed. Cir. 2010) .......... 59

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
305 F.3d 1318 (Fed. Cir. 2002) .......... 59

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) .......... 31, 39

*Storage Tech. Corp. v. Cisco Sys. Inc.*,
329 F.3d 823 (Fed. Cir. 2003) .......... 59

*Tech Props. Ltd. v. Huawei Techs. Co.*,
849 F.3d 1349 (Fed. Cir. 2017) .......... 58

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) .......... 25

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) .......... passim

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
733 F. App'x 1011 (Fed. Cir. 2018) .......... 30, 31, 34, 45

**Statutes**

28 U.S.C. § 1295 .......... 2

28 U.S.C. § 1331 .......... 2

28 U.S.C. §1338 .......... 2

35 U.S.C. § 112 .......... 26

35 U.S.C. § 282 .......... 26

# TABLE OF ABBREVIATIONS

**Parties**

| | |
|---|---|
| Infinity | Plaintiff-Appellant Infinity Computer Products, Inc. |
| Oki Data | Defendant-Appellee Oki Data Americas, Inc. |

**Defined Terms**

| | |
|---|---|
| ’811 Patent | U.S. Patent No. 6,894,811 |
| ’423 Patent | U.S. Patent No. 7,489,423 |
| ’574 Patent | U.S. Patent No. 8,040,574 |
| ’915 Patent | U.S. Patent No. 8,294,915 |
| Infinity Patents | Collectively, the ’811 Patent, ’423 Patent, ’574 Patent, and ’915 Patent |
| Asserted Claims | Claims 1, 2, 4, 6, 7, 18, 19, 20 of the ’811 Patent; claims 1, 2, 3, 4, 6 of the ’423 Patent; claims 1, 2, 4, 5, 7, 8 of the ’574 Patent; and claims 1, 6, 7, 8, 9, 14, 15 of the ’915 Patent |
| Perkins Reference | U.S. Patent No. 5,452,106 to Perkins |
| court *or* district court | United States District Court for the District of Delaware, Honorable Leonard P. Stark presiding |

| | |
|---|---|
| PTO | United States Patent and Trademark Office |
| PTAB | Patent Trial and Appeal Board of the United States Patent and Trademark Office |
| CBMR | Covered Business Method Review |

All emphasis added unless otherwise noted.

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5 of the Federal Circuit Rules, Infinity states that no other appeal in or from the same civil action or proceeding in the lower court has been before this or any other appellate court.

The following cases, all of which are stayed pending this Court's decision in this appeal, will be directly affected by this Court's decision in the appeal: (1) the cases consolidated in the United States District Court for the Eastern District of Pennsylvania: *Infinity Comput. Prods., Inc. v. Toshiba Am. Bus. Sols., Inc.*, 2:12-cv-06796; *Infinity Comput. Prods., Inc. v. Samsung Elecs. Am., Inc.*, 2:12-cv- 06798; *Infinity Comput. Prods., Inc. v. Konica Minolta Bus. Sols., U.S.A., Inc.*, 2:12-cv-06802; *Infinity Comput. Prods., Inc. v. Xerox Corp.*, 2:12-cv-06804; *Infinity Comput. Prods., Inc. v. Hewlett-Packard Co.*, 2:12-cv-06805; *Infinity Comput. Prods., Inc. v. Ricoh USA, Inc.*, 2:12-cv-06807; and *Infinity Comput. Prods., Inc. v. Dell, Inc.*, 2:12-cv-06808; (2) the case pending in the United States District Court for the Eastern District of New York: *Infinity Comput. Prods., Inc. v. Canon U.S.A., Inc.*, 2:18-cv-01823-MKB-SMG; and (3) the case pending in the United States District Court for the Eastern District of Kentucky: *Infinity Comput. Prods., Inc. v. Lexmark Int'l, Inc.*, 5:18-cv-198-JMH.

Counsel knows of no other case pending in this or any other court that will directly affect this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1338. The court entered a Final Judgment on October 28, 2019. Appx22. Infinity timely filed a notice of appeal on November 12, 2019. Appx3981-3983. This Court has jurisdiction pursuant to 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding two terms in the Asserted Claims— "computer" and "passive link"—to be indefinite where:

(a) The district court misinterpreted the technical meaning of the single prosecution history sentence on which it based its opinion, the language itself does not support the district court's interpretation, the only evidence of record from a person of ordinary skill in the art supports Infinity's position, and the record is devoid of contradictory testimony from any skilled artisan in the relevant field;

(b) The district court premised its opinion on a single statement regarding an unissued claim made in 2002, early in the 22-year prosecution history and disregarding all subsequent prosecution history at the PTO and PTAB, including where the PTAB and Infinity explicitly agreed on a construction of "passive link" and implicitly on "computer"; and

(c) The asserted claims, specification, and prosecution history inform with reasonable certainty those skilled in the art about the scope of the invention.

## STATEMENT OF THE CASE

The Infinity Patents are directed to methods for leveraging the hardware and circuitry of a facsimile machine to work not just to send and receive faxes, but also as a printer and/or scanner for a personal computer (PC). Appx72 (Abstract). More specifically, the patented method teaches connecting the fax machine and a PC with specific connectivity, including a passive link that spans the fax machine and the PC, and providing a procedure so that data communications can flow between the fax machine and PC over this passive link (rather than over a telephone line to a remote fax, for example) depending on mode of operation. *See, e.g.,* Appx73. Then, using the printing and scanning functionality inherent in a fax machine and certain generic communication software typically present in PCs (as opposed to requiring the user to download proprietary communications software), scan data is transferred from the fax machine to the PC or print data is transferred from the PC to the fax machine, and in some instances the data is printed. *See, e.g.,* Appx76 (Fig. 2b). The priority date for the Infinity Patents is April 11, 1994.

On June 30, 2010, Infinity filed suit alleging Oki Data infringed the Infinity Patents. Infinity accused Oki Data of infringing the Asserted Claims based on

multifunction peripheral devices (known as "All in Ones," "MFDs," or "MFPs") sold by Oki Data that are capable of faxing, scanning, and printing (the "Oki Data Accused Products"), and which are used in the United States by Oki Data's end users to scan data to or print data from a PC, and which also leverage printing and scanning hardware for multiple functions.

The court held a *Markman* hearing on February 4, 2019 (Appx3795-3889) and issued its Claim Construction Memorandum Opinion and Order ("Claim Construction Order") on June 10, 2019 (Appx28-41). In the Claim Construction Order, the district court ruled that two terms—"passive link" and "computer"—are indefinite. Appx38. The terms are interrelated: per the claims, the "passive link" is "between" the facsimile and the "computer," and the crux of the issue is how far the passive link must extend per the claim. In its Claim Construction Order, the district court adopted Oki Data's unsubstantiated attorney argument that a brief passage in the prosecution history—a sentence directed to a claim that the PTO never allowed—rendered the terms "computer" and "passive link" indefinite in all Asserted Claims.

The Claim Construction Order is erroneous because, *first,* it technically misinterprets and conflates a discussion in the September 26, 2002 Amendment and Response (the "September 26, 2002 Amendment") (Appx2188-2211) of ***<u>uninterrupted data flow</u>***—a permissive benefit of the claimed invention's digital

communications—with the ***endpoint of the claimed passive link***, which the Examiner, Applicant, PTAB, intrinsic record and unrebutted expert testimony unanimously agree **is a port or interface of the computer**.

*Second,* the Claim Construction Order does not properly consider the context of the full prosecution history of the Infinity Patents. The very term under discussion was discussed at length by the PTAB in three separate reexaminations, and a definition of the term was agreed upon by the Applicant and a unanimous panelt of three administrative law judges at the PTAB. *See, e.g.*, Appx2680-2694 ('811 Patent). In addition, the then-existent claim 27 discussed in the September 26, 2002 Amendment never issued and contained material language differences pertinent to the discussion of the Perkins reference that reinforce that the district court erred in its interpretation of the September 26, 2002 Amendment. The context demonstrates that "computer interface" was added to claim 27 to emphasize that the computer began where the card at issue connected to the computer—the interface—in the discussion of an alternative embodiment of the Perkins reference, eliminating all possible conflict from the discussion in the September 26, 2002 Amendment as to the asserted claims.

In the district court, because the terms "passive link" and "computer" appear in each of the independent Asserted Claims, Infinity stipulated that, in light of the court's erroneous indefiniteness ruling and subject to Infinity's planned appeal, the

Asserted Claims are invalid. Appx3975-3979. The court entered a Final Judgment on October 28, 2019. Appx22.

## STATEMENT OF FACTS

### I. THE PARTIES

Bruce Nachman was the sole named inventor of all asserted claims of the Infinity Patents. In 1974, as a young teenager, Bruce Nachman was dabbling in building computer equipment and teaching himself how to write computer code to program the devices he built. He later attended Drexel University, where he completed three years toward an engineering degree and various work internships related to advanced computer systems before being diagnosed with Hodgkin's disease. Appx2833.

In the 1980's, while Bruce was on medical leave from Drexel for treatment of terminal cancer, Bruce began working for a company his father owned. In the early 1990's, Bruce conceived an idea that, at the time, represented a pioneering breakthrough in how to conveniently and affordably use a single device—a fax machine—to scan data to a PC and print data from a PC. Before Bruce's invention, people either had to bear the relatively high expense of a separate fax machine, printer, and scanner, or purchase complicated and expensive interface devices to connect a fax machine to a PC for purposes of scanning to or printing from a PC. Bruce recognized that there was a different, better way. He envisioned using the

scanning and printing functionality already part of a fax machine and types of software commonly already present on a standard fax machine and most PCs to facilitate communication between the fax machine and the PC for printing and scanning. Appx2835.

Recognizing the value in the concept, Bruce formed Infinity in March 1994 as a Pennsylvania corporation, with the purpose of commercializing the invention. In April 1994, he sought patent protection by filing a first patent application, which was subsequently assigned to Infinity. During this early period, Infinity commercially released breakthrough products that allowed a single scanner and printhead to be used for multiple functions. One of Infinity's products—the Scan-by-Fax—reflected an alternate embodiment of many of the concepts and benefits set forth in Bruce's patent application. That product was presented at various major trade shows, where it received general accolades. Before Bruce had the opportunity to participate in the full success of his invention, he passed away on September 8, 1995. *See* Appx72.

About a year after his death, Bruce's patent application was granted and issued as U.S. Patent No. 5,530,558, (the "'558 Patent"). Appx3690. The '558 Patent is not asserted against Oki Data (or at direct issue in this appeal), but it is the parent application to all of the Infinity Patents, which claim priority to it. After the issuance of the '558 Patent, acting as legal representative of Bruce's estate, Mr. Marvin

Nachman continued to pursue patent protection for the inventions described in his son's original application in four subsequent patent applications (filed in 1996, 2005, 2009, and 2011). Each of those applications was ultimately granted by the USPTO and issued as the respective Infinity Patents at issue in this appeal. Appx72; Appx101; Appx126; Appx148.

## II. THE INFINITY PATENTS

The Patents-in-Suit teach using a group 1, 2, or 3 facsimile machine and analog and/or digital transmission for sending scan or print data between the facsimile machine and the PC. This method was made possible through the realization that standard fax machines based on emerging digital facsimile transmission standards could share data formats common to the data communications employed by personal computers.




Fig. 2g

Appx81.

In particular, as shown in Fig. 2g, a Group 3 facsimile machine is connected via a bidirectional RS 232 digital passive link for transmission of scan and print data with a PC using generic send receive communication software, which is representative of a typical MFP today.

The '811 Patent specification also teaches the use of digital connectivity with Group 3 facsimile machines and PCs, in accordance with ITU recommendations T.4, T.6 and T.30. Appx79-81; Appx86 at 6:38-40; Appx87 at 8:4-13. The operation of the digital embodiment is further explained in Dr. Marc Levitt's Declaration, the only expert to submit opinions in the underlying case. *See* Appx2957-3258. Group

3 Facsimile machines were developed for sending digitized documents over the General Switched Telephone Network (GSTN). These facsimile terminals are now in widespread use around the world. The operation of Group 3 Facsimile terminals has been standardized in ITU-T Recommendations T.4, T.6 and T.30.

In the ’811 Patent, Fig. 2e discloses that the use of digital transmission, as shown via RS-232, can be employed for communication between facsimile machine and computer. Fig. 2e demonstrates that the serial digital data that is transmitted as part of all other ’558 Patent arrangements could be accomplished without use of analog modulation at all, eliminating the need for that data processing circuitry and delay altogether. Appx79.

## III. PROSECUTION HISTORY

Seldom have patents been so thoroughly reviewed by the PTO and PTAB, over a 22-year period spanning April 11, 1994 to October 25, 2016. In addition to an 18-year underlying prosecution, the Patents-in-Suit withstood 10 reexaminations initiated by co-defendants of Oki Data. Specifically, Oki-Data’s co-defendant Ricoh and codefendant’s counsel, Baker Botts LLP, initiated 10 patent reexaminations relative to the Patents-in-Suit, as follows:

**Table 1—Patent Reexaminations Initiated by Appellee’s Codefendants**

| Patent | Filing Date | Requester |
|---|---|---|
| ’811 | 4/19/2011 | Baker Botts LLP |
| ’811 | 3/22/2013 | Ricoh Americas Corp. |
| ’811 | 4/10/2014 | Ricoh Americas Corp. |

| | | |
|---|---|---|
| ’423 | 4/19/2011 | Baker Botts LLP |
| ’423 | 3/22/2013 | Ricoh Americas Corp. |
| ’423 | 4/10/2014 | Ricoh Americas Corp. |
| ’574 | 3/22/2013 | Ricoh Americas Corp. |
| ’574 | 4/10/2014 | Ricoh Americas Corp. |
| ’915 | 3/22/2013 | Ricoh Americas Corp. |
| ’915 | 4/10/2014 | Ricoh Americas Corp. |

Upon institution of the first reexaminations, Appellee and its codefendants sought a stay in their cases pending in the Eastern District of Pennsylvania, arguing principally that the experts in the USPTO should be afforded an opportunity to weigh in on the validity of that Patents-in-Suit. Appx4081 (“because of the strong potential to conserve even more judicial resources by ***deferring to the USPTO***, a stay will almost certainly simplify the issues for trial”) (emphasis added); Appx530-534 (Oki Data explicitly adopting same). Although Infinity opposed the motion through its response filed April 26, 2013, the Court granted Oki Data’s motion on May 22, 2013, staying the case until the USPTO completed the reexaminations. Appx681-689. Once the stay was lifted, Appellee promptly challenged the determinations by the PTAB, and persuaded the district court through naked attorney argument that the experts in the PTAB should be countermanded without even entering competing technical testimony.

## IV. THE ASSERTED CLAIMS

Claim 1 of the ’811 Patent is an exemplary claim reciting a passive link between a facsimile machine and a computer, and is shown below.

> **1.** A method of creating a scanning capability from a facsimile machine to a computer, with scanned image digital data signals transmitted through a bi-directional connection ***via a passive link between the facsimile machine and the computer***, comprising the steps of:
>
> by-passing or isolating the facsimile machine and the computer from the public network telephone line;
>
> coupling the facsimile machine to the computer;
>
> conditioning the computer to receive digital facsimile signals representing data on a scanned document; and
>
> conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the computer, said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, ***said transmitted digital facsimile signals being received directly into the computer*** through the bi-directional direct connection ***via the passive link***, thereafter, said computer processing the received digital facsimile signals of the scanned document as needed.

Appx88 (emphasis added).

The passive link is "between the facsimile machine and the computer." Signals are also received "directly into the computer." No language is directed to the I/O bus or any other internal component of the computer until the "processing" after receipt. *See* Appx88.

## V. THE DISTRICT COURT PROCEEDINGS

### A. Infinity's Lawsuit against Oki Data

Infinity originally filed an initial single complaint in the Eastern District of Pennsylvania against multiple defendants, including Oki Data, on June 30, 2010.

That initial complaint asserted infringement of the ’811 and ’423 Patents, and the later issued ’574 and ’915 Patents were subsequently added.

Between April 2011 and October 2016, the Infinity Patents were subjected to a total of 10 reexaminations in the USPTO by various defendants, during which time the district court litigation was stayed. Specifically, the ’811 and ’423 Patents were each subjected to three separate reexaminations; and the ’574 and ’915 Patents were each subject to two separate reexaminations. During three of these reconsiderations and in connection with a challenge to the Infinity Patent’s priority date, the PTAB specifically considered the endpoint of the passive link in the asserted claims and determined that the passive link ended at the computer’s port, and adopted a construction of “passive link.” Ultimately, the patentability of each of the Infinity Patents was confirmed. *See* Appx2679-2694.

After the reexamination proceedings finally concluded, the court stay was lifted in May 2017. In January 2018, Oki Data and three other defendants’ motions to transfer under *TC Heartland* was granted, and the case against Oki Data was transferred to the District of Delaware.

### B. The District Court’s Claim Construction Order, Order Denying Reconsideration, and Final Judgment

The parties briefed claim construction regarding three claim terms: “fax/facsimile machine,” “passive link,” and “computer.” Appx2828-2850. The final two are at issue in this appeal. The claims state that there is a passive link

"between" the facsimile machine and the computer. There is no apparent dispute as to the proper construction of the terms, if determined definite. Infinity and Oki Data's respective positions are set forth in the table below:

**Table 2—Parties' Claim Construction Positions**

| TERM | INFINITY'S POSITION | OKI DATA'S POSITION |
|---|---|---|
| "Passive link" | No construction necessary;<br><br>or<br><br>"a link where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine, for purposes of providing scanning and/or printing data" | Indefinite<br><br>or<br><br>"a link where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine"[1] |
| "Computer" | No construction necessary | Indefinite |

Appx33-40.

[1] As shown, the constructions of Infinity and Oki Data are substantially identical and are derived from the definition adopted by the PTAB and Infinity during reexamination.

Infinity submitted extensive expert testimony in the form of declarations and an expert report of Dr. Marc Levitt explaining from the vantage point of a skilled artisan the demarcation of the passive link and computer as the ports or interfaces of the computer. Appx2957; Appx2975-2979. **Oki Data presented no testimony from the vantage point of a person of ordinary skill or any skilled artisan.**

In its Claim Construction Order, the district court adopted Oki Data's unsubstantiated attorney argument and ruled that the "passive link" and "computer" terms are indefinite. Appx33-40. The district court determined the statement made during prosecution and later statements made to the PTAB during *ex parte* reexamination were inconsistent. Appx39.

More specifically, the district court determined that all claims were indefinite because, in discussing the Perkins Reference, the patentee made the following statement with regard to unissued claim 27: "the non-intercepted data enters through the [serial] type connector port of the computer and passes directly to the I/O bus." The district court found that this statement conflicted with the definition of "passive link" repeatedly adopted by the PTAB, as properly reflected in the district court's opinion. Appx37; *accord* Appx2686.[2]

---

[2] The PTAB, armed with the Declaration of Dr. Levitt as a POSITA and the prosecution history including the Perkins Reference, exhibited no confusion in adopting the definition offered by Infinity and Dr. Levitt. Appx2686.

Critically, however, the statement on which the district court bases its entire opinion simply does not say that the claimed passive link extends to the I/O bus, as the district court erroneously concluded. It says only that the ***non-intercepted data*** passes to the I/O bus. On this basis, the district court must be reversed. Further, the statement on which the district court relied actually said that the non-intercepted data enters through the port "of the computer" (thereby demarcating the end of the passive link and beginning of the computer) and continues on to the I/O bus.[3] Thus, the sole statement on which the district court relies does not say that which the district court says it does. The district court made no effort to evaluate or discredit the uncontested testimony regarding the meaning of those terms to a person of ordinary skill in the art.

The district court erred on three related grounds. *First*, the district court misunderstood the statement made during prosecution regarding the Perkins reference. The statement was, per its explicit language, directed to non-interrupted data, or the data flow, not the passive link itself, over which the data flow occurs.[4]

---

[3] The Perkins Reference taught an analog system with no digital transmission from the facsimile machine to the computer. This is a key distinction explicitly considered and addressed by the PTAB as definitive. *See* Appx2692.

[4] An apt comparison may be made between the passive link and digital data passing through it, one the one hand, and a tunnel with vehicular traffic on the other. While the vehicular traffic passes through the tunnel (just as uninterrupted data passes through a passive link), it continues past the tunnel to its intermediate or final

*Second,* the district court erred in applying its own faulty technical assessment (derived nearly verbatim from Oki Data's attorneys) in lieu of the uncontroverted testimony of Infinity's expert. *Third*, the district court misapplied the law as it pertains to indefiniteness, failing to consider the prosecution history as a whole, including the express adoption of a definition of "passive link" with respect to the asserted claims by the PTAB.

The following tables highlight the district court's factual errors.

**Table 3-1—Factual Errors of the District Court**

| | |
|---|---|
| **District court's factual error**<br><br>Appx37 (citing Appx2201) | "the Office Action Response [] repeatedly mentions the 'I/O Bus' as the endpoint of the link between the 'facsimile transceiver' and the 'computer.' *See* D.I. 148-29 at 15 (Infinity37915)."<br><br>Comment: The district court conflates the claimed "passive link" (though only referring to a "link") with the data passing through it. The district court asserts that there are repeated "mentions," but provides a single citation that does not support its ruling. |
| **Evidence of Record (Infinity's actual statement)**<br><br>Appx2201 | "the non-intercepted data enters through the [serial] type connector port of the computer and passes directly to the I/O bus"<br><br>Comment: It is the data which passes to the I/O bus (and beyond to the CPU for |

destination. The tunnel and vehicles are different things, and the length of the tunnel and the length of travel are not typically coextensive.

| | |
|---|---|
| | processing). The passive link is between the facsimile machine and computer, and the computer begins at the port, per this very statement. |
| **Dr. Levitt's uncontested technical testimony**<br><br>Appx2957; Appx2975-2979 | Dr. Levitt testified that from a skilled artisan's viewpoint, whatever happens within the computer is irrelevant to whether there is a passive link between the facsimile machine and the computer.<br><br><u>Comment</u>: "Additionally, the use of a modulation procedure within the PC and facsimile machine as shown in the figures does not insert an intervening apparatus or processing element along the path, e.g. on the cable between the PC's RJ-11 and the fax's RJ-11 referenced in the '558 Patent in Figs. 2b, 2c, and 2d." Appx2977, ¶59. |

**Table 3-2—Factual Errors of the District Court**

| | |
|---|---|
| **District court's factual error**<br><br>Appx36 | "During prosecution of the '811 patent, the patentee maintained that a passive link must extend to a computer's I/0 bus without any intervening devices." |
| **Evidence of Record (No such statement)**<br><br>Table, *infra*, pp. 39-44 | <u>Comment</u>: Never once in the 22-year prosecution history did Infinity ever say that the passive link must extend to the I/O bus. |
| **Dr. Levitt's uncontested technical testimony**<br><br>Appx2957; Appx2975-2979 | Dr. Levitt testified that a POSITA would understand the terms consistently with the parties' jointly-proposed alternative construction for "passive link" extending to the |

| | |
|---|---|
| | computer, not to the circuitry within it. Appx2975, ¶57. "This clearly describes the connections shown in the '558 Patent in Figs. 2b, 2c, and 2d." Appx2976, ¶58. |

**Table 3-3—Factual Errors of the District Court**

| | |
|---|---|
| **District court's factual error**<br><br>Appx36-37 | "The patentee argued that Perkins lacked a passive link because, in Perkins' configuration, the 'facsimile transmission never enters the computer I/O bus until after it is processed by device 3….'" |
| **Evidence of Record (Infinity's actual statement)**<br><br>Appx2178-2179 (emphasis added) | "It is evident that Perkins does not envision a direct transfer of ***digital*** signals between the facsimile transceiver and the computer. At no time does Perkins state that the facsimile transceiver is equipped to receive or transmit ***digital*** signals, or that the facsimile transceiver is configured with a connector suitable for the receipt or transfer of ***digital*** signals, such as an RS 232 connector. Nor is Perkins' device 3 designed to transmit ***digital*** signals directly to the facsimile transceiver. Therefore, Perkins is limited to transferring only ***analog*** signals between the external connection of his card device 3, **when it's located in the computer**, and the facsimile transceiver."<br><br><u>Comment</u>: The patentee argued that Perkins required analog transmission, not digital. A benefit of claim 27's digital transmission is that the **non-intercepted data**—not the **passive link**—can pass to the I/O bus without modulation. |

| | |
|---|---|
| **Dr. Levitt's uncontested technical testimony**<br><br>Appx1980 | "[T]he use of a modulation procedure within the PC and facsimile machine as shown in the figure does not insert an intervening apparatus or processing element along the path, e.g., on the cable between the PC's RJ-11 and the fax's RJ-11."<br><br>Comment. A passive link is usually a simple cable with port interfaces on either end. That is not what Infinity invented. The digital transmission disclosed between facsimile machine and computer differentiated claim 27 from Perkins. |

In paragraph 59 of Dr. Levitt's expert report supporting Infinity's claim construction, he opines that a person of ordinary skill in the art would understand that what goes on internal to the computer, including a modulation procedure within the PC (or the fax machine on the other end of the passive link), is of no technical consequence to the existence of the passive link ***between*** the facsimile machine and computer. Appx2977. The district court never addressed this unrebutted technical evidence.

## SUMMARY OF ARGUMENT

The court erred in ruling that the terms "passive link" and "computer" in the Asserted Claims of the Infinity Patents are indefinite. The terms are complementary and interrelated, insofar as the "passive link" extends to the "computer," the point of the district court's alleged inconsistency.

The gravamen of Infinity's appeal is captured in the following passage from the district court's Reconsideration Order:

> For reasons explained at length in the Court's claim construction opinion (D.1. 172 at 8-11),[5] Infinity's characterization of the patentee's argument is simply inconsistent with the Office Action Response itself, which repeatedly mentions the "I/O Bus" as the endpoint of the link between the "facsimile transceiver" and the "computer." *See* D.I. 148-29 at 15 (Infinity37915).[6]

Appx24-25.

Notably, the district court references "mentioning" the "I/O Bus," but provides no citation to the intrinsic record where the I/O bus is used to define the endpoint of the passive link. Instead, the district court provided only ***a single*** statement that it incorrectly characterizes. As set forth in detail below, the claim language and specification, the entirety of the prosecution history including the context of the patentee's statements distinguishing the Perkins Reference and arguments elsewhere in prosecution, and expert testimony are all consistent about the passive link's endpoint: the passive link spans between the facsimile machine and the computer, with the computer beginning (sensibly) at the computer's port. This evidence far exceeds what is required to give a POSITA reasonable certainty in a garden-variety indefiniteness analysis. Even assuming *arguendo* that the statement cited by the district court is ambiguous that the passive link extends to the

[5] Appx36-39.
[6] Appx2201.

I/O bus (which as explained below it is not), this Court has not held that a single remark arguably inconsistent with the otherwise overwhelming intrinsic evidence providing reasonable certainty renders a patent indefinite.

Second, a review of that lone statement in context of the prosecution history (including Infinity's Office Action responses regarding the Perkins Reference) definitively demonstrates that the district court was simply mistaken in its interpretation of the statement at issue, and that the statement provides ***no*** evidence—much less clear and convincing evidence—that the words are indefinite. Properly understood, the passage supports Infinity's position that the computer begins at the port and not somewhere in the innards of the computer, and explicitly refers to the "port" "of the computer." The indefiniteness ruling is putatively supported by juxtaposing this single passage from the early prosecution history in 2002 discussing Infinity's interim claim language compared to a secondary embodiment of Perkins (*see* Appx36) with multiple passages from the prosecution history that describe the "passive link" as extending to the port of the computer (*see* Appx37), with which Infinity agrees.

The district court interprets the passage below to require that the passive link extend to a computer's I/O bus:

> [W]hen the applicant transfers digital data from the facsimile transceiver through a passive link for scanning to the computer, ***the non-intercepted data*** enters through the RS 232 type connector ***port of the computer*** and passes directly to the I/O bus and is processed by the

> receiving circuits (i.e. UART, CPU), of the computer, providing a true non-intercepted digital signal between the facsimile transceiver and the computer.

Appx2201 (the "data flow" passage). Because a link cannot pass to and be processed by the receiving circuits, the passage above is clearly directed the flow of digital ("non-intercepted") data, not the link. Note that the data is discussed continuing on to the CPU, but the district court does not include it in the passive link.

The demonstrative diagram below[7] depicts this crucial distinction in the context of the embodiment under discussion in the data flow passage:




**Figure Delineating Passive Link and Non-Interrupted Digital Data Flow**

[7] Substantively equivalent diagrams were presented to the district court. *See, e.g.*, Appx3908.

As can be seen above, the non-interrupted digital data flow (shown in red) passes through the passive link (light blue). Because it is already in digital format, it can continue in that format to the I/O bus, where it is diverted to the CPU. The data flow is not coterminous with the passive link between the facsimile transceiver and the computer, which ends at the computer port or interface (dark blue).

The passive link spans the distance between the facsimile machine and the computer, which begins at the RS232 type connector port, ***which the passage itself says is part of the computer*** ("the RS 232 type connector ***port of the computer***") Appx2201. The claim language confirms the beginning of the computer is at the port, or interface in claim 27, as amended). *See id*.

In the data flow passage, the applicant describes a technical benefit of this embodiment in claim 27 (never issued): essentially that no analog to digital fax modem is required to process the data and it exists in the digital domain all the way from the computer's port to the computer's I/O bus and then to the CPU. Appx2200-2202.

The district court's secondary justification—more or less that Perkins is so close a reference that its own erroneous interpretation must be correct—is also in error. Fundamentally, Perkins is an ***analog*** transmission scheme, whereas claim 27 (which never issued) claimed entirely ***digital*** transmission. Myriad other differences—many concomitant with the analog-digital distinction—were

contemporaneously identified as well, but the Applicant's focus always remained on the analog transmission issues, rendering Perkins immaterial prior art:

> It is evident that Perkins does not envision a direct transfer of digital signals between the facsimile transceiver and the computer. At no time does Perkins state that the facsimile transceiver is equipped to receive or transmit digital signals, or that the facsimile
>
> transceiver is configured with a connector suitable for the receipt or transfer of digital signals, such as an RS 232 connector. Nor is Perkins' device 3 designed to transmit digital signals directly to the facsimile transceiver. Therefore, Perkins is limited to transferring only analog signals between the external connection of his card device 3, when it's located in the computer, and the facsimile transceiver.

Appx2198-2199.

Finally, the unrebutted expert testimony of record supports Infinity's position that a skilled artisan would be reasonably certain the meaning of these terms. Appx2957; Appx2975-2979.

## STANDARD OF REVIEW

The district court's constructions of "passive link" and "computer" are reviewed *de novo* under *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 834 (2015), because the court reviewed and cited only to evidence intrinsic to the Infinity Patents and did not make factual findings about any disputed subsidiary facts based on extrinsic evidence in construing the term. *See generally* Appx28-41.

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2. This Court conducts a *de novo* review of a district court's determination of whether this definiteness requirement is satisfied. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017); *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015). As the party challenging the validity of the Infinity Patents, Oki Data continues to bear a heavy burden to show by clear and convincing evidence that all of the patent claims are indefinite. *BASF Corp.*, 875 F.3d at 1365; *see also Biosig*, 783 F.3d at 1377 ("A patent is presumed valid . . . .") (citing 35 U.S.C. § 282).

## ARGUMENT

### I. INTRODUCTION

A **link** is not **data**. A link *carries* data. Overlooking this fundamental distinction without the benefit of any technical evidentiary support in the record, the district court conflated "passive link" with the data it carries, disregarding the only expert testimony of record and highly relevant prosecution history. *See* Appx37.

The Infinity Patent claims are definite under the well-established *Nautilus* analysis used in the vast majority of patent cases: the claims and specification, prosecution history, and expert testimony provide "reasonable certainty" that the

passive link spans the fax machine and the computer, and the computer begins at the computer's port.

The district court's reliance on *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015) to hold the claims indefinite is erroneous. For the reasons below, the highly specific fact pattern addressed in *Teva* is inapplicable here. *Teva* does not stand for the proposition that a single statement—even if arguably inconsistent—during prosecution renders a claim *per se* indefinite. Furthermore, even if the data flow passage were interpreted to be inconsistent with later uses of the phrase "passive link" in connection with other claims, a proper reading of *Teva* does not mandate a finding of indefiniteness here because the record as a whole, including the explicit definition adopted later in prosecution, leaves no uncertainty to a person of ordinary skill, and there is no technical evidence in the record to the contrary.

The district court should be reversed.

## II. THE DISTRICT COURT MISINTERPRETED THE "DATA FLOW PASSAGE"

The district court's entire analysis rises and falls with its own interpretation of the data flow passage:

> [W]hen the applicant transfers digital data from the facsimile transceiver through a passive link for scanning to the computer, ***the non-intercepted data*** enters through the RS 232 type connector ***port of the computer*** and passes directly to the I/O bus and is processed by the receiving circuits (i.e. UART, CPU), of the computer, providing a true

> non-intercepted digital signal between the facsimile transceiver and the computer.

Appx2201 (emphasis added).

The district court interpreted this passage to mean that the passive link spans from the facsimile transceiver to the I/O bus. Appx24-25. A more careful reading demonstrates that the data flow passage does not say that, and the district court clearly erred in this factual determination. Instead, the passage says that the "non-intercepted data," which is carried over the passive link, can extend beyond the passive link and into the computer all the way to the I/O bus. This is so because the non-intercepted data is in digital format, unlike the analog format of *Perkins*. Appx2200-2204; *accord* Appx2692 (PTAB Decision on Appeal). In other words, the non-intercepted data is not coextensive with the passive link—it can extend beyond it because the data remains in the digital domain.

Ironically, the very passage on which the district court exclusively relies to rule that the beginning of the computer is indefinite sets forth where the computer begins. The statement says that the computer begins at the RS232 port ("enters through the RS 232 type connector port of the computer"). Appx2201.

## III. "PASSIVE LINK" AND "COMPUTER" ARE DEFINITE UNDER A *NAUTILUS* ANALYSIS

A claim is invalid for indefiniteness only when its language, read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable

certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id*. "The certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* "Reasonable certainty" does not require "absolute or mathematical precision." *Biosig*, 783 F.3d at 1381.

"In the face of an allegation of indefiniteness, general principles of claim construction apply." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) (internal quotation marks and citation omitted). "In that regard, claim construction involves consideration of primarily the intrinsic evidence, viz., the claim language, the specification, and the prosecution history." *Id.* "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.* at 1316. In *Tinnus Enterprises, LLC v. Telebrands Corp.,* this Court recently looked to the claim language and specification, the prosecution history, and expert testimony, in reversing a PTAB's finding of indefiniteness for the term "substantially filled." 733 F. App'x 1011, 1019

(Fed. Cir. 2018). This evidence likewise supports the definiteness of Infinity's patent claims.

### A. The Claims and Specification Inform a Person of Ordinary Skill of the Meaning of "Computer" Reasonable Certainty

The patent specification and diagrams consistently refer to the "computer" as simply a PC-type computer. *See, e.g.,* Appx75-83 (Figs. 2a-2i). The term "computer" is not given a special definition in the patent specification, but in the context of discussing Fig. 1, notes: "The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT)…" Appx85 ('811 Patent, 4:59-61).

Well-understood phrases in the computer arena have been subject to a "no construction necessary" approach despite such contrived conflict. As noted by the Federal Circuit in the context of less well-known electronics terms:

> [T]here is no dispute that the terms "volatile memory" and "non-volatile memory" have a meaning that is clear, settled, and objective in content.
>
> ***
>
> We are not persuaded that Apple's conclusion is properly drawn from the passages on which it relies. To begin with, the terms at issue have so clear an ordinary meaning that a skilled artisan would not be looking for clarification in the specification. There is no facial ambiguity or obscurity in the claim term. Moreover, the specification nowhere purports to set out a definition for "volatile" or "non-volatile" memory, and nothing in it reads like a disclaimer of the clear ordinary meaning. Under our claim-construction law, a clear ordinary meaning is not properly overcome (and a relevant reader would not reasonably think it

> overcome) by a few passing references that do not amount to a redefinition or disclaimer.

*Ancora Technologies, Inc. v. Apple, Inc.*, 744 F.3d 732, 737–38 (Fed. Cir. 2014).

### B. The Claims and Specification Inform a Person of Ordinary Skill of the Meaning of "Passive Link" With Reasonable Certainty

In determining definiteness under *Nautilus*, courts look to the claims and specification. *See e.g.*, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1291–94 (Fed. Cir. 2017); *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378-1380 (Fed. Cir. 2017). For example, in *Tinnus*, the PTAB held that the phrase "substantially filled" was indefinite in the context of the volume of an automatically-filling water balloon. *Tinnus,* 733 F. App'x 1011 at 1018. In reversing, this Court first turned to the claim language itself, and determined that "a person of ordinary skill" would understand the language of the claims. Here, the PTAB and parties agree, Infinity's expert agrees, and the Claim Construction Order expresses no evident disagreement, regarding what it means for a link to be "passive":

> a link where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine, for purposes of providing scanning and/or printing data

Appx2845 (Plaintiff's Opening Claim Construction Brief); *accord* Appx2781 (Decision on Appeal); *see generally* Appx28-41.

The sole basis of the district court's indefiniteness finding is allegedly conflicting discussion about the computer-side endpoint of the "passive link." Appx28-41. But there is no argument, analysis, or finding in the district court's Claim Construction Order indicating or suggesting that the claims themselves, specification, or figures generate any ambiguity whatsoever as to this endpoint. Indeed, the alleged conflict or ambiguity is exclusively predicated on a passage in the prosecution history directed to a different claim, considered in isolation, misinterpreted, and taken out of context of the discussion during prosecution.

Instead, the claims and specification consistently support Infinity's position that the passive link spans the facsimile machine and computer and the computer begins at the computer's port. The district court should be reversed on these grounds.

### C. The Prosecution History Necessitates Infinity's Proposed Construction of "Passive Link" and "Computer"

*Phillips* recognized the important but sometimes limited role of the prosecution history in construing claims.

> The prosecution history … consists of the ***complete record*** of the proceedings before the PTO. Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. Yet because the prosecution history represents an ***ongoing negotiation*** between the PTO and the applicant, ***rather than the final product of that negotiation***, ***it often lacks the clarity of the specification and thus is less useful for claim construction purposes***.

*Phillips*, 415 F.3d 1303 at 1317 (emphasis added). In this case, the prosecution history included an explicit discussion of "passive link" and "computer," including

an explicit construction of the former with which Oki Data agrees (subject to its claim of indefiniteness).

In its Decision on Appeal affirming the patentability of the asserted claims, the PTAB recited the explicit definition of "passive link" presented by Infinity and its technical expert, Dr. Marc Levitt.

> Turning to the claims, independent claims 1, 7, 19, and 20, recite, in pertinent part, coupling a fax machine to a computer over a bi-directional direct connection via a *passive link*. As Dr. Marc E. Levitt indicates in his Declaration filed November 12, 2014 ("Levitt Decl."), the term "passive link" is defined as:
>
> > [O]ne where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, *with no intervening apparatus or signal interception by a processing element or any active component*, along the path of an *unbroken direct connection* between the PC and facsimile machine . . . .

Appx2686 (July 19, 2016 Decision on Appeal reversing Examiner (re: '811 Patent) at 6). Oki Data recognized that the PTAB adopted this construction, though it erroneously asserted its inconsistency. Appx1603 (Joint Claim Construction Chart); Appx3350 (Oki Data's Opening Brief).

In *Tinnus*, this Court also considered the extensive discussion of the contested term in the prosecution history:

> The examiner's own remarks confirm that the claim language informs a person of ordinary skill of the objective boundaries of the claim term. Additionally, we presume that an examiner would not introduce an

> indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance. *See Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990) ("It is presumed that public officials do their assigned jobs"). Thus, we find that the '066 patent is not indefinite under the *Nautilus* standard because the claims, viewed in light of the specification and prosecution history, inform a person of ordinary skill about the scope of the invention with reasonable certainty.

*Tinnus*, 733 F. App'x 1011 at 1020.

Here, the prosecution history is replete with instances where Infinity describes the "passive link" as extending to the computer's port(s) in the asserted claims. These are summarized below in **Table 2**. As the district court correctly acknowledged, during *ex parte* reexamination Infinity consistently asserted that the computer began at the computer's port[8]—consistent with its proposed construction.

And the PTAB repeatedly concluded that "passive link" and "computer" were definite, rather than indefinite as in *Tinnus*, making the import of the PTO's and subsequent PTAB's conclusions of definiteness and explicit construction of "passive link" even more compelling. Indeed, in three reexamination decisions, the PTAB agreed with Infinity's definition of "passive link" and "computer." In evaluating whether the Kenmochi reference was prior art, the PTAB considered whether the '558 parent application offered support for the "passive link" claimed in the '811 Patent, such that the '811 Patent could claim priority to the '558 application.

---

[8] *See, e.g.*, Appx37.

Appx3282-3284. Specifically, the PTAB held that the evaluated link is that which spans the computer and the facsimile machine, not the internals of the computer. Appx3283. It even showed and explained its work in the following diagram.




**Figure 2e of the '278 application**

The PTAB showed the lack of a passive link in the context of Figure 2e because of the intervening circuitry, understanding that the computer begins where the RS-232 cable ends. Appx3283 (emphasis in original). The PTAB then explained that Fig. 2e is not a bi-directional direct connection, because of intervening circuitry 41. *Id.* The PTAB continued:

> Nevertheless, Figures 2b to 2d of the '278 application show a passive link, namely via the RJ-11 telephone cable connecting the fax machine directly to the computer. *Accord* Levitt Decl. ¶ 29.

Appx3284. Figures 2b to 2d were present in the '558 parent application, and further support the view that the passive link does not extend to the I/O bus. Appx3284-3285; *accord* Appx2802.

The PTAB thus evaluated four different figures in the '811 Patent and ruled as set forth in its Decision on Appeal:

<table>
<tr>
<td>


Fig. 2b
</td>
<td>PASSIVE<br><br>DIRECT<br><br>Interfacing CKT and Fax Modem Circuitry internal to PC</td>
</tr>
</table>

<table>
<tr>
<td>


Fig. 2c
</td>
<td>
PASSIVE<br><br>
DIRECT<br><br>
Interfacing CKT in Fax Machine<br><br>
Fax Modem Circuitry internal to PC
</td>
</tr>
<tr>
<td>


Fig. 2d
</td>
<td>
PASSIVE<br><br>
DIRECT<br><br>
Interfacing CKT on an internal PC card, Fax Modem internal to PC
</td>
</tr>
<tr>
<td>


Fig. 2e
</td>
<td>
ACTIVE<br><br>
INDIRECT<br><br>
Interfacing CKT and Fax Modem Circuitry along the communications path between fax machine and PC
</td>
</tr>
</table>

Appx3284-3285. In each instance, "PC Type Computer" is designated by box 40, the boundary of which is the terminus of the RJ-11 or RJ-232 connection. The PTAB has thus generated substantial corroborating prosecution history on the precise subject: the endpoints of the passive link *vis a vis* the computer, always depicted as the intersection of the RJ-11 or RS-232 cable and the computer—namely, the port. And the PTAB has confirmed the Infinity patent claims after three reexamination proceedings that the litigation defendants initiated in the underlying cases.

Relying on *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007), the district court declined to put any weight on the PTAB's finding that the passive link ended/the computer began at the computer's port. Appx39. This is an improper application of *Pfizer*. While the district court is not bound to the PTAB findings, it must consider them as a very material part of the prosecution history when construing "passive link" and "computer."

*Pfizer* did not address the weight to be accorded the PTAB's claim construction reasoning in this case. *Id*. at 1359–60. Instead, it dealt with whether an examiner's finding of *prima facie* obviousness would satisfy a defendant's burden to prove *prima facie* obviousness in district court when relying on the same reference—an issue not present here. *Id.* To the contrary, *Phillips* and *Nautilus* both recognize the importance of the PTAB's findings (and the prosecution history more

generally) in understanding the claim terms. *See e.g., Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d at 1379–80 (examiners had no trouble applying the challenged terms in successive reexaminations.) And here, the PTAB's Decision on Appeal reflected careful consideration of the meaning of the precise terms at issue.[9]

A unanimous panel of three administrative law judges should not have received the dismissive treatment they did by the district court. Reexamination decisions form part of the prosecution history that must be considered, and are ofttimes highly important. Particular attention should be given the "examiner's focus in allowing the claims" in reexamination. *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1322-23 (Fed. Cir. 2016); *see also Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998) (holding an amendment made during reexamination proceedings is a "highly influential piece of prosecution history."); *Implicit Networks, Inc. v. F5 Networks, Inc.*, 2015 WL 2194627, *2 (N.D. Cal. May 6, 2015) (applying disclaimer based on representations in reexam).

To sum up, the district court did not actually identify a single instance from the prosecution history where Infinity took a contrary position in the context of the Asserted Claims. Moreover, Infinity maintained consistent positions regarding the

---

[9] The Court's complete rejection of the PTAB's reasoning is particularly unsettling here, as Appellee Oki Data and its Co-defendants obtained a stay of approximately three and half years on the grounds that the PTAB's review would purportedly simplify the district court case.

passive link endpoint in support of claims that did not issue. Providing more fulsome context, the table below summarizes discussion of this salient distinction between Perkins and claim 27 (then at issue) and shows how Infinity consistently characterized the passive link ending/the computer beginning at the computer's port or interface.

**<u>Relevant PTO Communications re: the Perkins Reference</u>**

| Date | *Document*/Summary | Appx Cite |
|---|---|---|
| July 20, 1999 | Office Action in which the Examiner raises Perkins under 35 U.S.C. Section 102(e). | Appx2124-2132 |
| Oct. 20, 1999 | *Applicant's Response to Office Action dated July 20, 1999, addressing the Perkins reference raised by the Examiner.* | Appx2134-2144 |
| | The endpoint of the passive link is the computer's connector port for digital signal transfer: "The Applicant recognized and used the available serial port connector of a computer to enable the transfer of digital data for scanning…". | Appx2141 |
| | Focusing on the preferred embodiment in which device 3 is in-line between facsimile machine and computer, Perkins is differentiated as being reliant on device 3, including a microprocessor, modem, special software ("control program") and device controls: | Appx2141 |
| | "The Applicant does not provide or require" any of the above device 3 components and software. | Appx2141 |

| | | |
|---|---|---|
| | **NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | |
| April 17, 2000 | *Applicant's Response to Office Action dated January 19, 2000, addressing the Perkins reference raised by the Examiner.*<br><br>Endpoint of the Infinity link is described at the computer's RS232 connector port (or parallel port) for digital signal transfer.<br><br>Claim 27 is amended to require "scanned image digital data transferred directly between the facsimile machine and the computer"<br><br>The Applicant establishes a ***digital*** connection to "transfer non-intercepted digital signals through RS 232, or parallel connector type ports between the facsimile transfer and the computer."<br><br>Applicant discusses digital data entering through the RS 232 port ***of the computer***.<br><br>**NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx2146-2164<br><br>Appx2158<br><br>Appx2160 |
| Nov. 23, 2001 | *Applicant's Response to Office Action dated October 24, 2001, addressing the Perkins reference raised by the Examiner.*<br><br>Claim 27 is amended to recite that the "transmitted digital facsimile signals" are received "**directly**" at the **"computer interface"** **"without prior circuit interruption**." | Appx2166-2186<br><br>Appx2168 |

| | | |
|---|---|---|
| | The Applicant differentiates Perkins as teaching ***analog communications*** with a required A/D conversion external or internal to the computer on a fax modem:<br><br>"It is evident that Perkins does not envision a direct transfer of digital signals between the facsimile transceiver and the computer. At no time does Perkins state that the facsimile transceiver is equipped to receive or transmit digital signals, or that the facsimile transceiver is configured with a connector suitable for the receipt or transfer of digital signals, such as an RS 232 connector. **Nor is Perkins' device 3 designed or technically able to transmit digital signals to the facsimile transceiver**. Therefore, Perkins is limited to transferring only analog signals between the external connection of his card<br>device 3, when it's located in the computer, and the facsimile transceiver."<br><br>Endpoint of the passive link remains at the computer's RS 232 connector port for digital signal transfer. **NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx2178-2179 |
| July 17, 2002 | *Applicant's Response to Office Action dated July 17, 2002, addressing the Perkins reference raised by the Examiner.*<br><br>Endpoint of the Infinity link at the computer's RS232 connector port for digital signal transfer: "transfer non-intercepted digital signals through RS232, or parallel connector type ports between the facsimile transceiver and the computer." | Appx2213-2234<br><br>Appx2223 |

| | | |
|---|---|---|
| | data enters the computer through the RS232 port<br><br>Endpoint of the link in the Perkins embodiment is the card slot connector. Thus, Perkins described as having a modem contained on the card in the path of the link between the fax machine and the computer. **NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx2224<br><br>Appx2224 |
| September 26, 2002 | **First use of the "passive link" in claim 27 language.**<br><br>Endpoint of the Infinity link at the computer's RS232 connector port for digital signal transfer.<br><br>Referencing previous transmission between RS-232 ports described at page 8.<br><br>Discussing data entering through the RS232 port.<br><br>Endpoint of the link in the Perkins embodiment is the card slot connector.<br><br>Perkins described as having a modem contained on the card in the path of the link between the fax machine and the computer.<br><br>**NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx2188-2211<br><br>Appx2200-2201<br><br>Appx2225-2226<br><br>Appx2200-2204 |

| | | |
|---|---|---|
| April 29, 2004 | *Applicant's Response to Office Action dated January 29, 2004.*<br><br>The Applicant's definition of a "passive link" is one where the initiation of data flow" is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by "a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine, for purposes of providing both scanning or printing data.<br><br>**NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx1767-1792<br><br>Appx1784 |
| November 11, 2004 | *Applicant's Response to Office Action dated August 12, 2004.*<br><br>Argument re: priority date. Infinity passive link described as ending at computer's digital connection port.<br><br>**NO REFERENCE TO THE PASSIVE LINK EXTENDING TO THE COMPUTER'S I/O BUS** | Appx2235-2252<br><br>Appx2249-2250 |

Thus, taking the prosecution history as a whole, there is simply no reason to conclude that an isolated statement made in reference to the Perkins Reference in 2002 renders the terms "passive link" and "computer" indefinite, particularly in view of the very extensive subsequent discussion by the Board of Patent Appeals. Appx3284-3285. While the ongoing negotiation between the PTO and Infinity

shows some discussion of the meaning of "passive link," its outcome is very clear, in the form of an adopted definition. Appx2686. The district court should be reversed on these grounds.

### D. The Only Competent Testimony of a Skilled Artisan Confirms Infinity's Proposed Construction of "Passive Link" and "Computer"

In *Tinnus*, this Court considered and adopted the supporting declaration of the patentee's expert about a POSITA's understanding of the plain and ordinary meaning of the "substantially filled" terms at issue, as consistent with the specification. *Tinnus,* 733 F. App'x 1011 at 1019. Here, all of the evidence from the vantage point of a POSITA or expert about the plain and ordinary meaning of "passive link" and "computer" supports Infinity's position, including the testimony of Dr. Marc Levitt. Appx2957; Appx2975-2979.[10] Dr. Levitt describes the link in question as "the path of [a] connection between the PC and the facsimile machine." Appx2975-2976. He further identifies the cable between the PC's RJ-11 [port] and the facsimile machine's RJ-11 [port] as the passive link in the embodiments described in Figs. 2b, 2c, and 2d pf the '558 Patent. Appx2976.

[10] The PTAB articulated a "relatively high skill level" of a POSITA "familiar with Group III fax machine digital transmission capabilities and associated standards." Appx2788.

Thus, in a *Nautilus* analysis, the claim language and specification, the prosecution history, and expert opinion all support definiteness—and the district court should be reversed.

## IV. THE DISTRICT COURT'S INDEFINITENESS RULING IMPROPERLY EXPANDS THE HOLDING IN *TEVA*

The district court misapplied *Teva* to mean that any perceived inconsistency or ambiguity in the prosecution history renders a claim term indefinite. In its own language: "the question before this Court: whether the patentee took inconsistent positions with respect to the endpoint of the passive link." Appx39 (emphasis added).

But that is not the standard. The salient question is not whether any inconsistency exists over the 22-year prosecution history, which this Court has held reflects an ongoing negotiation and often lacks clarity. *See Phillips*, 415 F.3d at 1317. The salient question under *Teva* is whether, when the intrinsic evidence is taken *in toto*, "the patentee has failed to inform with reasonable certainty those skilled in the art about the scope of the invention" because the prosecution history contains an irreconcilable conflict regarding certain claim terms and the claim language and specification provide no or insufficient guidance. *Teva*, 789 F.3d at 1345. To the contrary, the district court's expansive application of *Teva* is legally and factually incorrect. For the reasons below, *Teva* does not mandate any different

result from the well-established *Nautilus* analysis described above. The district court should be reversed.

### A. *Teva* is Inapplicable Because the Claim Language and Specification Provide Reasonable Certainty to a POSITA to Understand the Claims

*Phillips* is the definitive claim construction case in modern patent law and was decided *en banc*. While holding that the prosecution history should be considered during claim construction, this Court explicitly recognized that it represents an ongoing negotiation between the applicant and PTO and should be understood in that context.

> [B]ecause the prosecution history represents an ***ongoing negotiation*** between the PTO and the applicant, ***rather than the final product of that negotiation***, ***it often lacks the clarity of the specification and thus is less useful for claim construction purposes***.

*Phillips*, 415 F.3d at 1317 (emphasis added). The lack of clarity to which the Court refers presumably relates to differences in claim language that often arise during prosecution, evolving discussion about the meaning of claim terms vis a vis the changing prior art in focus, and developing discussion about what is and is not patentable. This is particularly true where, as here, the prosecution history is voluminous, spans many years, and is replete with negotiation.

This Court's holding in *Teva* is consistent with this observation in *Phillips* because it was limited to a specific fact pattern in which the intrinsic record invoked three inconsistent methods of formulaic calculation and the specification failed to

provide guidance as to which to use. *BASF Corp.*, 875 F.3d at 1367; *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376–77 (Fed. Cir. 2017) (distinguishing *Teva* where figures in the specification provided guidance).

In *Teva*, the patents claimed "molecular weight," which could be calculated by three different formulas. Each formula was accepted in the industry and likely yielded different results, and neither the claims nor specification mentioned or provided any guidance as to which of the three formulas to use. *Teva*, 789 F.3d at 1335. Further, during the prosecutions of two related patents that contained substantively equivalent disclosures, the PTO twice found the disclosed information insufficient to show which formula to use and rejected claims for indefiniteness even under the lower pre-*Nautilus* standard. *Id.* at 1343–44. Indeed, in *Teva*, the patentee's contradictory positions during prosecution (to overcome these very indefiniteness rejections) did not create or provide any reasonable certainty, and the patent was indefinite because there were no other sources of reasonable certainty from the claims, specification, or expert testimony. In other words, the mere contradiction itself did not lead to a *per se* finding of indefiniteness. *See generally*, *Teva,* 789 F.3d 1335.

Contrary to the circumstances in *Teva*, Infinity's claims here involve no formulaic calculations. And through prosecution of four related patents and ten reexaminations, neither the PTO nor the PTAB ever found the Infinity patent claims

indefinite or that the claims and specification failed to identify that the computer began at its port. Further, as described above, the specification and claims of the Infinity patents and their embodiments contain numerous references to the passive link spanning the facsimile machine and the computer and the computer beginning at the computer's port, *i.e.*, the port being part of the claimed computer.

The specification further states that "The analog signals are processed by the [fax machine's] control/modem circuitry 76 where they are converted into a digital serial signal and then transmitted through the RS 232 sending interconnect port, the signal is then ***received by an RS232 connector at the PC***.") Appx87 at 8:7-11 (emphasis added). Thus, *Teva* is inapposite.

### B. The District Court's Application of *Teva* is Error Because Undisputed Expert Testimony Confirms the Meaning of the Terms

In *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, this Court found that *Teva* did not apply where expert testimony provided the plain meaning of a term to one of skill in the art. 845 F.3d 1357, 1370-71 (Fed. Cir. 2017); *see also Presidio Components*, 875 F.3d at 1376–77. And here, as described above, all of the evidence from the vantage point of a POSITA or expert refutes the holding of the district court, including the detailed declaration of Dr. Marc Levitt. Appx2957; Appx2975-2979. This testimony is evidence that a POSITA would have been reasonably certain

that a computer begins at a computer's port and the passive link spans the facsimile machine and the computer.

Appellant first advanced what became the district court's misinterpretation of the data flow passage without any declaration or other support from a person of ordinary skill. And, there is no opinion or testimony in the record that supports the district court's holding. Thus, the district court's decision constitutes a technical misapplication of a passage from the 22-year prosecution history relating to a claim that was never allowed and a reference that is immaterial to the asserted claims.

The district court should be reversed on these grounds.

### C. A Single Inconsistent Statement Does Not Mandate Indefiniteness under Governing Case Law, including *Teva*, or the Patent Act

*Teva* does not mandate reversal because it does not hold that, in general, any contradictory statement in prosecution dooms a patent to indefiniteness. Neither the district court nor Oki Data have identified precedent applying *Teva* to invalidate a patent that would otherwise be definite under *Nautilus* on the basis of a single statement alone in the face of overwhelming evidence to the contrary. And the *Teva* patentee's sole bases for overcoming two indefiniteness objections during prosecution were its irreconcilably inconsistent positions on the "molecular weight" formula. *Teva,* 789 F.3d at 1343-45. These circumstances are absent from the present case.

To the contrary, unlike in *Teva*, where the patentee's ultimate positions on indefiniteness during prosecution of two different continuation patents were in equipoise, here the cherry-picked statement in prosecution regarding the data flow upon which Oki Data relies can be (and would be) read by a person of ordinary skill in the art as consistent with both the avalanche of ***other statements distinguishing Perkins*** (in the same dialogue with the PTO), as well as with the later statements in prosecution about the priority date, and with three PTAB decisions regarding the passive link's endpoints. *See* Section III.C, *supra*, and table therein.

The district court juxtaposes the legion passages from the prosecution history that describe the "passive link" as extending to the port or interface of the computer[11]—with which Infinity agrees and which are consistent with its proposed construction (and the PTAB's construction)—to a single short discussion of interim claim language compared to a secondary embodiment of Perkins in which a proprietary card is inserted into a computer's card slot interface. But the Court ignores numerous other statements in the same September 26, 2002 Amendment and Response that are consistent with the patent owner's position in reexamination, including in discussion of the very same Perkins Reference by the PTAB. Appx2692.

*Teva* does not require or even permit the Court to ignore this evidence on the basis of a single remark, taken in isolation from the remainder of the record41. The

---

[11] *See, e.g.*, Appx37.

district court's holding is thus incorrect in light of *Phillips* characterization of the prosecution history as an "ongoing negotiation" and the attendant implications for claim construction:

> [B]ecause the prosecution history represents an ***ongoing negotiation*** between the PTO and the applicant, ***rather than the final product of that negotiation***, ***it often lacks the clarity of the specification and thus is less useful for claim construction purposes***.

*Phillips*, 415 F.3d at 1317 (emphasis added). Read as a whole, Infinity's arguments distinguishing Perkins and supporting the priority date are consistent—even with the presence of a single statement construed to the contrary.

The September 26, 2002 Amendment and Response further does not mandate a finding of indefiniteness because, even if Infinity argued the passive link extended to the I/O bus (which it did not, as discussed *infra*) Infinity undeniably provided, and the Court recognized, an additional basis to distinguish Perkins: that Perkins disclosed analog data flow and lacked digital transmission. Appx25; Appx27. Indeed, as discussed above, this was patentee's argument against Perkins that included the data flow passage. *See* Section III.C, *supra*, and table therein. The district court should be reversed on these grounds.

The expansion of *Teva* to mean that a single inconsistent statement during prosecution history renders a claim term indefinite without proper consideration of the prosecution history of a whole or consideration of technical testimony from a person of skill in the art runs afoul of the tenets of construction articulated *en banc*

in *Phillips*. *See id.*, 415 F.3d at 1317 (instructing district courts to place more or less weight on the prosecution history in claim construction depending on the degree of clarity yielded by the ongoing negotiation).

### D. Because the District Court Misinterpreted the Data Flow Passage, and Subsequent Prosecution History Adopted an Explicit Construction, There Is No Irreconcilable Conflict.

In *Teva*, when faced with indefiniteness objections regarding the very same "molecular weight" term during prosecution of related patents, the patentee gave irreconcilably different answers as which to method of calculation should be used. *Teva*, 789 F.3d at 1342–44. And, in *Teva*, the patentee never argued (nor could it) that the prosecution statements should be understood as anything but contradictory—rather, the patentee argued the district court should ignore one of the unambiguously contradictory statements because it was scientifically incorrect. *Id.* at 1343.

The present facts are readily distinguishable. During 22 years of prosecution and 10 reexamination proceedings, the PTO never determined or even suggested that the "passive link" or "computer" terms were indefinite. Infinity never took contrary positions regarding the endpoints of the passive link in that or in any other context. Putting aside that the passage relied on by the district court to invalidate every

Asserted Claim was directed to a different, non-issued claim[12] and made before the PTAB adopted Infinity's construction of "passive link," the passage does not say what the district court says it does when paraphrasing it.

In differentiating Perkins, the Applicant was distinguishing between Perkins' necessary analog transmission, resulting in a necessary transition between the analog and digital domains. Indeed, in the same amendment as the data flow passage, the Applicant repeatedly pointed out that the Perkins card could be placed "internal to the computer." Appx2198. The Applicant did not seek to differentiate this embodiment of Perkins based on the location of the device 3; instead, it was ***the lack of digital transmission*** to the facsimile machine that was the focus of the argument.

> **It is evident that Perkins does not envision a direct transfer of digital signals between the facsimile transceiver and the computer. At no time does Perkins state that the facsimile transceiver is equipped to receive or transmit digital signals, or that the facsimile transceiver is configured with a connector suitable for the receipt or transfer of digital signals, such as an RS 232 connector. Nor is Perkins' device 3 designed to transmit digital signals directly to the facsimile transceiver. Therefore, Perkins is limited to transferring only analog signals between the external connection of his card device 3, when it's located in the computer, and the facsimile transceiver.**

[12] Claim 27 incorporated language that the "passive link" extended to the "computer interface," not present here. Appx2188-2191.

Appx2198-2199. This discussion thus served to distinguish the ***analog*** disclosure of Perkins, which required a modem to bring the data into the digital domain, whether internal to the computer or external to the computer. This interpretation of the data flow passage is even more clear in light of Infinity's other correspondence with the PTO regarding the same Perkins reference, as described in detail in the chart above.[13] *See* III.C., *supra*, at pp. 40-44.

The PTAB came to the same conclusion in its evaluation of Perkins, which was considered during reexamination and which the PTAB characterized as "**analog-only**."

[13] It would make no sense for Infinity to distinguish Perkins based on the digital nature of the data flow between the computer interface (e.g. the card slot connector or RS232 port) and the I/O bus because the data flow is digital here for both Perkins and Claim 27.

> Lastly, we find unavailing the Examiner's allegation that statements made during prosecution of the '056 continuation-in-part application to overcome a rejection based on the Perkins reference (US 5,452,106) allegedly conflict with those made in the present proceeding. Ans. 30–34. As Appellant indicates, Perkins' configuration required converting digital signals into analog signals and, therefore, limited its disclosed RJ-11 connector to *solely analog* transmission. App. Br. 25–29; Reply Br. 8–11. As such, Appellant's arguments in the '056 application that Perkins did not teach or suggest a direct transfer of digital signals in light of its *analog-only* configuration to overcome a prior art rejection has little relevance to the question of whether the '278 application supports digital signal transmission to show possession of that feature.

Appx2692 (emphasis in original). Thus, the PTAB explicitly found that Perkins required analog transmission, directly contrary to the requirements of claim 27 under discussion in the 2002 data flow passage. *Id*.

The district court's basic premise is thus factually incorrect: ***never once in the 22-year prosecution history did the patentee ever say that the passive link extended to the computer's I/O bus.*** Instead, in the response at issue and others distinguishing Perkins, the patentee observed only that in the embodiment under discussion, a permissive benefit was that data flow—the non-intercepted data—could extend as far as the I/O bus and even to the CPU (which is also not part of the passive link). Appx2201. This was due to the digital nature of claim 27, which was under discussion, and the associated lack of an intervening modulation apparatus. Appx2201. In light of the ongoing negotiation between Infinity and the PTO

regarding Perkins, any interpretation that the passage at issue requires the "passive link" to extend to the computer's I/O bus is incorrect. *See Phillips*, 415 F.3d at 1317.

The undisputed technical expert evidence also shows that the district court's reading of the data flow passage is factually flawed. Dr. Levitt specifically testified that a POSITA would understand the passive link spans the fax machine and the computer, with the computer beginning at the RJ11 port. Appx2976-2979. The district court relies on no contrary expert opinion or analysis to support its interpretation of the single data flow passage at issue, and the record contains none.

Claim 27, which was under discussion in the September 22, 2002 Response to Office Action, required digital transmission. Appx2188-2191.[14] Claim 27 was thus fundamentally different than Perkin's analog transmission scheme:

> In Perkins' scanning application ***the signal which is transferred between connector 4 and line interface unit 7 when Perkins card is installed in the computer is a standard analog facsimile transmission***. After the analog facsimile transmission data enters the card installed in the computer through line interface unit 7, the modulated signals are demodulated by modem 9, and then transferred by Perkins' microprocessor 10 (located on his card), as digital information. Perkins col. 9, lines 31 to 33 states "The card would have a connector for the facsimile transceiver to connect the computer directly to the facsimile transceiver." The card connector must therefore be one of a PSTN type, in order to transfer analog signals between the facsimile transceiver and the computer, because the facsimile transceiver has not been adapted by Perkins to send or receive digital signals, and Perkins card / device 3 has not been designed to send digital signals to the facsimile transceiver.

[14] Note Appx2189-2190 appear out of sequence in the prosecution history.

Appx2180. The Perkins transmission scheme was wholly unlike that claimed in then-discussed claim 27, which again never was present in an issued patent. The PTO and PTAB have both repeatedly rejected the current invalidity positions with respect to Perkins; and the USPTO and PTAB adopted constructions for "passive link" and "computer." "It is presumed that public officials do their assigned jobs." *Northern Telecom,* 908 F.2d at 939.

The district court thus erred in misinterpreting the September 26, 2002 Amendment, and giving undue weight to the data flow passage that it misunderstood from the prosecution history some 15 years previously in connection with a different, unissued claim with materially different claim language. *See* Appx2197. Infinity did not take inconsistent positions, and, therefore, *Teva* does not apply. This Court should reverse the district court.

## V. THERE IS NO PROSECUTION HISTORY DISCLAIMER

While the district court does not engage in any legal analysis or even articulate the standard for prosecution history disclaimer in its Claim Construction Order, it cites *Tech Props. Ltd. v. Huawei Techs. Co*., 849 F.3d 1349, 1359 (Fed. Cir. 2017) for the proposition that the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference. Appx39. To the extent the district court is understood to have made any sort of ruling about prosecution history disclaimer, it was error.

Claim terms are generally given their ordinary and customary meaning, which is the meaning they would have to a person of ordinary skill in the art at the time of the invention. *Phillips*, at 1312–13 (*en banc*). Disavowal of claim scope can be effectuated by language in the specification or the prosecution history. *See id.* at 1316–17. In either case, the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature. *See Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513–14 (Fed. Cir. 2015); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–26 (Fed. Cir. 2003). Ambiguous language cannot support disavowal. *Omega*, 334 F.3d at 1324; *see also Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010).

This Court has thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope. *See, e.g., Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324–25 (Fed. Cir. 2002) ("[P]rosecution history ... cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter."); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326–27 (Fed. Cir. 2001); *Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1294–95 (Fed. Cir. 2000); *Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003)

("We therefore do not consider the applicants' statement to be a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided by the written description."); *Invitrogen Corp. v. Biocrest Mfg.*, L.P., 327 F.3d 1364, 1369 (Fed. Cir. 2003) ("The prosecution history does not show any clear and unambiguous disavowal of steps in advance of the step of growing E. coli cells in the claimed temperature range.").

As set forth above, there is no ambiguity with respect to the data flow passage from 2002; the "passive link" must extend to the "computer," which begins at the "computer port." The data flow can and does extend further. But even assuming *arguendo* that an ambiguity exists, it is legally insufficient to support a prosecution history disclaimer. Moreover, the district court erred in failing the apply this steep standard in what can only be described as an informal reference to disclaimer without the requisite analysis. These grounds support reversal.

## CONCLUSION

For all the foregoing reasons, the Court should (1) reverse the district court's erroneous construction of "passive link" and "computer"; (2) adopt the parties' otherwise agreed construction of "passive link," and rule that "computer" is a simple term that requires no construction; and (3) vacate the Final Judgment, which is based on the underlying ruling of indefiniteness.

Respectfully submitted

/s/ Andrew G. DiNovo
ANDREW G. DINOVO
NICOLE E. GLAUSER
DINOVO PRICE LLP
7000 N. MoPac Expressway, Suite 350
Austin, Texas 78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

*Counsel for Plaintiff-Appellant*
*Infinity Computer Products, Inc.*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INFINITY COMPUTER PRODUCTS, INC.<br>Plaintiff,<br>v.<br>OKI DATA AMERICAS, INC.,<br>Defendant. | Civil Action No. 18-463-LPS-CJB |

**FINAL JUDGMENT**

**It IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1. FINAL JUDGMENT of invalidity, under 35 U.S.C. §112, and therefore non-infringement is entered in favor of defendant and against plaintiff on claims 1, 2, 4, 6, 7, and 18-20 of U.S. Patent No. 6,894,811; claims 1-4 and 6 of U.S. Patent No. 7,489,423; claims 1, 2, 4, 5, 7, and 8 of U.S. Patent No. 8,040,574; and claims 1, 6-9, and 14-15 of U.S. Patent No. 8,294,915.

2. Any motion for an award of costs or attorneys' fees shall be filed within 30 days after the later of the date that the time for appeal of this Judgment has expired, or if there is an appeal from this Judgment, the date of issuance of the Mandate of the Court of Appeals, and no such motion shall be filed less than 20 days after the later of those two dates.

This is a final judgment and may be appealed.

October 25, 2019

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INFINITY COMPUTER PRODUCTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>OKI DATA AMERICAS, INC.,<br><br>Defendant. | C.A. No. 18-463-LPS |

**MEMORANDUM ORDER**

At Wilmington this 16th day of October, 2019:

Pending before the Court is Plaintiff Infinity Computer Products, Inc.'s ("Infinity") motion for reargument or reconsideration of the Court's holding, in its June 10, 2019 claim construction Opinion (D.I. 172) and Order (D.I. 173), that the claim terms "passive link" and "computer" are indefinite. (D.I. 177) Having reviewed the parties' submissions (D.I. 178, 184, 186-1 Ex. A), **IT IS HEREBY ORDERED** that Infinity's motion for reconsideration (D.I. 177) is **DENIED** for the following reasons:

1. Pursuant to Local Rule 7.1.5, a motion for reconsideration should be granted only "sparingly." The decision to grant such a motion lies squarely within the discretion of the district court. *See Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 419 (D. Del. 1999); *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990). These types of motions are granted only if the Court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. *See Schering Corp. v. Amgen, Inc.*, 25 F. Supp. 2d 293, 295 (D. Del. 1998); *Brambles*, 735 F. Supp. at 1241. A motion for reconsideration may be granted only if the

movant can show at least one of the following: (i) there has been an intervening change in controlling law; (ii) the availability of new evidence not available when the court made its decision; or (iii) there is a need to correct a clear error of law or fact to prevent manifest injustice. *See Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). However, in no instance should reconsideration be granted if it would not result in amendment of an order. *See Schering Corp.*, 25 F. Supp. 2d at 295.

2. Here, Infinity does not contend that there has been an intervening change in law or that new evidence is available. (*See generally* D.I. 178) Therefore, Infinity has the burden to demonstrate a clear error of law or fact in the Court's reasoning. Infinity has not met its burden.

3. Infinity fails to show a clear error of law or fact with respect to its first contention: that the Court's interpretation of the patentee's September 26, 2002 Office Action Response ("Office Action Response") is incorrect. (*See id.* at 2-6) After a review of that Office Action Response, the Court concluded that the patentee had, in distinguishing a prior art reference (U.S. Patent No. 5,452,106 to Perkins), taken the position that the patentee's claimed "passive link" was passive from a fax machine to a computer's input/output (I/O) bus. (D.I. 172 at 8-9) Infinity now argues that the Court's conclusion was in error; to Infinity, the patentee characterized the passive link as ending at a computer ***port***. (*See* D.I. 178 at 3-4) ("[T]he passive link spans the facsimile machine to the computer . . . and the computer begins at the RS 232 port . . . .") The Court is unpersuaded. For reasons explained at length in the Court's claim construction opinion (D.I. 172 at 8-11), Infinity's characterization of the patentee's argument is simply inconsistent with the Office Action Response itself, which repeatedly mentions the "I/O

Bus" as the endpoint of the link between the "facsimile transceiver" and the "computer."[1] (*See* D.I. 148-29 at 15 (Infinity37915)) Moreover, Infinity's position that the "passive link" ends at a computer port would not serve to distinguish Perkins. As the patentee noted (*see id.*), Perkins discloses embodiments in which a "facsimile device 3," which sits between a fax machine and a computer I/O bus, can be placed inside a computer, such that a fax machine is connected to the device via a port on the computer. (*See* Perkins, 3:59-68, 9:24-32) Thus, if the "passive link" ends at a computer ***port*** and not at the computer's I/O bus, as Infinity now suggests, Perkins would include a "passive link," rendering the patentee's distinction from Perkins nugatory. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

4. Infinity also fails to demonstrate that the Court made a clear error of law or fact with respect to Infinity's second contention: that the discussion in the Office Action Response is inapposite to the claims at issue in this case, as the Response concerned a different version of the claims.[2] (*See* D.I. 178 at 6-9) Infinity contends that claim 27, as it existed at the time of the Office Action Response, had an "additional requirement" over the current claims: "that the endpoint of the passive link lead directly to the 'computer interface.'" (*Id.* at 8) To Infinity, this

---

[1] Infinity argues that the Court "conflat[es] the discussion of ***the data flow*** which permissibly continues past the passive link connection to the I/O bus – and potentially on to the CPU – with the passive link's endpoint." (D.I. 178 at 4) (emphasis in original) To the extent that the Court does so, it is because the patentee did the same in the Office Action Response. *See Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017) (noting that scope of patent disclaimer is commensurate with "actual arguments made").

[2] The Court notes that Infinity did not raise this argument in its original briefing (*see generally* D.I. 149, 159), and first mentioned it during the claim construction hearing (Tr. at 63-66, 76-77). The Court will nevertheless consider the argument.

requirement renders the Office Action Response's distinction from Perkins inapplicable to the interpretation of the asserted claims, which do not recite a "computer interface" but instead recite a "passive link" that extends to a "computer." (*Id.* at 8-9) Infinity's argument is unpersuasive. Although Claim 27 recites sending data through a "passive link" to a "computer interface," it also recites "a passive link . . . from the facsimile machine to the computer," which is essentially the same limitation as appears in the asserted claims. (*See* D.I. 148-29 at 20 (Infinity37920)) Moreover, the patentee in the Office Action Response did not make any mention of, let alone place any material significance on, the phrase "computer interface" in its distinction of the claimed invention's "passive link" from the connection in Perkins. (*See id.* at 15) Therefore, a person of ordinary skill would find the patentee's discussion of the endpoint of the "passive link" in the Office Action Response to indicate the endpoint of the "passive link" in the asserted claims. *See Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632 (Fed. Cir. 1987) (holding that meaning of claim term must be consistent throughout patent); *see also Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1382 (Fed. Cir. 2001); Tr. at 76-77 (Infinity agreeing that "a [POSA] can, and should, rely on" "any discussion in the prosecution" of "passive link," as long as Patent Office agrees with discussion).

5. Infinity's third and final contention – that the Court applied the wrong standard for patent disclaimer – also lacks merit. (*See* D.I. 178 at 9-10) Infinity seems to find a conflict between "the proposition that surrender can exceed that which is required by the prior art" (which Infinity contends the Court adopted) and the standard that disavowal must be "clear and unmistakable" (which Infinity contends the Court did not). (*Id.*) Contrary to Infinity's contention, these two points of law are not in conflict here; the patentee's distinction from Perkins on the basis of the claimed "passive link" was not ambiguous or "amenable to multiple

reasonable interpretations." (*See id.* at 10) Instead, in the Office Action Response, the patentee took the clear and unmistakable position that the claimed "passive link" extends from a fax machine to the I/O bus of a computer. Even if the alternative distinctions from Perkins that Infinity has made in this litigation (*see id.* at 2-9) were persuasive (they are not), Infinity cannot negate the impact of the patentee's clear and unmistakable position during prosecution. *See Tech Properties Ltd. v. Huawei Techs. Co.*, 849 F.3d 1349 (Fed. Cir. 2017).

6. For these reasons, the Court denies Infinity's motion for reconsideration of the Court's holding that "passive link" and "computer"[3] are indefinite.

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT

[3] Infinity does not provide any additional arguments with respect to the Court's finding that the term "computer" is indefinite (D.I. 178 at 10), so Infinity's motion with respect to that term fails for the reasons explained above for "passive link."

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INFINITY COMPUTER PRODUCTS, INC.,<br>Plaintiff,<br>v.<br>OKI DATA AMERICAS, INC.,<br>Defendant. | C.A. No. 18-463-LPS |

William J. Rhodunda, Jr. and Chandra J. Williams, RHODUNDA WILLAMS & KONDRASCHOW, Wilmington, DE

Andrew G. DiNovo, Nicole E. Glauser, Gabriel R. Gervey, and Daniel L. Schmid, DINOVO PRICE LLP, Austin, TX

Attorneys for Plaintiff

John W. Shaw, Jeff Castellano, and Andrew E. Russell, SHAW KELLER LLP, Wilmington, DE

Marc R. Labgold and Patrick J. Hoeffner, NAGASHIMA HASHIMOTO & YASUKUNI, Reston, VA

Attorneys for Defendant

# MEMORANDUM OPINION

June 10, 2019
Wilmington, Delaware

**STARK, U.S District Judge:**

Plaintiff Infinity Computer Products, Inc. ("Infinity") sued Defendant Oki Data Americas, Inc. ("Oki Data"), alleging that Oki Data infringes Infinity's U.S. Patent Nos. 6,894,811 ("the '811 patent"), 7,489,423 ("the '423 patent"), 8,040,574 ("the '574 patent"), and 8,294,915 ("the '915 patent"). (D.I. 1) The asserted patents relate to systems for connecting a fax machine to a computer so that the fax machine can be used as a printer or scanner. (*See* '811 patent, Abstract) Oki Data makes devices that Infinity contends infringe the patents. (D.I. 1 ¶¶ 17-20)

Presently before the Court are the parties' disputes over the meaning of certain claim terms in the asserted claims. The parties submitted claim construction briefs. (D.I. 149, 151, 159, 162) Infinity submitted a technology tutorial (D.I. 150), to which Oki Data submitted objections (D.I. 161). The Court held a claim construction hearing on February 4, 2019. (*See* D.I. 170 ("Tr."))

## I. LEGAL STANDARDS

### A. Claim Construction

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in

the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

**B. Indefiniteness**

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). But "[i]f such an understanding of how to measure the claimed [feature] was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the

specification to identify a particular measurement technique." *Ethicon Endo–Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. "facsimile machine" and "fax machine"[1]

| |
|---|
| **Infinity**<br>No construction necessary<br><br>or<br><br>"a device that is capable of sending and receiving a fax, including associated scan and print functionality" |
| **Oki Data**<br>"a standard facsimile machine"<br><br>or<br><br>"a conventional facsimile machine" |
| **Court**<br>"a device that is capable of sending and receiving a fax over a phone line and includes associated scan and print functionality" |

The parties agree that a "fax machine" or "facsimile machine" must be capable of sending and receiving a fax over a phone line. (Tr. 11, 35 (Infinity: "in our view, I think a person of ordinary skill in the art would understand that a fax machine has a phone line sending capability"); *id.* at 17 (Oki Data: "fax machine . . . would normally only communicate with the outside world through a telephone line"))

[1] The terms "facsimile machine" or "fax machine" appear in claims 1, 2, 4, 6, 7, and 18-20 of the '811 patent, claims 1-4 and 6 of the '423 patent, claims 1, 2, 4, 5, 7, and 8 of the '574 patent, and claims 1, 6-9, 14, and 15 of the '915 patent.

The parties' central dispute regarding this term is whether, as Oki Data contends (D.I. 151 at 10-14), the "fax machine" and "facsimile machine"[2] must be standard or conventional, or whether, as Infinity contends (D.I. 149 at 13-16), the terms may include non-standard and non-conventional machines.

The Court agrees with Infinity because the plain meaning of "fax machine" does not exclude non-standard machines, and the specification further supports this broad construction. Generally, a construction should depart from plain and ordinary meaning only when a patentee acts as its own lexicographer or disavows claim scope during prosecution. *See Poly-Am, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). To narrow the scope of an otherwise broad term, the specification must demonstrate a "clear intention . . . using words or expressions of manifest exclusion or restriction." *Hill-Rom*, 755 F.3d at 1372. Here, the specification does not show any clear intention to require a fax machine to be standard or conventional. To the contrary, Figures 2c, 2f, and 2h show the inventive "interface circuit 10" inside the fax machine. A fax machine including interface circuit 10 would not be standard or conventional. Such a fax machine would also be excluded from the claims under Oki Data's construction, a result that is disfavored. *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct.") (internal alterations and quotation marks omitted).

The specification suggests that the use of a conventional fax machine may be a preferred embodiment ('811 patent, Abstract), and that a "principal object" of the invention is to allow a conventional fax machine to be used as a scanner or printer using "a circuit of highly simplified

---

[2] The claims use "fax machine" and "facsimile machine" interchangeably. For clarity, the Court will refer to both terms as fax machines.

design and low cost" (*id.*, 1:25-40). Still, nothing in the specification establishes that the fax machine used in the invention ***must*** be conventional. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) (holding claims not limited to certain context even though inventor conceived that invention "would be used principally, if not exclusively," in that context, even when specification "refers repeatedly to the advantages of the invention in that context").

Oki Data contends that the patentee's arguments distinguishing U.S. Patent No. 5,598,533 to Yokota ("Yokota") limit the claims to conventional fax machines. (D.I. 151 at 12-13) However, the patentee merely argued that the claimed invention, unlike Yokota, ***could be used*** with a standard fax machine. (D.I. 148-10 Ex. 6 at 20) (distinguishing Yokota as requiring "a complex memory and interrupt service routine based interface between PC-like and Fax-like components that were integrated into a single box")

**B. "passive link"**[3]

| |
|---|
| **Infinity**<br>No construction necessary<br><br>or<br><br>"a link where the initiation of data flow is activated from a setup procedure within the PC and/or the facsimile machine, and the data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and facsimile machine, for purposes of providing scanning and/or printing data" |
| **Oki Data**<br>Indefinite<br><br>or |

[3] The term "passive link" appears in claims 1, 6, 7, and 18-20 of the '811 patent, claims 1, 2, and 6 of the '423 patent, claims 1, 7, and 8 of the '574 patent, and claims 1 and 9 of the '915 patent.

| |
|---|
| "a link where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine" |
| **Court**<br>Indefinite |

Each of the asserted independent claims recites connecting a fax machine to a computer "via a passive link." Oki Data contends that "passive link" is indefinite because, during prosecution of the '811 patent, the patentee took contradictory positions as to whether a passive link must extend (i) all the way to the I/O bus of a computer, or (ii) only to a port on the housing of the computer, such that an "intervening apparatus" (such as a fax modem) may be located between the passive link and the I/O bus. (D.I. 151 at 15) Infinity agrees that in order for the Court not to find "passive link" indefinite, one of skill in the art would have to be reasonably certain as to where the passive link ends and the computer begins (Tr. 61-62), and further agrees that one of skill in the art would look to the prosecution history in determining the meaning of "passive link" (*id.* at 67).

During prosecution of the '811 patent, the patentee maintained that a passive link must extend to a computer's I/O bus without any intervening devices. In response to an obviousness rejection, the patentee distinguished U.S. Patent No. 5,452,106 to Perkins ("Perkins") on the basis that Perkins did not include a passive link as recited by the claims. (D.I. 148-29 Ex. 25) Perkins discloses a system for connecting a fax machine to a computer via a "facsimile device 3" that connects to the fax machine via a phone line and to the computer via a serial cable. (Perkins 3:59-68) The facsimile device might be a standalone device or, alternatively, be located on a card inside a computer. (*Id.* 3:59-68, 9:24-32) The patentee argued that Perkins lacked a passive link because, in Perkins' configuration, the "facsimile transmission ***never enters the computer***

***I/O bus until after it is processed by device 3****. . . .* Contrary to the above, [in the claimed invention], ***the non-intercepted data enters through the [serial] type connector port of the computer and passes directly to the I/O bus*** . . . providing a true non-intercepted signal between the facsimile transceiver and the computer." (D.I. 148-29 Ex. 25 at 12) (emphasis added)

However, during a later *ex parte* reexamination of the '811 patent, the patentee argued that a passive link need only extend to a computer port without any intervening device. During reexamination, the claims were rejected as anticipated by U.S. Patent No. 5,900,947 to Kenmochi et al. ("Kenmochi"). (D.I. 151-5 Ex. 52 at 14) The patentee responded that Kenmochi was not prior art because the effective priority date of the claims was not the filing date of the '056 application, but rather the filing date of the '278 application, of which the '056 application was a continuation-in-part. (D.I. 148-18 Ex. 14 at 7) The patentee argued that written description for the "passive link" term could be found in Figures 2b, 2c, and 2d, which were present in the '278 application. (*Id.*) Specifically, the patentee argued that passive link in each of Figs. 2b-2d was the RJ-11 (phone line) cable from the fax machine to the RJ-11 port on the computer's fax modem. (*Id.*) On this understanding, a passive link need only be uninterrupted from the fax machine to a port on the computer; it may be further processed in the computer before it passes to the I/O bus. (*See id.*; U.S. Patent App. No. 90/013,208, Final Office Action dated 2/11/2015 at 20-25 (concluding, based on patentee's arguments, that "the claimed 'passive link' . . . constitutes the direct physical connection between the facsimile machine and the computer, ***regardless of whether the PC included an internal modem***") (emphasis added).

Oki Data's diagrams characterizing the prosecution history, reproduced below, accurately depict the understanding a person of ordinary skill would have when reading the prosecution history.




Location of the passive link to the "computer" in distinguishing *Perkins*




Location of the passive link to the "computer" during re-examination

(D.I. 151 at 8)

Oki Data has met its burden to show indefiniteness by clear and convincing evidence. During prosecution, the patentee distinguished prior art references by characterizing "passive link" as requiring the link to be entirely passive from the fax machine to the computer's I/O bus (in the patentee's words, "a true non-intercepted digital signal"). (D.I. 128-29 Ex. 25 at 12) This is depicted in the first diagram above. Then, however, in order to claim the filing date of the '278 application, the patentee characterized "passive link" as only requiring the link to be passive from the fax machine to a port on the computer. (D.I. 148-18 Ex. 14 at 7) This is depicted in the second diagram above.

Under the patentee's first definition, the '278 application lacks written description for a passive link because the '278 application does not disclose a link that was passive until the computer's I/O bus. Rather, under that definition, each embodiment disclosed in the '278 application includes an intervening apparatus – a modem – between the fax machine and the I/O bus. (*See* '811 patent, Figs. 2b-2d) Conversely, the patentee's second definition, used to overcome the written description rejection, would not distinguish the Perkins patent because Perkins teaches connecting a fax machine to a computer a via an intervening device: a "facsimile

device" inside the computer. (Perkins 9:24-32) The patentee's contentions regarding "passive link" have been materially inconsistent. Hence, a person of ordinary skill in the art would not be reasonably certain as to which of the patentee's two inconsistent definitions of "passive link" is used in the claims, rendering the claims indefinite. *See Teva*, 789 F.3d at 1345 (holding claim term indefinite where patentee used two inconsistent definitions of term during prosecution).

Infinity is not correct that the PTAB's construction during reexamination is "the definitive outcome of the prosecution history." (D.I. 159 at 5) The PTAB's construction of a claim term is not binding on a district court. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007). Moreover, the PTAB did not consider the argument now before this Court. (*See generally* D.I. 149-9 Ex. 3) The issue before the PTAB was whether there was written description for both analog and digital signals in the '278 patent, and the PTAB only rejected the contention that the patentee, in distinguishing Perkins, limited the claims to "***solely analog*** transmission." (D.I. 149-9 Ex. 3 at 12) (emphasis in original). The PTAB's conclusion is not relevant to the question before this Court: whether the patentee took inconsistent positions with respect to the ***endpoint*** of the passive link.

Infinity's argument that its construction does not, in fact, conflict with Perkins also misses the mark. (*See* D.I. 159 at 7-9) Infinity's post hoc distinction of Perkins does not negate the patentee's far more specific arguments during prosecution. *See Tech. Properties*, 849 F.3d at 1359 (holding that "the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference" but rather to "the actual arguments made"). Moreover, Infinity's distinction fails on its merits: Perkins contemplates the facsimile device being inside a PC and, so, envisions embodiments with a direct, passive connection between a fax machine and a PC port. (Perkins, 9:24-32)

### C. "computer"[4]

| |
|---|
| **Infinity**<br>No construction necessary |
| **Oki Data**<br>Indefinite |
| **Court**<br>Indefinite |

The parties' dispute over "computer" mirrors their dispute over "passive link." Infinity contends that the term is a "straightforward word" that is "readily understood by a person of skill in the art, the Court and jury without construction." (D.I. 149 at 20) Oki Data argues that "computer" is indefinite for essentially the same reasons as it provided for "passive link." (D.I. 151 at 20)

The Court agrees with Oki Data for the same reasons as provided above for "passive link." Each claim that recites "passive link" states that the passive link connects a "facsimile machine" and a "computer." (*See, e.g.*, '811 patent. cl. 12) (reciting "transferring data signals . . . via a passive link between the facsimile machine and the computer")) Given that the two definitions for "passive link" vary in their endpoint – one connects the fax machine to a port on a computer, and another connects the fax machine to the I/O bus of the computer – it follows that the scope of "computer" changes depending on the definition. Specifically, where the passive link ends at a computer port, the computer begins at the port, and where the passive link ends at the I/O bus, the computer begins at the I/O bus. Accordingly, a person of ordinary skill in the art

[4] The term "computer" appears in claims 1, 2, 4, 6, 7, and 18-20 of the '811 patent, claims 1-4, and 6 of the '423 patent, claims 1, 2, 4, 5, 7, and 8 of the '574 patent, and claims 1 and 9 of the '915 patent.

would not be reasonably certain as to what the claims mean by "computer." *See Teva*, 789 F.3d at 1345.

Infinity provides several arguments as to why "computer" is not indefinite, but none are persuasive. (*See* D.I. 149 at 20-21; D.I. 159 at 10) Infinity points to the statement in the specification that "[t]he PC . . . may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT)." (D.I. 149 at 20) Infinity also notes that "computer" has been construed or given its plain meaning in many unrelated patents. (*Id.*) Infinity further points out that defendants in related cases have not suggested that "computer" is indefinite. (D.I. 159 at 10) Yet neither the specification nor any case cited by Infinity resolves the ambiguity created by the prosecution history of the patents-in-suit. The fact that an indefiniteness argument was not made by defendants in other cases does not render the argument being made here less meritorious.

## III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INFINITY COMPUTER PRODUCTS, INC.,

Plaintiff,

v.

OKI DATA AMERICAS, INC.,

Defendant.

C.A. No. 18-463-LPS

**ORDER**

At Wilmington, this **10th** day of **June, 2019**:

For the reasons set forth in the Memorandum Opinion issued this date,

**IT IS HEREBY ORDERED** that the claim terms in this case are construed as follows:

| Claim Term | Court's Construction |
|---|---|
| **"facsimile machine"** | "a device that is capable of sending and receiving a fax over a phone line and includes associated scan and print functionality" |
| **"fax machine"** | "a device that is capable of sending and receiving a fax over a phone line and includes associated scan and print functionality" |
| **"passive link"** | Indefinite |
| **"computer"** | Indefinite |

[signature]

UNITED STATES DISTRICT JUDGE

US006894811B1

(12) **United States Patent**
**Nachman et al.**

(10) **Patent No.: US 6,894,811 B1**
(45) **Date of Patent: May 17, 2005**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE COUPLED TO A PC AS A SCANNER OR PRINTER**

(76) Inventors: **Bruce Nachman**, deceased, late of Wayne, PA (US); by **Marvin Nachman**, legal representative, 315 Saybrook Rd., Villanova, PA (US) 19085

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/669,056**

(22) Filed: **Jun. 24, 1996**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**[7] ............................ **H04N 1/32**; H04N 1/04

(52) **U.S. Cl.** ...................... **358/442**; 358/468; 358/474; 379/100.01

(58) **Field of Search** ................................ 358/442, 468, 358/443, 400, 401, 434–437, 474, 1.13, 1.15, 440, 1.6; 379/100, 251, 252, 375, 93, 100.15, 100.01, 100.02, 100.06, 100.05, 100.13

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,821,312 A * 4/1989 Horton et al. .............. 358/442
5,452,106 A * 9/1995 Perkins ....................... 358/442
5,530,558 A * 6/1996 Nachman .................... 358/442
5,608,546 A * 3/1997 Nakamura et al. .......... 358/442
5,823,689 A * 10/1998 Nehowig et al. ............. 400/83
6,134,017 A * 10/2000 Schlank et al. ............ 358/1.15

* cited by examiner

*Primary Examiner*—Cheukfan Lee

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.

**20 Claims, 11 Drawing Sheets**




9 VOLT RING GENERATOR CIRCUIT
CURRENT GENERATOR CIRCUIT
TONE RCVR
SWITCH DRIVER
POWER
+9 VOLTS
TO PC
TO FAX
TO TLL 1
TO TLL 2

Fig. 1


NUMBER RCVD ?
N
Y
OPERATE 26
DEPRESS BUTTON (OPERATE 27)
SET TIMER
2 SEC ELAPSED ?
N
Y
RELEASE BUTTON (DEENERGIZE 27)
THIS GENERATES OFF-HOOK COND.
PRINTING/ SCANNING COMPLETE ?
N
Y
RETURN

Fig. 1a


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
41
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 2
51
Interfacing CKT 10
CO Tel 1
50
Standard Fax Machine
30

*Fig. 2a*


PC Type Computer
Internal Fax Modem / Present Invention Card
Interfacing CKT 10
Fax Modem Circuitry
41
40
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
Standard Fax Machine
30
CO Tel 1
50

*Fig. 2b*


PC Type Computer
Internal
Fax Modem
Fax Modem
Circuitry
41
40
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
30
Standard
Fax Machine
Interfacing
CKT 10
50
CO Tel 1

*Fig. 2c*


PC Type Computer
Interfacing CKT 10
On an Internal PC Card
Internal Fax Modem
To Wall Tel Line
41
40
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard Fax Machine

*Fig. 2d*



PC Type Computer
40
RS-232 Cable
41
External Fax Modem/
Present Invention Circuitry
Fax Modem
Circuitry
Interfacing
CKT 10
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard
Fax Machine


*Fig. 2e*


Fax Machine/Fax Modem
Present Invention Circuitry
PC Type Computer
40
RS-232 Cable
Standard
Fax Machine
30
Interface
Circuit 10
Fax Modem
Circuitry
41
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 2
51
CO Tel 1
50

Fig. 2f



PC Type Computer with Generic Send/Receive Communication Software
40
CO Tel 2
51
CO Tel 1
50
RJ-11 Tel Cable
RJ-11 Tel Cable
RS-232 Cable
RS232 Connector
Standard Fax Machine
30
Fax Machines Optical Digital Scanning Device
75
Printer Circuitry
77
Control Circuitry & Line Driver Internal to fax modem with Auto tone detection functions
76


Fig. 2g


PC Type Computer
40
RS-232 Cable
Standard Fax Machine
30
Interface Circuit 10
Fax Modem Circuitry
ISDN, ADSL, HDSL Interface
60
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 2
51
CO Tel 1
50

Fig. 2h


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
RS232 when PC does not contain fax modem
RJ-11
Tele Cable
Interface Circuit 10
70
Storage Device such as RAM or Fixed Disk
Fax modem circuitry
RJ-11
Tel Cable
CO Tel 2
51
RJ-11
Tel Cable
CO Tel 1
50
RJ-11
Tele Cable
Standard Fax Machine
30

Fig. 2i

# INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE COUPLED TO A PC AS A SCANNER OR PRINTER

This application is a continuation-in-part of application Ser. No. 08/226,278, filed Apr. 11, 1994, now U.S. Pat. No. 5,530,558.

## FIELD OF THE INVENTION

The present invention relates to interfacing a facsimile with a PC and more particularly to an interface circuit of highly simplified design and including a novel ringing circuit capable of generating a sine wave of a given amplitude and frequency from a small, portable DC battery or 9V DC power supply.

## BACKGROUND OF THE INVENTION

As is well known in the art, a conventional facsimile scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile.

Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.

It has been recognized that conventional facsimile machines may be utilized as scanners or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

## OBJECT OF THE INVENTION

It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

## BRIEF DESCRIPTION OF THE INVENTION

The present invention achieves all of the above as well as other objectives through apparatus which is characterized by comprising first switch means capable of selectively coupling a PC modem and a facsimile modem to independent telephone lines when in a non-scanning/printing mode and for decoupling the PC and facsimile modems from the telephone lines and coupling these modems to one another when placed in a scanning/printing mode.

Second manually operable switch means activates a novel ringing circuit which generates a sine wave of appropriate amplitude and frequency and applies this ringing circuit to the PC modem, when used as a scanner or to the facsimile when being used as a printer, causing the PC or facsimile machine to respond to the simulated transmit request.

Release of the circuitry operating button causes the interface circuitry to apply an off-hook condition to the facsimile. Document scanning or printing is initiated by pressing the facsimile start button or the start button provided as part of the PC or by a program step integrated into the PC as part of a print mode (selecting the facsimile as the output device for printing). Transmitted data may be directly stored in a PC memory. Documents incorporating alphanumeric data may be converted by a software program incorporated into the PC.



The ring generating circuit responsive to pressing of the operating button generates a transmit request signal by converting the low voltage from a DC source into a 20 cycle sine wave of 90 volt amplitude through the employment of a pulse generating circuit coupled to phase delay means and applying phase delayed and undelayed pulses to a transistorized switching circuit for selectively applying positive DC voltage to opposing inputs of a step-up transformer which applies a boosted sinusoidal ring signal to the PC modem, the ring generating circuit generating a ringing signal of the appropriate amplitude and frequency in a highly simplified and inexpensive manner. Since operation of the ringing circuit is completed in less than two seconds, a battery, if used, will have an extremely long operating life. Alternatively, if a 9V DC power source is used the battery is not required at all.

The simple, straightforward operation of only three switches eliminates the need for complicated, expensive and typically microprocessor-based circuitry.

## BRIEF DESCRIPTION OF THE FIGURES

The above, as well as other objects of the present invention, will become apparent upon reading the accompanying description and drawings in which:

FIG. **1** is a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile as a sophisticated scanner or printer.

FIG. **1***a* is a flow diagram of the circuitry of FIG. **1** employing the microprocessor-based tone detecting circuit of FIG. **1**.

FIGS. **2***a*–**2***i* show simplified block diagrams of various system arrangements employing the circuitry of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION AND PREFERRED EMBODIMENTS THEREOF

FIG. **1** shows an interface circuit **10** embodying the principles of the present invention and being comprised of a switch assembly SW**2** which is a four-pole double-throw switch having four movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8**, and SW**2**-**11**, each cooperating with a pair of stationary contacts, as shown. For example, and for simplicity, note that switch arms SW**2**-**2** is switchable between stationary contacts SW**2**-**1** and SW**2**-**3**.

Movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8** and SW**2**-**11** are all ganged to operate in unison as shown by common operating button B**2** coupled to the switch arms through a linkage arm LA**2** shown in schematic fashion as a dotted line. The switch is designed so that the switch arms are retained in the positions to which they are moved.

The switch arms are arranged in pairs, switch arms SW**2**-**2** and SW**2**-**5** selectively coupling a modem of a PC (not shown for purposes of simplicity) to either a first telephone line #1 through jumper JP**3** or directly to a local facsimile machine (not shown for purposes of simplicity) through a jumper terminal JP**2**.

In a similar fashion, a pair of switch arms SW**2**-**8** and SW**2**-**11** selectively couple the local facsimile machine through jumper JP**2** to either a separate telephone line #2 (through jumper JP**4**) or to the modem of the PC.

A double-pole single-throw switch **SW3** is provided to couple either the local facsimile machine or the PC modem to a single telephone line or alternatively, disconnects the PC modem and facsimile machine from the common telephone line. For example, in applications where both the local facsimile and the PC each have an independent, dedicated telephone line, switch **SW3** remains open. In applications where only a single telephone line is provided, both PC and the local facsimile may share the single telephone line by gaining access thereto in a staggered manner.

Switch SW**1** which is a three-pole, double-throw switch, comprises three movable switch arms **SW1-1**, **SW1-4** and **SW1-7**, each movable switch arm cooperating with a pair of stationary switch arms.

Movable switch arm **SW1-1** selectively couples the output terminal of the pair of secondary windings **W2** of a step-up transformer TR**1** either to stationary terminal **SW1-2**, which isolates the output of the transformer TR**1** from the operating circuitry, or stationary contact **SW1-3** which couples the secondary winding **W2** of transformer TR**1** through movable switch arm **SW1-7** and stationary contact **SW1-9** simultaneously to stationary contacts **SW2-6** and **SW2-12** of four-pole double-throw switch SW**2** for simultaneous connection to the PC modem and the local facsimile, when switch arms **SW2-5** and **SW2-11** respectively engage stationary contacts **SW2-6** and **SW2-12**.

Movable switch arm **SW1-4** selectively couples a small nine volt (9V) DC source (through jumper **J5**) to either stationary switch arm **SW1-5** for coupling nine volt (9V) DC to a current generator circuit **12** or alternatively coupling nine volt (9V) DC to stationary terminal **SW1-6** which in turn provides DC power to the nine volt (9V) ring generator circuit arranged within the dotted region as shown.

Current generator circuit **12** is comprised of resistors R**1**, R**2** and R**5**, transistors Q**1** and Q**6**, diode D**2** and LED-type diode D**3** which are connected in the manner shown to provide a constant current which simulates an off-hook signal, utilized in the manner to be more fully described hereinbelow. Resistor R**2** serves as a current limiting resistor. LED D**3** lights to denote operation of the constant current generator.

Ring generator circuit **14**, which is utilized to generate a 20 Hz sine wave of a 90 volt amplitude, comprises a 555-type timing circuit **16** which, when activated by a nine volt DC input, applied to timer **16** through terminal VCC and resistor R**13**, provides a pulse train of equal width, positive-going pulses at a pulse rate of approximately 20 Hz at its output **16***a*.

The pulse train generated by the 555 timer **16** is simultaneously applied to the input of inverter U**1**A whose output is simultaneously coupled to the base electrodes of transistors Q**2** and Q**4**, through resistor R**6** and through inverter U**1**B and resistor R**9**.

The pulse train, as was set forth hereinabove, is simultaneously coupled to the −T input of a one-shot multivibrator operating as a phase delay circuit and whose Q output is coupled to the input of inverter U**1**E. The Q output of one-shot multivibrator U**2**A provides a phase delayed pulse which is coupled through the output of inverter U**1**E simultaneously to the base of transistor Q**5** through resistor R**8** and to the base of transistor Q**3** through inverter U**1**F and resistor R**7**. Transistors Q**2**–Q**5** and resistors R**6**–R**9**, together with resistor RIO, form a full bridge switching circuit which is powered by the nine volt (9V) DC source applied to the terminal VCC to provide drive current sufficient to drive transformer TR**1**, comprised of a pair of primary windings W**1** and a pair of secondary windings W**2**, to generate a sine wave output. The pair of primary windings W**1** and secondary windings W**2** are coupled in parallel and the windings are arranged to provide a step-up transformer to magnify the input voltage preferably by ten to one (10:1), generating the desired output voltage which, in the present application, is a 20 Hz output of 90 volt amplitude with 15 mils of current from a nine volt (9V) DC, 150 mils current source. If desired, the frequency, amplitude and current of the circuit can be changed by selecting different component values for the passive elements. The component values chosen in the present invention have been selected to generate a signal which reproduces a standard bell ring signal employed in a conventional transmission between remote facsimile machines. The branch circuits BC**1** and BC**2** of the bridge circuit are alternately rendered conductive to alternately apply a positive voltage to opposing inputs of the input windings W**1** for generating a sine wave from the positive-going pulses produced by timer circuit **16**. The two input windings W**1** are coupled in parallel as are the output windings W**2**.

The bell ring signal is selectively supplied through movable switch arm **SW1-1** of the three-pole, double-throw switch SW**1** described hereinabove.

The operation of the interface circuit of the present invention is as follows:

Assuming that the local facsimile is desired to be operated in combination with the PC and to function as a scanner, the switch SW**2** is moved from the normal position, in which the movable switch arms are shown in solid line fashion, to the dotted line position simultaneously disconnecting the PC modem and the local facsimile from the telephone lines and directly connecting the PC receive line, PCR**1** to ground and the PC transmit line PCT**1** directly to stationary contact **SW1-9**. The local facsimile transmit line FXT**2** is directly connected to ground and the facsimile receive line FXR**2** is connected in common with line PCT**1** to stationary contact **SW1-9** of switch SW**1**. Switch SW**3** may be either in the open or the closed position when switch SW**2** is moved to the scan mode.

Switch SW**1** is operated by pressing button B**1** which is ganged to the movable switch arms **SW1-1**, **SW1-4** and **SW1-7** by a common linkage arm represented schematically by dotted line LA**1**. A biasing member or spring SWP**1** normally biases the movable switch arms to the solid line position shown in Figure. By depressing switch button B**1**, the switch arms **SW1-1**, **SW1-4** and **SW1-7** are simultaneously moved to the dotted line positions shown in FIG. **1**. Button B**1** is maintained in the depressed position for a period preferably between one and two seconds. In the dotted line position, the nine volt (9V) DC source is coupled through switch arm **SW1-4** and stationary terminal **SW1-6** to the VCC terminals of ring generator circuit **14**, producing a 20 Hz sine wave of 90 volt amplitude and a current of 15 mils at the secondary windings W**2**, which is applied to the PC line PCT**1** through **SW1-1**, **SW1-3**, **SW1-7**, **SW1-9**, **126**, **SW2-6** and **SW2-5**, simulating what the PC believes is a request by a "remote" facsimile to transmit data thereto. The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT) is provided with either an internal or external group III facsimile interface board, and shifts to a receive mode for receiving what appears to the PC to be a facsimile transmission from a "remote" facsimile machine.

After holding the button B**1** depressed for a time which need not exceed approximately two seconds, button B**1** is

released causing the nine volt (9V) DC source to be coupled to input **12***a* of current generator circuit **12**, which circuit applies the constant current to the facsimile receive line FXR**2** to create what appears to the facsimile machine to be an off-hook condition. Simultaneously therewith, LED D3 lights indicating that the current generator circuit is presently in operation.

The local facsimile machine recognizes the constant current as representative of an off-hook condition preparing the local facsimile machine for transmission.

Thereafter, the conventional start button of the facsimile machine (not shown for purposes of simplicity) is pressed to start communication of the data scanned by the local facsimile machine from a document (or documents) placed within the facsimile machine document input (also not shown for purposes of simplicity).

The facsimile machine may be either a group I, group II, or group III machine, although optimum document resolution can be obtained through the use of a group III facsimile machine.

The conventional PC can store the transmitted data in its memory as a "picture" the resolution of the picture being 200 by 100 pixels for old facsimile machines, 200 by 200 pixels for standard facsimile machines and 400 by 400 pixels for new facsimile machines. Alternatively, a conventional OCR software package such as, for example, a CAERE OCR program available from Bitsoftware may be employed. Many alternative OCR software packages may be utilized to convert the "picture" transmitted by the facsimile machine to binary character form for word processing use or the like.

Operation of the facsimile machine in combination with the PC wherein the facsimile machine operates as a printer is as follows:

The ring generating circuit is not required to be operated in this mode and in applications where a facsimile machine is interfaced with a PC for use only as a printer, the ring generating circuit and the cooperating spring bias switch may be eliminated.

Switch SW2 shown in FIG. **1** is moved from the solid line to the dotted line position decoupling the PC and facsimile machine from the telephone lines and coupling the PC and facsimile machine together.

Switch SW**1** is operated to power the current generator circuit **12** causing both the PC and the facsimile machine to see an off-hook condition.

The computer (PC) is operated either by providing a switch such as a push button switch (not shown for purposes of simplicity) to enter into a standard protocol with the facsimile machine and thereafter to transmit information in standard facsimile machine format. The facsimile machine senses that it is communicating with a remote facsimile machine and creates a document in accordance with the data received from the PC in "pixel" form. The PC may be provided with a standard program having a print mode in which the facsimile machine is identified in the printing routine as the specific output device being utilized during such a print mode. Upon completion of printing mode, switch SW**2** may be returned to the solid line position decoupling the PC from the facsimile machine and recoupling the PC and facsimile modems to their associated telephone lines.

FIGS. **2***a*–**2***h* show various arrangements in which the present invention may be utilized.

Noting, for example, FIG. **2***a*, the circuitry **10** of the present invention is coupled between a standard facsimile machine **30**, a PC-type computer **40** having a facsimile modem circuitry **41** and central office telephone lines **50** and **51**. In the arrangement shown in FIG. **2***a*, the facsimile modem circuitry may be either internal or external to the PC-type computer **40**.

FIG. **2***b* shows another alternative embodiment in which the circuitry of the present invention is incorporated into the PC-type computer and may be arranged on its own printed wiring board or on a printed wiring board which is common to the circuitry **10** of the present invention and the facsimile modem circuitry **41**. The arrangement of FIG. **2***b* is otherwise the same as that shown in FIG. **2***a*. The circuit **10** shown in FIG. **2***b* is provided with three RJ-11 telephone cable connections for respective connection with the facsimile machine **30** and telephone lines **50** and **51**. If only one additional telephone cable is provided, the standard facsimile machine **40** and the internal facsimile modem **41** may share that cable.

FIG. **2***c* shows another alternative arrangement in which the circuitry **10** of the present invention is integrated into the standard facsimile machine **30**. The operation of the arrangement of FIG. **2***c* is otherwise similar to those shown in FIGS. **2***a* and **2***b*.

FIG. **2***d* shows an arrangement in which the circuitry **10** of the present invention is mounted upon its own printed wiring board and is arranged within the PC-type computer **40** and is electrically connected to the internal facsimile modem **41** by an external RJ-11 cable as shown. The operation is otherwise the same as the embodiments of FIGS. **2***a*–**2***c* described hereinabove.

The circuitry **10** of the present invention may alternatively be placed upon a printed circuit card of approximately a credit card size for insertion in a bus slot provided in present-day PCs enabling the circuit on the printed circuit card, inserted into a slot provided along the exterior of the PC, to be coupled to a PCMCIA bus which is an additional bus that may be addressed by the PC.

FIG. **2***e* shows still another arrangement in which the PC-type computer **40** is coupled to external facsimile modem circuitry **41**, for example, through an RS-232 cable. The facsimile machine interfaces to the external facsimile modem **41** through circuitry **10** by way of an RJ-11 telephone cable. When in the normal mode of operation, circuitry **10** interfaces central office telephone lines **50** and **51** through the RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50** may be shared in the manner previously described.

FIG. **2***f* shows an arrangement in which interface circuit **10** is internal to the facsimile machine. PC-type computer **40** is coupled to the facsimile modem circuitry **41** and interface circuit **10** through an RS-232 cable. When in the normal mode of operation, circuitry **10** interfaces the central office telephone lines **50** and **51** through RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50**, for example, may be shared in the manner previously described. The arrangement of FIG. **2***f* is used with PC's which do not have a fax modem installed. When interface **10** is installed internal to the facsimile, the fax modem of the fax machine incorporates many of the functions of circuit **10**, through integration of the already existing circuitry components of the fax modem.

The present invention may be employed with telephone systems having digital signal processing. FIG. **2***h*, which is similar to FIG. **2***f*, and which shows like circuits designated with like numerals, further includes an interface **60** for digital signal processing. The send and receive options required for scanning and printing are provided by interface **60**, which may, for example, be a chip set such as PEB 2091 N-V4.4 and EPB 2186 N-V4.4, manufactured by Siemens. Any other chip set having similar operating characteristics may be employed. As other digital signal formats come into use, such as ADSL (Asymmetric Digital Subscriber Line) HDSL (High Bit Rate Digital Subscriber Line), or the like, a chip set for handling such formats may be substituted for interface **60**.

As shown in FIG. **2***i*, a RAM and/or Fixed Disk **70** may be incorporated into the interface **10**, integrated with a fax modem **30** to allow for the capture of images or documents for later transfer into the PC **40** or the facsimile machine **30**, or for image enhancement within the interface configuration **10**. The addition of the data storage feature is particularly desirable for the fax machine or fax modem when they are in normal fax send or receive modes.

Optionally, the data storage feature is desirable for field application usage where information may be downloaded from a PC and stored in interface **10** for later transfer to a facsimile machine or a PC. Storage would be retained in this instance by battery backup incorporated in the RAM memory **70**. Battery backup is not necessary for fixed disk storage.

FIG. **2***j* shows an arrangement for automated scanning and printing functions between a fax modem and a fax machine.

As represented in FIGS. **2***a*–**2***f*, in order to activate an automated process for scanning or printing, the ring circuit **4** (FIG. **1**) interfaces with the Tip and Ring features of the fax modem or fax machine. This is dependent on keying in a code on the fax keypad, such as ## or #* or any other predetermined code in order to respectively identify the scanning and printing functions. Interface **10** detects the tones generated by the inserted code (at the tone receiver **25** and generates a ring signal. The ring signal is detected and interpreted by the ring detect circuit of the fax modem or the fax machine. The fax modem or fax machine then generates receive signals or tones which indicate a connection. The fax modem or fax machine commences the scanning of the fax image or print cycle.

By depressing a predetermined code such as ## on the fax machine key pad, the tone detector circuit **25** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the PC fax modem. The PC fax modem answers and starts the scanning process from the fax machine to the PC.

A communication program stored in the PC allows the code #* (for example) to be entered, generating the tone signal from the fax modem. The tone detector circuit in the interface **10** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the fax machine. The fax machine answers and starts the printing process form the PC fax modem.



The switch version does not require the ## or #* or any other code, but activates the automated scanning/printing by pressing the ringer button B**2**.

The provision of the scan and print functions internal to the facsimile machine may also be accomplished by utilizing the analog output of the optical scanning circuit **75** of the facsimile machine (FIG. **2***g*). The analog signals are processed by the control/modem circuitry **76** where they are converted into a digital serial signal and then transmitted through the RS 232 sending interconnect port, the signal is then received by an RS232 connector at the PC. The aforementioned procedure utilizes unused signal lines which are available on most modem chips such as the Rockwell chip series.

A send and receive driver software package then implements the following action. The receive driver software accepts the digital image for storage or processing as appropriate. This send/receive driver communications software package also has the ability to send a digital image to the facsimile machine for printing purposes. The facsimile machine's control/modem circuitry then processed by the print driver **77** for printing. This linkage method for scanning and printing utilizing a fax machine is particularly useful for a computer without a fax modem. Any available send/receive communications software package is acceptable.

The commands of ## or #* for sending and receiving are still appropriate for this application although any other desired commands may be selected.

For the automated operation, the circuitry **10** of FIG. **1** is provided with device **25** which includes an automatic tone detector circuit for receiving a unique number dialed by either the facsimile machine or the PC modem. Upon recognition of the unique number, as set forth above or by generation using other techniques, the tone receiver operates a driver circuit **26** for operating switch SW**2** to decouple the PC and the facsimile machine from their associated telephone lines and for connecting the PC to the facsimile machine. Driver circuit **26** may be a relay or its equivalent for operating an armature (not shown) to move the switch arms between their two operating states. Driver unit **27** which likewise may be a relay or its equivalent, operates the switch SW**1** to the position energizing the ringing circuit **14**. A timer is set and when two seconds elapses, unit **27** is deenergized causing the off-hook signal to be generated by current generator circuit **12** through the release of the operating button. When printing or scanning is complete, the tone receiver unit is reset. A simplified flow diagram of the aforementioned operation is shown in FIG. **1***a*.

The circuitry of the present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of operating independently for transmission or reception to remote facsimile machines as well as functioning as a scanner or printer with a local PC. The circuitry of the present invention provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line. The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer as and when needed and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers.

Simple switching of SW**2** returns the PC and facsimile machine to normal use.

The novel ring circuit provides the required ring signal which is conventional in present-day facsimile transmission

application through the employment of an inexpensive, low voltage, DC battery or 9V power source and, through the operation of two switches incorporated in the novel interface circuitry of the present invention, followed by operation of the facsimile start switch, provides an interface circuit which is extremely easy to use and which eliminates the need for more complicated and expensive microprocessor-based devices.

A latitude of modification, change and substitution is intended in the foregoing disclosure, and in some instances, some features of the invention will be employed without a corresponding use of other features. Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the spirit and scope of the invention herein described.

What is claimed is:

**1**. A method of creating a scanning capability from a facsimile machine to a computer, with scanned image digital data signals transmitted through a bi-directional connection via a passive link between the facsimile machine and the computer, comprising the steps of:

by-passing or isolating the facsimile machine and the computer from the public network telephone line;

coupling the facsimile machine to the computer;

conditioning the computer to receive digital facsimile signals representing data on a scanned document; and

conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the computer, said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the computer through the bi-directional direct connection via the passive link, thereafter, said computer processing the received digital facsimile signals of the scanned document as needed.

**2**. The method of claim **1** to create a scanning capability through a bi-directional direct connection via a passive link between a facsimile machine and a computer by transfer of scanned image data signals from the facsimile machine through said connection, said facsimile machine by-passing or isolated from the public network telephone line, and connected to an appropriate receiving port of a computer or other office product capable of receiving and processing said signals.

**3**. The method of claim **1**, including transferring a parallel data source signal of a scanned image from said facsimile machine to said computer.

**4**. The method of claim **1**, including transferring a digital serial data source signal of a scanned image from said facsimile machine to said computer.

**5**. The method of claim **1** further comprising optically recognizing the scanned data within the computer and converting the scanned data into character codes within the computer, said computer being equipped with Optical Character Recognition Software.

**6**. A method of creating a scanning capability from a facsimile machine to a computer equipped with a modem, with scanned image data signals transferred through a bi-directional direct connection via a passive link between the facsimile machine and the computer, comprising the steps of:

by-passing or isolating the facsimile machine and the computer from the public network telephone line;

coupling the facsimile to the computer;

conditioning the computer to receive facsimile signals representing data on a scanned document; and

conditioning the facsimile machine to transmit signals representing data on a scanned document to the computer, said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted facsimile signals being received through the bi-directional direct connection via the passive link to the computer modem, thereafter, said computer processing the received facsimile signals of the scanned document as needed.

**7**. A method of making a facsimile machine operable as a scanner and printer for a personal computer, by transferring digital data through a bi-directional direct connection via a passive link between the facsimile machine and the computer, each of the facsimile machine and personal computer for communicating normally using at least one public network telephone line, comprising the steps of:

configuring the facsimile machine to communicate with the personal computer using a digital connector port of the facsimile machine and personal computer, with both the facsimile machine and personal computer isolated from said at least one public network telephone line;

arranging the facsimile machine to be in a digital connection mode; and

shifting the personal computer to a connected mode for sending or receiving digital signals through the bi-directional direct connection via the passive link for scanning and printing between the computer and the facsimile machine, in a facsimile format, using the digital connector port of the personal computer, said computer being equipped with send/receive driver communications software enabling the transfer of the scanning and printing signals between the computer and the facsimile machine.

**8**. The method of claim **7** including using RS 232 connector ports to interface between the facsimile machine and the personal computer.

**9**. The method of claim **7** including using parallel connector ports to interface between the facsimile machine and the personal computer.

**10**. The method of claim **7**, using RS 232, parallel or other suitable digital port type connectors to interface between said facsimile machine and said computer.

**11**. The method of claim **7** further comprising optically recognizing the scanned data within the computer and converting the scanned data into character codes within the computer, said computer being equipped with Optical Character Recognition Software.

**12**. A method of using a facsimile machine as a scanner and printer by transferring data signals through a bi-directional direct connection via a passive link between the facsimile machine and the personal computer, each of the facsimile machine and personal computer for communicating using telephone types of circuits, said facsimile machine and computer being isolated from the public telephone network, comprising the steps of:

(a) configuring the facsimile machine to communicate with the personal computer using the facsimile machine, and by-passing or isolating the facsimile machine and computer from the public telephone network;

(b) arranging the facsimile machine to be in a simulated off-hook condition, or connection mode; and

(c) shifting the personal computer to an off-hook condition, or connection mode for sending or receiving signals in facsimile formats through the bi-directional direct connection via the passive link between the personal computer and the facsimile machine;

said computer being equipped with send/receive driver communications software enabling the transfer of the scanning and printing signals between the computer and the facsimile machine.

**13**. The method of claim **12** including using serial data transmissions for both scanning and printing through the bi-directional direct connection via the passive link between the facsimile machine and the personal computer.

**14**. The method of claim **12** including using parallel data transmissions for both scanning and printing through the bi-directional direct connection via the passive link between the facsimile machine and the personal computer.

**15**. The method of claim **12** including using analog data transmissions for both scanning and printing through the bi-directional direct connection via the passive link between the facsimile machine and the personal computer.

**16**. The method of claim **12** using analog or digital serial, parallel data transmissions, for both scanning and printing through the bi-directional direct connection via the passive link, between the facsimile machine and the personal computer.

**17**. The method of claim **12** further comprising optically recognizing the scanned data within the computer and converting the scanned data into character codes within the computer, said computer being equipped with Optical Character Recognition Software.

**18**. A method of using a facsimile machine with a computer, one or both of which being connected to a telephone line such that said facsimile machine operates as a scanning and printing device for the computer when isolated from the telephone line comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link;

(b) generating a signal to simulate an off-hook condition or connection mode providing a direct path whereby the facsimile machine is conditioned to transmit or receive signals through the bi-directional direction via the passive link to the computer;

(c) generating a facsimile machine signal whereby the computer is conditioned to receive signals representing data on a scanned document; and

(d) generating a computer signal whereby the facsimile machine is conditioned to receive signals representing data on a document to be printed;

said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine or the sending of computer data to the facsimile machine for printing.

**19**. A method of using a facsimile machine with a computer, one or both of which being connected to a telephone line such that said facsimile machine operates as a printing device for the computer when isolated from the telephone line, comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link, which enables transfer of digital image signals in both directions;

(b) generating a signal representative of a facsimile machine communications signals, whereby the computer is conditioned to transmit signals representing data on a document to be printed; and

(c) generating a signal to simulate an off-hook condition or connection mode providing a direct path whereby the facsimile machine is conditioned to receive signals through the bi-directional direct connection via the passive link representing data from the computer of a document to be printed.

**20**. A method of making a facsimile machine operable as a scanner and printer for a computer, each of the facsimile machine and computer for communicating normally using at least one public network telephone line, comprising the steps of:

(a) configuring the facsimile machine to communicate with the personal computer through a bi-directional direct connection via a passive link between a digital connector port on the facsimile machine and a digital connector port on the computer, with both the facsimile machine and computer by-passing or isolated from said at least one public network telephone line;

(b) arranging the facsimile machine to send or receive digital data signals; and

(c) coupling the digital data signals through the bi-directional direct connection via the passive link between the personal computer and the facsimile machine;

said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine or the sending of computer data to the facsimile machine for printing.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,894,811 B1
APPLICATION NO. : 08/669056
DATED : May 17, 2005
INVENTOR(S) : Bruce Nachman



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Drawings

Figure 2j was resubmitted by hand to the examiner at the Interview of 4/14/04, however, it was not incorporated into the issued patent. An additional copy is attached herewith as 4 of 4.

The Specification correction now requires:

Column 8, line 21, after "circuitry" insert --76 receives the digital image and it is--

Claim 1, Column 9, line 19, change "a bi-directional connection" to --a bi-directional --direct-- connection--

Claim 18, Column 11, line 43, change "direction" to --direct connection--

Signed and Sealed this

Tenth Day of June, 2008

Jon W. Dudas

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,894,811 B1
APPLICATION NO. : 08/669056
DATED : May 17, 2005
INVENTOR(S) : Bruce Nachman

Page 2 of 2

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Drawings insert as Page 12 of 12




Fig. 2j

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 6,894,811 C1
APPLICATION NO. : 90/009901
DATED : July 31, 2012
INVENTOR(S) : Bruce Nachman

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, lines 34-35, “unmodified standard protocol” should read --generic--

Column 1, lines 57-58, “unmodified standard protocol” should read --generic--

Column 3, lines 4-5, “unmodified standard protocol” should read --generic--

Column 3, line 27, “unmodified standard protocol” should read --generic--

Column 4, lines 22-23, “unmodified standard protocol” should read --generic--

Signed and Sealed this
Twelfth Day of March, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 6,894,811 C1
APPLICATION NO. : 90/009901
DATED : July 31, 2012
INVENTOR(S) : Bruce Nachman

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 1, lines 34-35, "unmodified standard protocol" should read
--generic--

Column 1, lines 57-58, "unmodified standard protocol" should read
--generic--

Column 3, lines 4-5, "unmodified standard protocol" should read
--generic--

Column 3, line 26, after "printed," should read
--wherein the computer is equipped with **generic** send/receive driver communications software **to send the digital image signals to the facsimile machine for printing**.--

Column 4, lines 22-23, "unmodified standard protocol" should read
--generic--

This certificate supersedes the Certificate of Correction issued March 12, 2013.

Signed and Sealed this
Twenty-second Day of July, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

US006894811C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9159th)

**United States Patent** (10) **Number: US 6,894,811 C1**

**Nachman et al.** (45) **Certificate Issued: Jul. 31, 2012**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Nachman**, deceased, late of Wayne, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products, Inc.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/009,901, Apr. 19, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,894,811** |
| Issued: | **May 17, 2005** |
| Appl. No.: | **08/669,056** |
| Filed: | **Jun. 24, 1996** |

Certificate of Correction issued Jun. 10, 2008.

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.** ........................ **358/442**; 358/468; 358/474; 379/100.01

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,901, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Colin LaRose

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **6**, **7**, **12** and **18**-**20** are determined to be patentable as amended.

Claims **2**-**5**, **8**-**11** and **13**-**17** dependent on an amended claim, are determined to be patentable.

**1**. A method of creating a scanning capability from a facsimile machine to a computer, with scanned image digital data signals transmitted through a bi-directional direct connection via a passive link between the facsimile machine and the computer, comprising the steps of:

by-passing or isolating the facsimile machine and the computer from the public network telephone line;

coupling the facsimile machine to the computer;

conditioning the computer to receive digital facsimile signals representing data on a scanned document; and

conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the computer, said computer being equipped with *unmodified standard protocol* send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the computer through the bi-directional direct connection via the passive link, thereafter, said computer processing the received digital facsimile signals of the scanned document as needed.

**6**. A method of creating a scanning capability from a facsimile machine to a computer equipped with a modem, with scanned image data signals transferred through a bi-directional direct connection via a passive link between the facsimile machine and the computer, comprising the steps of:

by-passing or isolating the facsimile machine and the computer from the public network telephone line;

coupling the facsimile to the computer;

conditioning the computer to receive facsimile signals representing data on a scanned document; and

conditioning the facsimile machine to transmit signals representing data on a scanned document to the computer, said computer being equipped with *unmodified standard protocol* send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted facsimile signals being received through the bi-directional direct connection via the passive link to the computer modem, thereafter, said computer processing the received facsimile signals of the scanned document as needed.

**7**. A method of making a facsimile machine operable as a scanner and printer for a personal computer, by transferring digital data through a bi-directional direct connection via a passive link between the facsimile machine and the computer, each of the facsimile machine and personal computer for communicating normally using at least one public network telephone line, comprising the steps of:

configuring the facsimile machine to communicate with the personal computer using a digital connector port of the facsimile machine and personal computer, with both the facsimile machine and personal computer isolated from said at least one public network telephone line;

arranging the facsimile machine to be in a digital connection mode; and

*using an unmodified standard protocol for* shifting the personal computer to a connected mode for sending or receiving digital signals through the bi-directional direct connection via the passive link for scanning and printing between the computer and the facsimile machine, in a facsimile format, using the digital connector port of the personal computer, said computer being equipped with send/receive driver communications software enabling the transfer of the scanning and printing signals between the computer and the facsimile machine.

**12**. A method of using a facsimile machine as a scanner and printer by transferring data signals through a bi-directional direct connection via a passive link between the facsimile machine and the personal computer, each of the facsimile machine and personal computer for communicating using telephone types of circuits, said facsimile machine and computer being isolated from the public telephone network, comprising the steps of:

(a) configuring the facsimile machine to communicate with the personal computer using the facsimile machine, and by-passing or isolating the facsimile machine and computer from the public telephone network;

(b) arranging the facsimile machine to be in a simulated off-hook condition, or connection mode; and

(c) *using an unmodified standard protocol for* shifting the personal computer to an off-hook condition, or connection mode for sending or receiving signals in facsimile formats through the bi-directional direct connection via the passive link between the personal computer and the facsimile machine;

said computer being equipped with send/receive driver communications software enabling the transfer of the scanning and printing signals between the computer and the facsimile machine.

**18**. A method of using a facsimile machine with a computer, one or both of which being connected to a telephone line such that said facsimile machine operates as a scanning and printing device for the computer when isolated from the telephone line comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link;

(b) generating a signal to simulate an off-hook condition or connection mode providing a direct path whereby the facsimile machine is conditioned to transmit or receive signals through the bi-directional direct connection via the passive link to the computer;

(c) generating a facsimile machine signal whereby the computer is conditioned to receive signals representing data on a scanned document; and

(d) generating a computer signal whereby the facsimile machine is conditioned to receive signals representing data on a document to be printed;

said computer being equipped with *unmodified standard protocol* send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine or the sending of computer data to the facsimile machine for printing.

**19**. A method of using a facsimile machine with a computer, one or both of which being connected to a telephone line such that said facsimile machine operates as a printing device for the computer when isolated from the telephone line, comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link, which enables transfer of digital image signals in both directions;

(b) generating a signal representative of a facsimile machine communications signals, whereby the computer is conditioned to transmit signals representing data on a document to be printed; and

(c) generating a signal to simulate an off-hook condition or connection mode providing a direct path whereby the facsimile machine is conditioned to receive signals through the bi-directional direct connection via the passive link representing data from the computer of a document to be printed*, wherein the computer is equipped with unmodified standard protocol send/receive driver communication software.*



**20**. A method of making a facsimile machine operable as a scanner and printer for a computer, each of the facsimile machine and computer for communicating normally using at least one public network telephone line, comprising the steps of:

(a) configuring the facsimile machine to communicate with the personal computer through a bi-directional direct connection via a passive link between a digital connector port on the facsimile machine and a digital connector port on the computer, with both the facsimile machine and computer by-passing or isolated from said at least one public network telephone line;

(b) arranging the facsimile machine to send or receive digital data signals; and

(c) coupling the digital data signals through the bi-directional direct connection via the passive link between the personal computer and the facsimile machine;

said computer being equipped with *unmodified standard protocol* send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine or the sending of computer data to the facsimile machine for printing.

* * * * *

US006894811C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10087th)

# United States Patent

**Nachman**

(10) **Number: US 6,894,811 C2**

(45) **Certificate Issued: Mar. 25, 2014**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Nachman**, Wayne, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products, Inc.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/012,816, Mar. 22, 2013

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,894,811** |
| Issued: | **May 17, 2005** |
| Appl. No.: | **08/669,056** |
| Filed: | **Jun. 24, 1996** |

Reexamination Certificate C1 6,894,811 issued Jul. 31, 2012

Certificate of Correction issued Jun. 10, 2008
Certificate of Correction issued Mar. 12, 2013

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 1/32*** | (2006.01) |
| ***H04N 1/04*** | (2006.01) |
| ***H04N 1/00*** | (2006.01) |

(52) **U.S. Cl.**
USPC ....... **358/442**; 358/468; 358/474; 379/100.01

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,816, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Mark Sager

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-20** is confirmed.

* * * * *

US006894811C3

(12) EX PARTE REEXAMINATION CERTIFICATE (10945th)

**United States Patent** (10) **Number: US 6,894,811 C3**

**Nachman** (45) **Certificate Issued: Sep. 20, 2016**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Nachman**, Wayne, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **INFINITY COMPUTER PRODUCTS, INC.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/013,208, Apr. 10, 2014

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,894,811** |
| Issued: | **May 17, 2005** |
| Appl. No.: | **08/669,056** |
| Filed: | **Jun. 24, 1996** |

Reexamination Certificate C1 6,894,811 issued Jul. 31, 2012

Reexamination Certificate C2 6,894,811 issued Mar. 25, 2014

Certificate of Correction issued Jun. 10, 2008

Certificate of Correction issued Jul. 22, 2014

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/00*** (2006.01)

(52) **U.S. Cl.**
CPC ...... ***H04N 1/00236*** (2013.01); ***H04N 1/00238*** (2013.01); ***H04N 1/00241*** (2013.01); *H04N 2201/0034* (2013.01); *H04N 2201/0062* (2013.01); *H04N 2201/0093* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,208, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Luke S Wassum

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-20** is confirmed.

* * * * *

US007489423B2

(12) **United States Patent**
**Nachman**

(10) **Patent No.: US 7,489,423 B2**
(45) **Date of Patent: Feb. 10, 2009**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(76) Inventor: **Bruce Gregory Nachman**, Wayne, PA (US); **Marvin Jules Nachman**, legal representative, 315 Saybrook Rd., Villanova, PA (US) 19085

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 642 days.

(21) Appl. No.: **11/084,297**

(22) Filed: **Mar. 19, 2005**

(65) **Prior Publication Data**

US 2005/0243380 A1 Nov. 3, 2005

**Related U.S. Application Data**

(60) Division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.** ....................... **358/442**; 358/468; 358/474; 358/296; 379/100.01

(58) **Field of Classification Search** ................ 358/442, 358/468, 443, 400, 401, 474, 434–437, 1.13, 358/1.15, 440, 1.6, 296; 379/100.15, 100.01, 379/100.02, 100.06, 100.05, 100.13, 93.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,558,811 A 1/1971 Montevecchio

(Continued)

FOREIGN PATENT DOCUMENTS

CN 1069155 A 2/1993

(Continued)

OTHER PUBLICATIONS

English Language Abstract of JP63187960; Aug. 3, 1988.

(Continued)

*Primary Examiner*—Cheukfan Lee

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.

**6 Claims, 12 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,607,289 | A | | 8/1986 | Kurokawa |
| 4,802,204 | A | | 1/1989 | Chang |
| 4,816,911 | A | | 3/1989 | Kirsch et al. |
| 4,868,672 | A | | 9/1989 | Hiroki et al. |
| 4,910,607 | A | | 3/1990 | Kita et al. |
| 4,964,154 | A | | 10/1990 | Shimotono |
| 4,989,163 | A | | 1/1991 | Kawamata et al. |
| 4,991,200 | A | | 2/1991 | Lin |
| 5,021,892 | A | | 6/1991 | Kita et al. |
| 5,175,750 | A | | 12/1992 | Donovan et al. |
| 5,216,517 | A | | 6/1993 | Kinoshita et al. |
| RE34,429 | E | | 11/1993 | Baran et al. |
| 5,297,146 | A | | 3/1994 | Ogawa |
| 5,390,031 | A | | 2/1995 | Kang et al. |
| 5,425,135 | A | | 6/1995 | Motoyama et al. |
| 5,452,106 | A | | 9/1995 | Perkins |
| 5,459,579 | A | | 10/1995 | Hu et al. |
| 5,528,385 | A | | 6/1996 | Manning |
| 5,530,554 | A | | 6/1996 | Maehara |
| 5,532,844 | A | | 7/1996 | Kagami et al. |
| 5,552,901 | A | | 9/1996 | Kikuchi et al. |
| 5,588,047 | A | | 12/1996 | Rosengren et al. |
| 5,590,339 | A | | 12/1996 | Chang |
| H1677 | H | | 9/1997 | Hu et al. |
| 5,680,227 | A | | 10/1997 | Picard |
| 5,684,607 | A | * | 11/1997 | Matsumoto ................ 358/442 |
| 5,847,843 | A | | 12/1998 | Shibata et al. |
| 5,872,901 | A | | 2/1999 | Konno et al. |
| 5,914,789 | A | | 6/1999 | Murata |
| 6,064,491 | A | | 5/2000 | Matsumoto |
| 6,307,639 | B1 | | 10/2001 | Eom et al. |
| 6,519,057 | B1 | | 2/2003 | Kurosawa et al. |
| 7,099,050 | B2 | | 8/2006 | Motoyama |
| 7,262,871 | B2 | | 8/2007 | Matsueda et al. |
| 2003/0200403 | A1 | | 10/2003 | Niwa et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 4239349 A1 | 9/1994 |
| DE | 4312136 A1 | 10/1994 |
| EP | 0655852 B1 | 5/1995 |
| JP | 63-187960 | 3/1988 |
| JP | 64-22166 | 1/1989 |
| JP | 1-168161 | 7/1989 |
| JP | 2-151459 | 6/1990 |
| JP | 3-38163 | 2/1991 |
| JP | 4-33061 | 2/1992 |
| JP | 5-14580 | 1/1993 |
| JP | 5-189104 | 7/1993 |
| JP | 6-54106 | 2/1994 |
| JP | 6-54107 | 2/1994 |
| JP | 6-70083 | 3/1994 |
| WO | WO 95/19089 | 7/1995 |

OTHER PUBLICATIONS

Abstract of "Turning Microcomputers into Fax Machines"; Lu, Cary; High Technology; vol. 7, Iss. 3; pp. 60-61; Mar. 1987.
"Okidata deploys i960 in multi-use peripheral—Doc-It peripheral device—Product Announcement"; Electronic News; Sep. 28, 1992.
"Company News; New Product from Okidata"; The New York Times; Sep. 29, 1992.
Abstract of "Rockwell International's low cost RFX96V12 MONOFAX fax modem chip"; Newsbytes News Network, Mar. 15, 1994.
"Information Delivery and Fax Technology"; Hawkins; Online, pp. 98-101; Jul. 1990.
"Personal Computer Image Communications Using Facsimile"; IEEE Journal on Selected Areas in Communications, vol. 7, No. 2, pp. 276-282; Feb. 1989.
Abstract of "Pursuing One Peripheral"; Blankenhorn, Dana; Barrington, vol. 34, Iss. 20, pp. 71-73; Oct. 15, 1988.
English Language Abstract of CN1069155; Feb. 17, 1993.
English Language Abstract of JP5014580; Jan. 22, 1993.
English Language Abstract of JP6070083; Mar. 11, 1994.
English Language Abstract of JP3038163; Feb. 19, 1991.
English Language Abstract of JP4033061; Feb. 4, 1992.
English Language Abstract of JP1168161; Jul. 3, 1989.
English Language Abstract of JP2151459; Jun. 11, 1990.
English Language Abstract of JP5189104; Jul. 30, 1993.
English Language Abstract of DE4312136; Oct. 20, 1994.
English Language Abstract of DE4239349; Sep. 22, 1994.

* cited by examiner


9 VOLT RING GENERATOR CIRCUIT
CURRENT GENERATOR CIRCUIT
JP5
POWER
+9 VOLTS
TONE RCVR
SWITCH DRIVER
TO SW2
TO SW1
FROM FAX
FROM PC
TO PC
TO FAX
TO TLL
RJ11
LM7555
4049
4045
4047
2N4403
PN2222
1N4006
TR1
SW4PDT
DPST


*Fig. 1*


NUMBER RCVD ?
N
Y
OPERATE 26
DEPRESS BUTTON (OPERATE 27)
SET TIMER
2 SEC ELAPSED ?
N
Y
RELEASE BUTTON (DEENERGIZE 27)
THIS GENERATES OFF-HOOK COND.
PRINTING/ SCANNING COMPLETE ?
N
Y
RETURN

*Fig. 1a*


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
41
40
RJ-11 Tel Cable
51
CO Tel 2
RJ-11 Tel Cable
Interfacing CKT 10
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 1
50
30
Standard Fax Machine

*Fig. 2a*


PC Type Computer
Internal Fax Modem / Present Invention Card
Fax Modem Circuitry
Interfacing CKT 10
41
40
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard Fax Machine

Fig. 2b


PC Type Computer
Internal Fax Modem
Fax Modem Circuitry
41
40
RJ-11 Tel Cable
51
CO Tel 2
RJ-11 Tel Cable
RJ-11 Tel Cable
30
Standard Fax Machine
Interfacing CKT 10
50
CO Tel 1

*Fig. 2c*


PC Type Computer
Interfacing CKT 10
On an Internal PC Card
Internal Fax Modem
To Wall Tel Line
41
40
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard Fax Machine

*Fig. 2d*


PC Type Computer
40
RS-232 Cable
41
External Fax Modem/
Present Invention Circuitry
Interfacing
CKT 10
Fax Modem
Circuitry
RJ-11
Tel Cable
51
CO Tel 2
RJ-11
Tel Cable
50
CO Tel 1
RJ-11
Tel Cable
30
Standard
Fax Machine

*Fig. 2e*



PC Type Computer
40
RS-232 Cable
Standard
Fax Machine
30
Fax Modem
Circuitry
41
Interface
Circuit 10
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 2
51
CO Tel 1
50


Fig. 2f



PC Type Computer with Generic Send/Receive Communication Software
40
CO Tel 2
51
CO Tel 1
50
RJ-11
Tel Cable
RJ-11
Tel Cable
RS-232 Cable
RS232 Connector
Standard Fax Machine
30
Fax Machines Optical Digital Scanning Device
75
Control Circuitry & Line Driver Internal to fax modem with Auto tone Detection functions
76
Printer Circuitry
77


Fig. 2g


PC Type Computer
40
RS-232 Cable
Standard Fax Machine
30
Interface Circuit 10
Fax Modem Circuitry
ISDN, ADSL, HDSL Interface
60
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 2
51
CO Tel 1
50

Fig. 2h


PC Type Computer
Internal or External
Fax Modem
Fax Modem
Circuitry
40
RS232 when PC
does not contain
fax modem
RJ-11
Tele Cable
51
CO Tel 2
RJ-11
Tel Cable
Interface
Circuit 10
70
Storage Device
such as RAM or
Fixed Disk
Fax modem
circuitry
RJ-11
Tel Cable
CO Tel 1
50
RJ-11
Tele Cable
30
Standard
Fax Machine

Fig. 2i


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
RJ-11
Tele Cable
Interface Circuit 10
Automatic tone detection & Switching Control
RJ-11
Tele Cable
Standard Fax Machine
RJ-11
Tel Cable
CO Tel 1
RJ-11
Tel Cable
CO Tel 2

Fig. 2j

## INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER

This application is a divisional of the continuation-in-part application Ser. No. 08/669,056, filed Jun. 24, 1996 now U.S. Pat. No. 6,894,811, which is a continuation-in-part of application Ser. No. 08/226,278, filed Apr. 11, 1994, which issued as U.S. Pat. No. 5,530,558. These applications are incorporated herein by reference.

The following represents a true and accurate copy of continuation-in-part application Ser. No. 08/669,056, except for the addition of the new claims.

The claims herein incorporate matter subject to a restriction requirement in the CIP application Ser. No. 08/669,056.

### FIELD OF THE INVENTION

The present invention relates to interfacing a facsimile with a PC and more particularly to an interface circuit of highly simplified design and including a novel ringing circuit capable of generating a sign wave of a given amplitude and frequency from a small, portable DC battery or 9V DC power supply.

### BACKGROUND OF THE INVENTION

As is well known in the art, a conventional facsimile scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile.

Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.

It has been recognized that conventional facsimile machines may be utilized as scanners: or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

### OBJECT OF THE INVENTION

It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

### BRIEF DESCRIPTION OF THE INVENTION

The present invention achieves all of the above as well as other objectives through apparatus which is characterized by comprising first switch means capable of selectively coupling a PC modem and a facsimile modem to independent telephone lines when in a non-scanning/printing mode and for decoupling the PC and facsimile modems from the telephone lines and coupling these modems to one another when placed in a scanning/printing mode.

Second manually operable switch means activates a novel ringing circuit which generates a sine wave of appropriate



amplitude and frequency and applies this ringing circuit to the PC modem, when used as a scanner or to the facsimile when being used as a printer, causing the PC or facsimile machine to respond to the simulated transmit request.

Release of the circuitry operating button causes the interface circuitry to apply an off-hook condition to the facsimile. Document scanning or printing is initiated by pressing the facsimile start button or the start button provided as part of the PC or by a program step integrated into the PC as part of a print mode (selecting the facsimile as the output device for printing). Transmitted data may be directly stored in a PC memory. Documents incorporating alphanumeric data may be converted by a software program incorporated into the PC.

The ring generating circuit responsive to pressing of the operating button generates a transmit request signal by converting the low voltage from a DC source into a 20 cycle sine wave of 90 volt amplitude through the employment of a pulse generating circuit coupled to phase delay means and applying phase delayed and undelayed pulses to a transistorized switching circuit for selectively applying positive DC voltage to opposing inputs of a step-up transformer which applies a boosted sinusoidal ring signal to the PC modem, the ring generating circuit generating a ringing signal of the appropriate amplitude and frequency in a highly simplified and inexpensive manner. Since operation of the ringing circuit is completed in less than two seconds, a battery, if used, will have an extremely long operating life. Alternatively, if a 9V DC power source is used the battery is not required at all.

The simple, straightforward operation of only three switches eliminates the need for complicated, expensive and typically microprocessor-based circuitry.

### BRIEF DESCRIPTION OF THE FIGURES

The above, as well as other objects of the present invention, will become apparent upon reading the accompanying description and drawings in which:

FIG. **1** is a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile as a sophisticated scanner or printer.

FIG. **1***a* is a flow diagram of the circuitry of FIG. **1** employing the microprocessor-based tone detecting circuit of FIG. **1**.

FIGS. **2***a*- **2***j* show simplified block diagrams of various system arrangements employing the circuitry of the present invention.

### DETAILED DESCRIPTION OF THE INVENTION AND PREFERRED EMBODIMENTS THEREOF

FIG. **1** shows an interface circuit **10** embodying the principles of the present invention and being comprised of a switch assembly SW**2** which is a four-pole double-throw switch having four movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8**, and SW**2**-**11**, each cooperating with a pair of stationary contacts, as shown. For example, and for simplicity, note that switch arms SW**2**-**2** is switchable between stationary contacts SW**2**-**1** and SW**2**-**3**.

Movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8** and SW**2**-**11** are all ganged to operate in unison as shown by common operating button B**2** coupled to the switch arms through a linkage arm LA**2** shown in schematic fashion as a dotted line. The switch is designed so that the switch arms are retained in the positions to which they are moved.

The switch arms are arranged in pairs, switch arms SW**2**-**2** and SW**2**-**5** selectively coupling a modem of a PC (not shown for purposes of simplicity) to either a first telephone line #**1**

through jumper JP**3** or directly to a local facsimile machine (not shown for purposes of simplicity) through a jumper terminal JP**2**.

In a similar fashion, a pair of switch arms SW**2-8** and SW**2-11** selectively couple the local facsimile machine through jumper JP**2** to either a separate telephone line #**2** (through jumper JP**4**) or to the modem of the PC.

A double-pole single-throw switch SW**3** is provided to couple either the local facsimile machine or the PC modem to a single telephone line or alternatively, disconnects the PC modem and facsimile machine from the common telephone line. For example, in applications where both the local facsimile and the PC each have an independent, dedicated telephone line, switch SW**3** remains open. In applications where only a single telephone line is provided, both PC and the local facsimile may share the single telephone line by gaining access thereto in a staggered manner.

Switch SW**1** which is a three-pole, double-throw switch, comprises three movable switch arms SW**1-1**, SW**1-4** and SW**1-7**, each movable switch arm cooperating with a pair of stationary switch arms.

Movable switch arm SW**1-1** selectively couples the output terminal of the pair of secondary windings W**2** of a step-up transformer TR**1** either to stationary terminal SW**1-2**, which isolates the output of the transformer TR**1** from the operating circuitry, or stationary contact SW**1-3** which couples the secondary winding W**2** of transformer TR**1** through movable switch arm SW**1-7** and stationary contact SW**1-9** simultaneously to stationary contacts SW**2-6** and SW**2-12** of four-pole double-throw switch SW**2** for simultaneous connection to the PC modem and the local facsimile, when switch arms SW**2-5** and SW**2-11** respectively engage stationary contacts SW**2-6** and SW**2-12**.

Movable switch arm SW**1-4** selectively couples a small nine volt (9V) DC source (through jumper J**5**) to either stationary switch arm SW**1-5** for coupling nine volt (9V) DC to a current generator circuit **12** or alternatively coupling nine volt (9V) DC to stationary terminal SW**1-6** which in turn provides DC power to the nine volt (9V) ring generator circuit arranged within the dotted region as shown.

Current generator circuit **12** is comprised of resistors R**1**, R**2** and R**5**, transistors Q**1** and Q**6**, diode D**2** and LED-type diode D**3** which are connected in the manner shown to provide a constant current which simulates an off-hook signal, utilized in the manner to be more fully described hereinbelow. Resistor R**2** serves as a current limiting resistor. LED D**3** lights to denote operation of the constant current generator.

Ring generator circuit **14**, which is utilized to generate a 20 Hz sine wave of a 90 volt amplitude, comprises a 555-type timing circuit **16** which, when activated by a nine volt DC input, applied to timer **16** through terminal VCC and resistor R**13**, provides a pulse train of equal width, positive-going pulses at a pulse rate of approximately 20 Hz at its output **16***a*.

The pulse train generated by the 555 timer **16** is simultaneously applied to the input of inverter U**1**A whose output is simultaneously coupled to the base electrodes of transistors Q**2** and Q**4**, through resistor R**6** and through inverter U**1**B and resistor R**9**.

The pulse train, as was set forth hereinabove, is simultaneously coupled to the –T input of a one-shot multivibrator operating as a phase delay circuit and whose Q output is coupled to the input of inverter U**1**E. The Q output of one-shot multivibrator U**2**A provides a phase delayed pulse which is coupled through the output of inverter U**1**E simultaneously to the base of transistor Q**5** through resistor R**8** and to the base of transistor Q**3** through inverter U**1**F and resistor R**7**. Transistors Q**2**-Q**5** and resistors R**6**-R**9**, together with resistor RIO, form a full bridge switching circuit which is powered by the nine volt (9V) DC source applied to the terminal VCC to provide drive current sufficient to drive transformer TR**1**, comprised of a pair of primary windings W**1** and a pair of secondary windings W**2**, to generate a sine wave output. The pair of primary windings W**1** and secondary windings W**2** are coupled in parallel and the windings are arranged to provide a step-up transformer to magnify the input voltage preferably by ten to one (10:1), generating the desired output voltage which, in the present application, is a 20 Hz output of 90 volt amplitude with 15 mils of current from a nine volt (9V) DC, 150 mils current source. If desired, the frequency, amplitude and current of the circuit can be changed by selecting different component values for the passive elements. The component values chosen in the present invention have been selected to generate a signal which reproduces a standard bell ring signal employed in a conventional transmission between remote facsimile machines. The branch circuits BC**1** and BC**2** of the bridge circuit are alternately rendered conductive to alternately apply a positive voltage to opposing inputs of the input windings W**1** for generating a sine wave from the positive-going pulses produced by timer circuit **16**. The two input windings W**1** are coupled in parallel as are the output windings W**2**.



The bell ring signal is selectively supplied through movable switch arm SW**1-1** of the three-pole, double-throw switch SW**1** described hereinabove.

The operation of the interface circuit of the present invention is as follows:

Assuming that the local facsimile is desired to be operated in combination with the PC and to function as a scanner, the switch SW**2** is moved from the normal position, in which the movable switch arms are shown in solid line fashion, to the dotted line position simultaneously disconnecting the PC modem and the local facsimile from the telephone lines and directly connecting the PC receive line, PCR**1** to ground and the PC transmit line PCT**1** directly to stationary contact SW**1-9**. The local facsimile transmit line. FXT**2** is directly connected to ground and the facsimile receive line FXR**2** is connected in common with line PCT**1** to stationary contact SW**1-9** of switch SW**1**. Switch SW**3** may be either in the open or the closed position when switch SW**2** is moved to the scan mode.

Switch SW**1** is operated by pressing button BI which is ganged to the movable switch arms SW**1-1**, SW**1-4**.and SW**1-7** by a common linkage arm represented schematically by dotted line LA**1**. A biasing member or spring SWP**1** normally biases the movable switch arms to the solid line position shown in Figure. By depressing switch button B**1**, the switch arms SW**1-1**, SW**1-4** and SW**1-7** are simultaneously moved to the dotted line positions shown in FIG. **1**. Button B**1** is maintained in the depressed-position for a period preferably between one and two seconds. In the dotted Line position, the nine volt (9V) DC source is coupled through switch arm SW**1-4** and stationary terminal SW**1-6** to the VCC terminals of ring generator circuit **14**, producing a 20 Hz sine wave of 90 volt amplitude and a current of 15 mils at the secondary windings W**2**, which is applied to the PC line PCT**1** through SW-**1**, SW**1-3**, SW**1-7**, SW**1-9**, **126**, SW**2-6** and SW**2-5**, simulating what the PC believes is a request by a "remote" facsimile to transmit data thereto. The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT) is provided with either an internal or external group III facsimile interface board, and shifts to a receive mode for receiving what appears to the PC to be a facsimile transmission from a "remote" facsimile machine.

After holding the button B**1** depressed for a time which need not exceed approximately two seconds, button B**1** is released causing the nine volt (9V) DC source to be coupled to input **12***a* of current generator circuit **12**, which circuit applies the constant current to the facsimile receive line FXR**2** to create what appears to the facsimile machine to be an off-hook condition. Simultaneously therewith, LED D**3** lights indicating that the current generator circuit is presently in operation.

The local facsimile machine recognizes the constant current as representative of an off-hook condition preparing the local facsimile machine for transmission.

Thereafter, the conventional start button of the facsimile machine (not shown for purposes of simplicity) is pressed to start communication of the data scanned by the local facsimile machine from a document (or documents) placed within the facsimile machine document input (also not shown for purposes of simplicity).

The facsimile machine may be either a group I, group II, or group III machine, although optimum document resolution can be obtained through the use of a group III facsimile machine.

The conventional PC can store the transmitted data in its memory as a "picture" the resolution of the picture being 200 by 100 pixels for old facsimile machines, 200 by 200 pixels for standard facsimile machines and 400 by 400 pixels for new facsimile machines. Alternatively, a conventional OCR software package such as, for example, a CAERE OCR program available from Bitsoftware may be employed. Many alternative OCR software packages may be utilized to convert the "picture" transmitted by the facsimile machine to binary character form for word processing use or the like.

Operation of the facsimile machine in combination with the PC wherein the facsimile machine operates as a printer is as follows:

The ring generating circuit is not required to be operated in this mode and in applications where a facsimile machine is interfaced with a PC for use only as a printer, the ring generating circuit and the cooperating spring bias switch may be eliminated.

Switch SW**2** shown in FIG. **1** is moved from the solid line to the dotted line position decoupling the PC and facsimile machine from the telephone lines and coupling the PC and facsimile machine together.

Switch SW**1** is operated to power the current generator circuit **12** causing both the PC and the facsimile machine to see an off-hook condition.

The computer (PC) is operated either by providing a switch such as a push button switch (not shown for purposes of simplicity) to enter into a standard protocol with the facsimile machine and thereafter to transmit information in standard facsimile machine format. The facsimile machine senses that it is communicating with. a remote facsimile machine and creates a document in accordance with the data received from the PC in "pixel" form. The PC may be provided with a standard program having a print mode in which the facsimile machine is identified in the printing routine as the specific output device being utilized during such a print mode. Upon completion of printing mode, switch SW**2** may be returned to the solid line position decoupling the PC from the facsimile machine and recoupling the PC and facsimile modems to their associated telephone lines.

FIGS. **2***a*-**2***h* show various arrangements in which the present invention may be utilized.

Noting, for example, FIG. **2***a*, the circuitry **10** of the present invention is coupled between a standard facsimile machine **30**, a PC-type computer **40** having a facsimile modem circuitry **41** and central office telephone lines **50** and **51**. In the arrangement shown in FIG. **2***a*, the facsimile modem circuitry may be either internal or external to the PC-type computer **40**.



FIG. **2***b* shows another alternative embodiment in which the circuitry of the present invention is incorporated into the PC-type computer and may be arranged on its own printed wiring board or on a printed wiring board which is common to the circuitry **10** of the present invention and the facsimile modem circuitry **41**. The arrangement of FIG. **2***b* is otherwise the same as that shown in FIG. **2***a*. The circuit **10** shown in FIG. **2***b* is provided with three RJ-**11** telephone cable connections for respective connection with the facsimile machine **30** and telephone lines **50** and **51**. If only one additional telephone cable is provided, the standard facsimile machine **40** and the internal facsimile modem **41** may share that cable.

FIG. **2***c* shows another alternative arrangement in which the circuitry **10** of the present invention is integrated into the standard facsimile machine **30**. The operation of the arrangement of FIG. **2***c* is otherwise similar to those shown in FIGS. **2***a* and **2***b*.

FIG. **2***d* shows an arrangement in which the circuitry **10** of the present invention is mounted upon its own printed wiring board and is arranged within the PC-type computer **40** and is electrically connected to the internal facsimile modem **41** by an external RJ-**11** cable as shown. The operation is otherwise the same as the embodiments of FIGS. **2***a*-**2***c* described hereinabove.

The circuitry **10** of the present invention may alternatively be placed upon a printed circuit card of approximately a credit card size for insertion in a bus slot provided in present-day PCs enabling the circuit on the printed circuit card, inserted into a slot provided along the exterior of the PC, to be coupled to a PCMCIA bus which is an additional bus that may be addressed by the PC.

FIG. **2***e* shows still another arrangement in which the PC-type computer **40** is coupled to external facsimile modem circuitry **41**, for example, through an RS-**232** cable. The facsimile machine interfaces to the external facsimile modem **41** through circuitry **10** by way of an RJ-**11** telephone cable. When in the normal mode of operation, circuitry **10** interfaces central office telephone lines **50** and **51** through the RJ-**11** telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50** may be shared in the manner previously described.

FIG. **2***f* shows an arrangement in which interface circuit **10** is internal to the facsimile machine. PC-type computer **40** is coupled to the facsimile modem circuitry **41** and interface circuit **10** through an RS-**232** cable. When in the normal mode of operation, circuitry **10** interfaces the central office telephone lines **50** and **51** through RJ-**11** telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50**, for example, may be shared in the manner previously described. The arrangement of FIG. **2***f* is used with PC's which do not have a fax modem installed. When interface **10** is installed internal to the facsimile, the fax modem of the fax machine incorporates many of the functions of circuit **10**, through integration of the already existing circuitry components of the fax modem.

The present invention may be employed with telephone systems having digital signal processing. FIG. **2***h*, which is similar to FIG. **2***f*, and which shows like circuits designated with like numerals, further includes an interface **60** for digital

signal processing. The send and receive options required for scanning and printing are provided by interface **60**, which may, for example, be a chip set such as PEB 2091 N-V4.4 and EPB 2186 N-V4.4, manufactured by Siemens. Any other chip set having similar operating characteristics may be employed. As other digital signal formats come into use, such as ADSL (Asymmetric Digital Subscriber Line) HDSL (High Bit Rate Digital Subscriber Line), or the like, a chip set for handling such formats may be substituted for interface **60**.

As shown in FIG. **2***i*, a RAM and/or Fixed Disk **70** may be incorporated into the interface **10**, integrated with a fax modem **30** to allow for the capture of images or documents for later transfer into the PC **40** or the facsimile machine **30**, or for image enhancement within the interface configuration **10**. The addition of the data storage feature is particularly desirable for the fax machine or fax modem when they are in normal fax send or receive modes.

Optionally, the data storage feature is desirable for field application usage where information may be downloaded from a PC and stored in interface **10** for later transfer to a facsimile machine or a PC. Storage would be retained in this instance by battery backup incorporated in the RAM memory **70**. Battery backup is not necessary for fixed disk storage.

FIG. **2***j* shows an arrangement for automated scanning and printing functions between a fax modem and a fax machine.

As represented in FIGS. **2***a*-**2***f*, in order to activate an automated process for scanning or printing, the ring circuit **4** (FIG. **1**) interfaces with the Tip and Ring features of the fax modem or fax machine. This is dependent on keying in a code on the fax keypad, such as ## or #* or any other predetermined code in order to respectively identify the scanning and printing functions. Interface **10** detects the tones generated by the inserted code (at the tone receiver **25** and generates a ring signal. The ring signal is detected and interpreted by the ring detect circuit-of the fax modem or the fax machine. The fax modem or fax machine then generates receive signals or tones which indicate a connection. The fax modem or fax machine commences the scanning of the fax image or print cycle.

By depressing a predetermined code such as ## on the fax machine key pad, the tone detector circuit **25** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the PC fax modem. The PC fax modem answers and starts the scanning process from the fax machine to the PC.

A communication program stored in the PC allows the code #* (for example) to be entered, generating the tone signal from the fax modem. The tone detector circuit in the interface **10** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the fax machine. The fax machine answers and starts the printing process from the PC fax modem.

The switch version does not require the ## or #* or any other code, but activates the automated scanning/printing by pressing the ringer button B**2**.

The provision of the scan and print functions internal to the facsimile machine may also be accomplished by utilizing the analog output of the optical scanning circuit **75** of the facsimile machine (FIG. **2***g*). The analog signals are processed by the control/modem circuitry **76** where they are converted into a digital serial signal and then transmitted through the RS **232** sending interconnect port, the signal is then received by an RS**232** connector at the PC. The aforementioned procedure utilizes unused signal lines which are available on most modem chips such as the Rockwell chip series.

A send and receive driver software Package then implements the following action. The receive driver software accepts the digital image for storage or processing as appropriate. This send/receive driver communications software package also has the ability to send a digital image to the facsimile machine for printing purposes. The facsimile machine's control/modem circuitry **76** receives the digital image data and it's then-processed by the print driver **77** for printing. This linkage method for scanning and printing utilizing a fax machine is particularly useful for a computer without a fax modem. Any available send/receive communications software package is acceptable.

The commands of ## or #* for sending and receiving are still appropriate for this application although any other desired commands may be selected.

For the automated operation, the circuitry **10** of FIG. **1** is provided with device **25** which includes an automatic tone detector circuit for receiving a unique number dialed by either the facsimile machine or the PC modem. Upon recognition of the unique number, as set forth above or by generation using other techniques, the tone receiver **25** operates a driver circuit **26** for operating switch SW**2** to decouple the PC and the facsimile machine from their associated telephone lines and for connecting the PC to the facsimile machine. Driver circuit **26** may be a relay or its equivalent for operating an armature (not shown) to move the switch arms between their two operating states. Driver unit **27** which likewise may be a relay or its equivalent, operates the switch SW**1** to the position energizing the ringing circuit **14**. A timer is set and when two seconds elapses, unit **27** is deenergized causing the off-hook signal to be generated by current generator circuit **12** through the release of the operating button. When printing or scanning is complete, the tone receiver unit is reset. A simplified flow diagram of the aforementioned operation is shown in FIG. **1***a*.

The circuitry of the present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of operating independently for transmission or reception to remote facsimile machines as well as functioning as a scanner or printer with a local PC. The circuitry of the present invention provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line. The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer as and when needed and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers.

Simple switching of SW**2** returns the PC and facsimile machine to normal use.

The novel ring circuit provides the required ring signal which is conventional in present-day facsimile transmission application through the employment of an inexpensive, low voltage, DC battery or 9V power source and, through the operation of two switches incorporated in the novel interface circuitry of the present invention, followed by operation of the facsimile start switch, provides an interface circuit which is extremely easy to use and which eliminates the need for more complicated and expensive microprocessor-based devices.

A latitude of modification, change and substitution is intended in the foregoing disclosure, and in some instances, some features of the invention will be employed without a corresponding use of other features. Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the spirit and scope of the invention herein described.

What is claimed is:

**1**. A method of transferring digital image data signals between a computer equipped with send/receive driver communications software and a facsimile machine to cause said facsimile machine to operate as a printing device, comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link;

(b) conditioning the facsimile machine to receive print image data from the computer;

(c) conditioning the computer for initiating transmission of print image digital data to said facsimile machine of a document to be printed by said facsimile machine;

(d) upon activating the send driver communications software of the computer the print image digital data from the computer is transferred without interruption through a receiving port of the facsimile machine, whereby the print image digital signals of the computer are processed by the facsimile machine into signals for printing.

**2**. A method of connecting the scan or print apparatus of a facsimile machine configuration to a computer, in order to support image data transmissions for scanning or printing between the facsimile machine and the computer, comprising the steps of:

coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link between the facsimile machine and the computer; conditioning a scan or print mode for the facsimile machine and the computer, as needed;

conditioning the transmission of image data signals between the facsimile machine and the computer for the selected scan or print mode;

said computer being equipped with send/receive driver communications software enabling the sending of image data to the facsimile machine for printing or receiving of the scanned facsimile machine image data by the computer for use as needed.

**3**. The method of claim **2**, including transferring serial or parallel digital signals of scan or print data images between said facsimile machine and said computer as needed.

**4**. The method of claim **2**, including transferring a digital data source signal of a scan or print data image between said facsimile machine and said computer as needed.

**5**. The method of claim **2** further comprising optically recognizing the scanned data within the computer and converting the scanned data into character codes within the computer, said computer being equipped with Optical Character Recognition Software.

**6**. A method of using a facsimile machine operably linked to a computer to print transmitted digital image data received from a computer by the facsimile machine, or scan digital image data transmitted from the facsimile machine to the computer through a bi-directional direct connection via a passive link, the method comprising:

(a) providing the bi-directional direct connection via a passive link for transfer of digital image data representative of images between the computer and the facsimile machine;

(b) activating a print or scan mode on the computer and facsimile machine, said computer or facsimile machine being equipped with send and receive driver communications software enabling the transfer of the digital image data between the computer and the facsimile machine; and

(c) transmitting the digital image data from the computer to the facsimile machine for printing, or transmitting scanned digital image data from the facsimile machine to the computer, over the bi-directional direct connection via the passive link in accordance with an instruction.

* * * * *

US007489423C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8994th)

**United States Patent** (10) **Number: US 7,489,423 C1**

**Nachman et al.** (45) **Certificate Issued: May 1, 2012**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Gregory Nachman**, Wayne, PA (US); **Marvin Jules Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products, Inc.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/009,902, Apr. 19, 2011

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,489,423** |
| Issued: | **Feb. 10, 2009** |
| Appl. No.: | **11/084,297** |
| Filed: | **Mar. 19, 2005** |

**Related U.S. Application Data**

(60) Division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.** ........................ **358/442**; 358/468; 358/474; 358/296; 379/100.01

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,902, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Colin Larose

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **2**, **6** are determined to be patentable as amended.

Claims **3-5** dependent on an amended claim, are determined to be patentable.

**1**. A method of transferring digital image data signals between a computer equipped with *generic* send/receive driver communications software and a facsimile machine to cause said facsimile machine to operate as a printing device, comprising the steps of:

(a) coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link;

(b) conditioning the facsimile machine to receive print image data from the computer;

(c) conditioning the computer for initiating transmission of print image digital data to said facsimile machine of a document to be printed by said facsimile machine;

(d) upon activating the *generic* send driver communications software of the computer the print image digital data from the computer is transferred without interruption through a receiving port of the facsimile machine, whereby the print image digital signals of the computer are processed by the facsimile machine into signals for printing.



**2**. A method of connecting the scan or print apparatus of a facsimile machine configuration to a computer, in order to support image data transmissions for scanning or printing between the facsimile machine and the computer, comprising the steps of:

coupling the facsimile machine to the computer through a bi-directional direct connection via a passive link between the facsimile machine and the computer; conditioning a scan or print mode for the facsimile and the computer, as needed;

conditioning the transmission of image data signals between the facsimile machine and the computer for the selected scan or print mode;

said computer being equipped with *generic* send/receive driver communications software enabling the sending of image data to the facsimile machine for printing or receiving of the scanned facsimile machine image data by the computer for use as needed.

**6**. A method of using a facsimile machine operably linked to a computer to print transmitted digital image data received from a computer by the facsimile machine, or scan digital image data transmitted from the facsimile machine to the computer through a bi-directional direct connection via a passive link, the method comprising:

(a) providing the bi-directional direct connection via a passive link for transfer of digital image data representative of images between the computer and the facsimile machine;

(b) activating a print or scan mode on the computer and facsimile machine, said computer or facsimile machine being equipped with *generic* send and receive driver communications software enabling the transfer of the digital image data between the computer and the facsimile machine; and

(c) transmitting the digital image data from the computer to the facsimile machine for printing, or transmitting scanned digital image data from the facsimile machine to the computer, over the bi-directional direct connection via the passive link in accordance with an instruction.

* * * * *

US007489423C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10110th)

**United States Patent** (10) **Number: US 7,489,423 C2**

**Nachman** (45) **Certificate Issued: Apr. 9, 2014**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Gregory Nachman**, Wayne, PA (US); **Marvin Jules Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products, Inc.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/012,815, Mar. 22, 2013

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,489,423** |
| Issued: | **Feb. 10, 2009** |
| Appl. No.: | **11/084,297** |
| Filed: | **Mar. 19, 2005** |

Reexamination Certificate C1 7,489,423 issued May 1, 2012

**Related U.S. Application Data**

(60) Division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.**
USPC .......... **358/442**; 358/296; 358/468; 358/474; 379/100.01

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,815, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Mark Sager

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-6** is confirmed.

* * * * *

US007489423C3

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10944th)

# United States Patent

**Nachman**

(10) **Number: US 7,489,423 C3**

(45) **Certificate Issued: Sep. 19, 2016**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Gregory Nachman**, Wayne, PA (US); **Marvin Jules Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **INFINITY COMPUTER PRODUCTS, INC.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/013,207, Apr. 10, 2014

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,489,423** |
| Issued: | **Feb. 10, 2009** |
| Appl. No.: | **11/084,297** |
| Filed: | **Mar. 19, 2005** |

Reexamination Certificate C1 7,489,423 issued May 1, 2012

Reexamination Certificate C2 7,489,423 issued Apr. 9, 2014

**Related U.S. Application Data**

(60) Division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 1/32*** | (2006.01) |
| ***H04N 1/04*** | (2006.01) |
| ***H04N 1/00*** | (2006.01) |

(52) **U.S. Cl.**
CPC ...... ***H04N 1/00236*** (2013.01); ***H04N 1/00238*** (2013.01); ***H04N 1/00241*** (2013.01); *H04N 2201/0034* (2013.01); *H04N 2201/0062* (2013.01); *H04N 2201/0093* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,207, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Luke S Wassum

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan/print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-6** is confirmed.

* * * * *

US008040574B2

(12) **United States Patent**
**Nachman**

(10) **Patent No.: US 8,040,574 B2**
(45) **Date of Patent: *Oct. 18, 2011**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE TO A PC AS A SCANNER OR PRINTER**

(75) Inventor: **Bruce Gregory Nachman**, Villanova, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products Inc.**, Villanova, PA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 287 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/322,908**

(22) Filed: **Feb. 9, 2009**

(65) **Prior Publication Data**

US 2009/0237742 A1 Sep. 24, 2009

**Related U.S. Application Data**

(60) Continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.** ........ **358/442**; 358/468; 358/474; 358/296; 379/100.01

(58) **Field of Classification Search** .................. 358/442, 358/468, 474, 296, 440, 1.15, 1.6, 434–437, 358/1.13; 379/100.01, 100.02, 100.06, 100.05, 379/100.13, 93.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,558,811 A 1/1971 Montevecchio
(Continued)

FOREIGN PATENT DOCUMENTS

CN 1069155 A 2/1993
(Continued)

OTHER PUBLICATIONS

English Language Abstract of CN1069155; Feb. 17, 1993.
English Language Abstract of JP5014580; Jan. 22, 1993.
English Language Abstract of JP6070083; Mar. 11, 1994.
English Language Abstract of JP3038163; Feb. 19, 1991.
English Language Abstract of JP4033061; Feb. 4, 1992.
(Continued)

*Primary Examiner* — Cheukfan Lee

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.

**8 Claims, 11 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,607,289 | A | 8/1986 | Kurokawa |
| 4,802,204 | A | 1/1989 | Chang |
| 4,816,911 | A | 3/1989 | Kirsch et al. |
| 4,868,672 | A | 9/1989 | Hiroki et al. |
| 4,910,607 | A | 3/1990 | Kita et al. |
| 4,964,154 | A | 10/1990 | Shimotono |
| 4,989,163 | A | 1/1991 | Kawamata et al. |
| 4,991,200 | A | 2/1991 | Lin |
| 5,021,892 | A | 6/1991 | Kita et al. |
| 5,175,750 | A | 12/1992 | Donovan et al. |
| 5,216,517 | A | 6/1993 | Kinoshita et al. |
| RE34,429 | E | 11/1993 | Baran et al. |
| 5,297,146 | A | 3/1994 | Ogawa |
| 5,390,031 | A | 2/1995 | Kang et al. |
| 5,425,135 | A | 6/1995 | Motoyama et al. |
| 5,452,106 | A | 9/1995 | Perkins |
| 5,459,579 | A | 10/1995 | Hu et al. |
| 5,528,385 | A | 6/1996 | Manning |
| 5,530,554 | A | 6/1996 | Maehara |
| 5,532,844 | A | 7/1996 | Kagami et al. |
| 5,552,901 | A | 9/1996 | Kikuchi et al. |
| 5,588,047 | A | 12/1996 | Rosengren et al. |
| 5,590,339 | A | 12/1996 | Chang |
| H1677 | H | 9/1997 | Hu et al. |
| 5,680,227 | A | 10/1997 | Picard |
| 5,684,607 | A | 11/1997 | Matsumoto |
| 5,847,843 | A | 12/1998 | Shibata et al. |
| 5,872,901 | A | 2/1999 | Konno et al. |
| 5,914,789 | A | 6/1999 | Murata |
| 6,064,491 | A | 5/2000 | Matsumoto |
| 6,307,639 | B1 | 10/2001 | Eom et al. |
| 6,519,057 | B1 | 2/2003 | Kurosawa et al. |
| 7,099,050 | B2 | 8/2006 | Motoyama |
| 7,262,871 | B2 | 8/2007 | Matsueda et al. |
| 2003/0200403 | A1 | 10/2003 | Niwa et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 4239349 A1 | 9/1994 |
| DE | 4312136 A1 | 10/1994 |
| EP | 0655852 B1 | 5/1995 |
| JP | 63-187960 | 3/1988 |
| JP | 64-22166 | 1/1989 |
| JP | 1-168161 | 7/1989 |
| JP | 2-151459 | 6/1990 |
| JP | 3-38163 | 2/1991 |
| JP | 4-33061 | 2/1992 |
| JP | 5-14580 | 1/1993 |
| JP | 5-189104 | 7/1993 |
| JP | 6-54106 | 2/1994 |
| JP | 6-54107 | 2/1994 |
| JP | 6-70083 | 3/1994 |
| WO | WO 95/19089 | 7/1995 |

OTHER PUBLICATIONS

English Language Abstract of JP1168161; Jul. 3, 1989.
English Language Abstract of JP2151459; Jun. 11, 1990.
English Language Abstract of JP5189104; Jul. 30, 1993.
English Language Abstract of DE4312136; Oct. 20, 1994.
English Language Abstract of DE4239349; Sep. 22, 1994.
RS-232C Interface Kit for Fax-L770, Technical Specifications, CANON1990.
Fax-L770 RS-232C Service Manual, Revision 0, CANON, Feb. 1991.
English Language Abstract of JP63187960; Aug. 3, 1988.
Abstract of "Turning Microcomputers into Fax Machines"; Lu, Cary; High Technology; vol. 7, Iss. 3; pp. 60-61; Mar. 1987.
"Okidata deploys i960 in multi-use peripheral—Doc-It peripheral device-Product Announcement"; Electronic News; Sep. 28, 1992.
"Company News; New Product from Okidata"; The New York Times; Sep. 29, 1992.
Abstract of "Rockwell International's low cost RFX96V12 MONOFAX fax modem chip"; Newsbytes News Network, Mar. 15, 1994.
"Information Delivery and Fax Technology"; Hawkins; Online, pp. 98-101; Jul. 1990.
"Personal Computer Image Communications Using Facsimile"; IEEE Journal on Selected Areas in Communications, vol. 7, No. 2, pp. 276-282; Feb. 1989.
Abstract of "Pursuing One Peripheral"; Blankenhorn, Dana; Barrington, vol. 34, Iss. 20, pp. 71-73; Oct. 15, 1988.


9 VOLT RING GENERATOR CIRCUIT
CURRENT GENERATOR CIRCUIT
TONE RCVR
SWITCH DRIVER
POWER
+9 VOLTS
TO PC
TO FAX
TO TLL
FROM FAX
FROM PC
LM7555
4538
4049
PN2222
2N4403
1N4006

Fig. 1


N
NUMBER RCVD
Y
Operate 26
DEPRESS BUTTON (OPERATE 27)
SET TIMER
N
2 SEC ELAPSED ?
Y
RELEASE BUTTON (DEENERGIZE 27)
THIS GENERATES OFF – HOOK COND.
N
PRINTING / SCANNING COMPLETE ?
Y
RETURN

*Fig. 1a*


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
41
RJ-11 Tel Cable
Interfacing CKT 10
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 2
51
CO Tel 1
50
Standard Fax Machine
30

*Fig. 2a*


PC Type Computer
Internal Fax Modem / Present Invention Card
Interfacing CKT 10
Fax Modem Circuitry
41
40
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 2
51
CO Tel 1
50
Standard Fax Machine
30

*Fig. 2b*


PC Type Computer
Internal Fax Modem
Fax Modem Circuitry
40
41
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 2
51
Standard Fax Machine
Interfacing CKT 10
30
CO Tel 1
50

*Fig. 2c*


PC Type Computer
Interfacing CKT 10
On an Internal PC Card
Internal Fax Modem
To Wall Tel Line
41
40
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
RJ-11 Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard Fax Machine

*Fig. 2d*


PC Type Computer
40
RS-232 Cable
41
External Fax Modem/
Present Invention Circuitry
Fax Modem
Circuitry
Interfacing
CKT 10
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard
Fax Machine

Fig. 2e


Fax Machine/Fax Modem
Present Invention Circuitry
40
PC Type Computer
RS-232 Cable
30
Standard
Fax Machine
Fax Modem
Circuitry
41
Interface
Circuit 10
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1

Fig. 2f


40
PC Type Computer
with Generic
Send/Receive
Communication Software
51
CO Tel 2
CO Tel 1
50
RJ-11
Tel Cable
RJ-11
Tel Cable
RS-232 Cable
30
Standard
Fax Machine
RS232
Connector
Fax Machines
Optical Digital
Scanning Device
75
Control Circuitry
& Line Driver
Internal to fax
modem with
Auto tone
Detection functions
76
Printer
Circuitry
77

Fig. 2g


PC Type Computer
40
RS-232 Cable
Standard Fax Machine
30
Interface Circuit 10
Fax Modem Circuitry
ISDN, ADSL, HDSL Interface
60
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 1
50
CO Tel 2
51

Fig. 2h



PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
RS-232 when PC does not contain fax modem
RJ-11
Tele Cable
RJ-11
Tele Cable
51
CO Tel 2
Interface Circuit 10
Storage Device such as RAM or Fixed Disk
Fax Modem Circuitry
RJ-11
Tele Cable
CO Tel 1
70
RJ-11
Tele Cable
50
Standard Fax Machine
30


Fig. 2i

# INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE TO A PC AS A SCANNER OR PRINTER

This application is a Continuation of application Ser. No. 11/084,297 filed Mar. 19, 2005, now U.S. Pat. No. 7,489,423, which is a Divisional of Continuation-in-Part application Ser. No. 08/669,056, filed Jun. 24, 1996, which issued as U.S. Pat. No. 6,894,811, which is a Continuation-in-Part of application Ser. No. 08/226,278, filed Apr. 11, 1994, which issued as U.S. Pat. No. 5,530,558.

The following represents a true and accurate copy of application Ser. No. 11/084,297.

Claims **1**, **7**, and **10**, herein are representative of the preceding disclosure application Ser. No. 08/669/056, and germane to the invention as claimed in this Continuation application.

## FIELD OF THE INVENTION

The present invention relates to interfacing a facsimile with a PC and more particularly to an interface circuit of highly simplified design and including a novel ringing circuit capable of generating a sign wave of a given amplitude and frequency from a small, portable DC battery or 9V DC power supply.

## BACKGROUND OF THE INVENTION

As is well known in the art, a conventional facsimile scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile. Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.

It has been recognized that conventional facsimile machines may be utilized as scanners or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

## OBJECT OF THE INVENTION

It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

## BRIEF DESCRIPTION OF THE INVENTION

The present invention achieves all of the above as well as other objectives through apparatus which is characterized by comprising first switch means capable of selectively coupling a PC modem and a facsimile modem to independent telephone lines when in a non-scanning/printing mode and for decoupling the PC and facsimile modems from the telephone lines and coupling these modems to one another when placed in a scanning/printing mode.



Second manually operable switch means activates a novel ringing circuit which generates a sine wave of appropriate amplitude and frequency and applies this ringing circuit to the PC modem, when used as a scanner or to the facsimile when being used as a printer, causing the PC or facsimile machine to respond to the simulated transmit request.

Release of the circuitry operating button causes the interface circuitry to apply an off-hook condition to the facsimile. Document scanning or printing is initiated by pressing the facsimile start button or the start button provided as part of the PC or by a program step integrated into the PC as part of a print mode (selecting the facsimile as the output device for printing). Transmitted data may be directly stored in a PC memory. Documents incorporating alphanumeric data may be converted by a software program incorporated into the PC.

The ring generating circuit responsive to pressing of the operating button generates a transmit request signal by converting the low voltage from a DC source into a 20 cycle sine wave of 90 volt amplitude through the employment of a pulse generating circuit coupled to phase delay means and applying phase delayed and undelayed pulses to a transistorized switching circuit for selectively applying positive DC voltage to opposing inputs of a step-up transformer which applies a boosted sinusoidal ring signal to the PC modem, the ring generating circuit generating a ringing signal of the appropriate amplitude and frequency in a highly simplified and inexpensive manner. Since operation of the ringing circuit is completed in less than two seconds, a battery, if used, will have an extremely long operating life. Alternatively, if a 9V DC power source is used the battery is not required at all.

The simple, straightforward operation of only three switches eliminates the need for complicated, expensive and typically microprocessor-based circuitry.

## BRIEF DESCRIPTION OF THE FIGURES

The above, as well as other objects of the present invention, will become apparent upon reading the accompanying description and drawings in which:

FIG. **1** is a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile as a sophisticated scanner or printer.

FIG. **1***a* is a flow diagram of the circuitry of FIG. **1** employing the microprocessor-based tone detecting circuit of FIG. **1**.

FIGS. **2***a*-**2***i* show simplified block diagrams of various system arrangements employing the circuitry of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION AND PREFERRED EMBODIMENTS THEREOF

FIG. **1** shows an interface circuit **10** embodying the principles of the present invention and being comprised of a switch assembly SW**2** which is a four-pole double-throw switch having four movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8**, and SW**2**-**11**, each cooperating with a pair of stationary contacts, as shown. For example, and for simplicity, note that switch arms SW**2**-**2** is switchable between stationary contacts SW**2**-**1** and SW**2**-**3**.

Movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8** and SW**2**-**11** are all ganged to operate in unison as shown by common operating button B**2** coupled to the switch arms through a linkage arm LA**2** shown in schematic fashion as a dotted line. The switch is designed so that the switch arms are retained in the positions to which they are moved.

The switch arms are arranged in pairs, switch arms SW**2**-**2** and SW**2**-**5** selectively coupling a modem of a PC (not shown

for purposes of simplicity) to either a first telephone line #**1** through jumper JP**3** or directly to a local facsimile machine (not shown for purposes of simplicity) through a jumper terminal JP**2**.

In a similar fashion, a pair of switch arms SW**2**-**8** and SW**2**-**11** selectively couple the local facsimile machine through jumper JP**2** to either a separate telephone line #**2** (through jumper JP**4**) or to the modem of the PC.

A double-pole single-throw switch SW**3** is provided to couple either the local facsimile machine or the PC modem to a single telephone line or alternatively, disconnects the PC modem and facsimile machine from the common telephone line. For example, in applications where both the local facsimile and the PC each have an independent, dedicated telephone line, switch SW**3** remains open. In applications where only a single telephone line is provided, both PC and the local facsimile may share the single telephone line by gaining access thereto in a staggered manner.

Switch SW**1** which is a three-pole, double-throw switch, comprises three movable switch arms SW**1**-**1**, SW**1**-**4** and SW**1**-**7**, each movable switch arm cooperating with a pair of stationary switch arms.

Movable switch arm SW**1**-**1** selectively couples the output terminal of the pair of secondary windings W**2** of a step-up transformer TR**1** either to stationary terminal SW**1**-**2**, which isolates the output of the transformer TR**1** from the operating circuitry, or stationary contact SW**1**-**3** which couples the secondary winding W**2** of transformer TR**1** through movable switch arm SW**1**-**7** and stationary contact SW**1**-**9** simultaneously to stationary contacts SW**2**-**6** and SW**2**-**12** of four-pole double-throw switch SW**2** for simultaneous connection to the PC modem and the local facsimile, when switch arms SW**2**-**5** and SW**2**-**11** respectively engage stationary contacts SW**2**-**6** and SW**2**-**12**.

Movable switch arm SW**1**-**4** selectively couples a small nine volt (9V) DC source (through jumper J**5**) to either stationary switch arm SW**1**-**5** for coupling nine volt (9V) DC to a current generator circuit **12** or alternatively coupling nine volt (9V) DC to stationary terminal SW**1**-**6** which in turn provides DC power to the nine volt (9V) ring generator circuit arranged within the dotted region as shown.

Current generator circuit **12** is comprised of resistors R**1**, R**2** and R**5**, transistors Q**1** and Q**6**, diode D**2** and LED-type diode D**3** which are connected in the manner shown to provide a constant current which simulates an off-hook signal, utilized in the manner to be more fully described hereinbelow. Resistor R**2** serves as a current limiting resistor. LED D**3** lights to denote operation of the constant current generator.

Ring generator circuit **14**, which is utilized to generate a 20 Hz sine wave of a 90 volt amplitude, comprises a 555-type timing circuit **16** which, when activated by a nine volt DC input, applied to timer **16** through terminal VCC and resistor R**13**, provides a pulse train of equal width, positive-going pulses at a pulse rate of approximately 20 Hz at its output **16***a*.

The pulse train generated by the 555 timer **16** is simultaneously applied to the input of inverter U**1**A whose output is simultaneously coupled to the base electrodes of transistors Q**2** and Q**4**, through resistor R**6** and through inverter U**1**B and resistor R**9**.

The pulse train, as was set forth hereinabove, is simultaneously coupled to the –T input of a one-shot multivibrator operating as a phase delay circuit and whose Q output is coupled to the input of inverter U**1**E. The Q output of one-shot multivibrator U**2**A provides a phase delayed pulse which is coupled through the output of inverter U**1**E simultaneously to the base of transistor Q**5** through resistor R**8** and to the base of transistor Q**3** through inverter U**1**F and resistor R**7**. Transistors Q**2**-Q**5** and resistors R**6**-R**9**, together with resistor R**10**, form a full bridge switching circuit which is powered by the nine volt (9V) DC source applied to the terminal VCC to provide drive current sufficient to drive transformer TR**1**, comprised of a pair of primary windings W**1** and a pair of secondary windings W**2**, to generate a sine wave output. The pair of primary windings W**1** and secondary windings W**2** are coupled in parallel and the windings are arranged to provide a step-up transformer to magnify the input voltage preferably by ten to one (10:1), generating the desired output voltage which, in the present application, is a 20 Hz output of 90 volt amplitude with 15 mils of current from a nine volt (9V) DC, 150 mils current source. If desired, the frequency, amplitude and current of the circuit can be changed by selecting different component values for the passive elements. The component values chosen in the present invention have been selected to generate a signal which reproduces a standard bell ring signal employed in a conventional transmission between remote facsimile machines. The branch circuits BC**1** and BC**2** of the bridge circuit are alternately rendered conductive to alternately apply a positive voltage to opposing inputs of the input windings W**1** for generating a sine wave from the positive-going pulses produced by timer circuit **16**. The two input windings W**1** are coupled in parallel as are the output windings W**2**.



The bell ring signal is selectively supplied through movable switch arm SW**1**-**1** of the three-pole, double-throw switch SW**1** described hereinabove.

The operation of the interface circuit of the present invention is as follows:

Assuming that the local facsimile is desired to be operated in combination with the PC and to function as a scanner, the switch SW**2** is moved from the normal position, in which the movable switch arms are shown in solid line fashion, to the dotted line position simultaneously disconnecting the PC modem and the local facsimile from the telephone lines and directly connecting the PC receive line, PCR**1** to ground and the PC transmit line PCT**1** directly to stationary contact SW**1**-**9**. The local facsimile transmit line FXT**2** is directly connected to ground and the facsimile receive line FXR**2** is connected in common with line PCT**1** to stationary contact SW**1**-**9** of switch SW**1**. Switch SW**3** may be either in the open or the closed position when switch SW**2** is moved to the scan mode.

Switch SW**1** is operated by pressing button B**1** which is ganged to the movable switch arms SW**1**-**1**, SW**1**-**4** and SW**1**-**7** by a common linkage arm represented schematically by dotted line LA**1**. A biasing member or spring SWP**1** normally biases the movable switch arms to the solid line position shown in Figure. By depressing switch button B**1**, the switch arms SW**1**-**1**, SW**1**-**4** and SW**1**-**7** are simultaneously moved to the dotted line positions shown in FIG. **1**. Button B**1** is maintained in the depressed position for a period preferably between one and two seconds. In the dotted line position, the nine volt (9V) DC source is coupled through switch arm SW**1**-**4** and stationary terminal SW**1**-**6** to the VCC terminals of ring generator circuit **14**, producing a 20 Hz sine wave of 90 volt amplitude and a current of 15 mils at the secondary windings W**2**, which is applied to the PC line PCT**1** through SW**1**-**1**, SW**1**-**3**, SW**1**-**7**, SW**1**-**9**, **126**, SW**2**-**6** and SW**2**-**5**, simulating what the PC believes is a request by a "remote" facsimile to transmit data thereto. The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT) is provided with either an internal or external group III facsimile interface board, and

shifts to a receive mode for receiving what appears to the PC to be a facsimile transmission from a "remote" facsimile machine.

After holding the button B1 depressed for a time which need not exceed approximately two seconds, button B1 is released causing the nine volt (9V) DC source to be coupled to input **12***a* of current generator circuit **12**, which circuit applies the constant current to the facsimile receive line FXR**2** to create what appears to the facsimile machine to be an off-hook condition. Simultaneously therewith, LED D**3** lights indicating that the current generator circuit is presently in operation.

The local facsimile machine recognizes the constant current as representative of an off-hook condition preparing the local facsimile machine for transmission.

Thereafter, the conventional start button of the facsimile machine (not shown for purposes of simplicity) is pressed to start communication of the data scanned by the local facsimile machine from a document (or documents) placed within the facsimile machine document input (also not shown for purposes of simplicity).

The facsimile machine may be either a group I, group II, or group III machine, although optimum document resolution can be obtained through the use of a group III facsimile machine.

The conventional PC can store the transmitted data in its memory as a "picture" the resolution of the picture being 200 by 100 pixels for old facsimile machines, 200 by 200 pixels for standard facsimile machines and 400 by 400 pixels for new facsimile machines. Alternatively, a conventional OCR software package such as, for example, a CAERE OCR program available from Bitsoftware may be employed. Many alternative OCR software packages may be utilized to convert the "picture" transmitted by the facsimile machine to binary character form for word processing use or the like.

Operation of the facsimile machine in combination with the PC wherein the facsimile machine operates as a printer is as follows:

The ring generating circuit is not required to be operated in this mode and in applications where a facsimile machine is interfaced with a PC for use only as a printer, the ring generating circuit and the cooperating spring bias switch may be eliminated.

Switch SW**2** shown in FIG. **1** is moved from the solid line to the dotted line position decoupling the PC and facsimile machine from the telephone lines and coupling the PC and facsimile machine together.

Switch SW**1** is operated to power the current generator circuit **12** causing both the PC and the facsimile machine to see an off-hook condition.

The computer (PC) is operated either by providing a switch such as a push button switch (not shown for purposes of simplicity) to enter into a standard protocol with the facsimile machine and thereafter to transmit information in standard facsimile machine format. The facsimile machine senses that it is communicating with a remote facsimile machine and creates a document in accordance with the data received from the PC in "pixel" form. The PC may be provided with a standard program having a print mode in which the facsimile machine is identified in the printing routine as the specific output device being utilized during such a print mode. Upon completion of printing mode, switch SW**2** may be returned to the solid line position decoupling the PC from the facsimile machine and recoupling the PC and facsimile modems to their associated telephone lines.

FIGS. **2***a*-**2***h* show various arrangements in which the present invention may be utilized.

Noting, for example, FIG. **2***a*, the circuitry **10** of the present invention is coupled between a standard facsimile machine **30**, a PC-type computer **40** having a facsimile modem circuitry **41** and central office telephone lines **50** and **51**. In the arrangement shown in FIG. **2***a*, the facsimile modem circuitry may be either internal or external to the PC-type computer **40**.

FIG. **2***b* shows another alternative embodiment in which the circuitry of the present invention is incorporated into the PC-type computer and may be arranged on its own printed wiring board or on a printed wiring board which is common to the circuitry **10** of the present invention and the facsimile modem circuitry **41**. The arrangement of FIG. **2***b* is otherwise the same as that shown in FIG. **2***a*. The circuit **10** shown in FIG. **2***b* is provided with three RJ-11 telephone cable connections for respective connection with the facsimile machine **30** and telephone lines **50** and **51**. If only one additional telephone cable is provided, the standard facsimile machine **40** and the internal facsimile modem **41** may share that cable.

FIG. **2***c* shows another alternative arrangement in which the circuitry **10** of the present invention is integrated into the standard facsimile machine **30**. The operation of the arrangement of FIG. **2***c* is otherwise similar to those shown in FIGS. **2***a* and **2***b*.

FIG. **2***d* shows an arrangement in which the circuitry **10** of the present invention is mounted upon its own printed wiring board and is arranged within the PC-type computer **40** and is electrically connected to the internal facsimile modem **41** by an external RJ-11 cable as shown. The operation is otherwise the same as the embodiments of FIGS. **2***a*-**2***c* described hereinabove.

The circuitry **10** of the present invention may alternatively be placed upon a printed circuit card of approximately a credit card size for insertion in a bus slot provided in present-day PCs enabling the circuit on the printed circuit card, inserted into a slot provided along the exterior of the PC, to be coupled to a PCMCIA bus which is an additional bus that may be addressed by the PC.

FIG. **2***e* shows still another arrangement in which the PC-type computer **40** is coupled to external facsimile modem circuitry **41**, for example, through an RS-232 cable. The facsimile machine interfaces to the external facsimile modem **41** through circuitry **10** by way of an RJ-11 telephone cable. When in the normal mode of operation, circuitry **10** interfaces central office telephone lines **50** and **51** through the RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50** may be shared in the manner previously described.

FIG. **2***f* shows an arrangement in which interface circuit **10** is internal to the facsimile machine. PC-type computer **40** is coupled to the facsimile modem circuitry **41** and interface circuit **10** through an RS-232 cable. When in the normal mode of operation, circuitry **10** interfaces the central office telephone lines **50** and **51** through RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50**, for example, may be shared in the manner previously described. The arrangement of FIG. **2***f* is used with PC's which do not have a fax modem installed. When interface **10** is installed internal to the facsimile, the fax modem of the fax machine incorporates many of the functions of circuit **10**, through integration of the already existing circuitry components of the fax modem.

The present invention may be employed with telephone systems having digital signal processing. FIG. **2***h*, which is similar to FIG. **2***f*, and which shows like circuits designated with like numerals, further includes an interface **60** for digital signal processing. The send and receive options required for scanning and printing are provided by interface **60**, which may, for example, be a chip set such as PEB 2091 N-V4.4 and EPB 2186 N-V4.4, manufactured by Siemens. Any other chip set having similar operating characteristics may be employed. As other digital signal formats come into use, such as ADSL (Asymmetric Digital Subscriber Line) HDSL (High-Bit Rate Digital Subscriber Line), or the like, a chip set for handling such formats may be substituted for interface **60**.

As shown in FIG. **2***i*, a RAM and/or Fixed Disk **70** may be incorporated into the interface **10**, integrated with a fax modem **30** to allow for the capture of images or documents for later transfer into the PC **40** or the facsimile machine **30**, or for image enhancement within the interface configuration **10**. The addition of the data storage feature is particularly desirable for the fax machine or fax modem when they are in normal fax send or receive modes.

Optionally, the data storage feature is desirable for field application usage where information may be downloaded from a PC and stored in interface **10** for later transfer to a facsimile machine or a PC. Storage would be retained in this instance by battery backup incorporated in the RAM memory **70**. Battery backup is not necessary for fixed disk storage.

FIG. **2***j* shows an arrangement for automated scanning and printing functions between a fax modem and a fax machine.

As represented in FIGS. **2***a*-**2***f*, in order to activate an automated process for scanning or printing, the ring circuit **4** (FIG. **1**) interfaces with the Tip and Ring features of the fax modem or fax machine. This is dependent on keying in a code on the fax keypad, such as ## or #* or any other predetermined code in order to respectively identify the scanning and printing functions. Interface **10** detects the tones generated by the inserted code (at the tone receiver **25** and generates a ring signal. The ring signal is detected and interpreted by the ring detect circuit of the fax modem or the fax machine. The fax modem or fax machine then generates receive signals or tones which indicate a connection. The fax modem or fax machine commences the scanning of the fax image or print cycle.

By depressing a predetermined code such as ## on the fax machine key pad, the tone detector circuit **25** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the PC fax modem. The PC fax modem answers and starts the scanning process from the fax machine to the PC.

A communication program stored in the PC allows the code #* (for example) to be entered, generating the tone signal from the fax modem. The tone detector circuit in the interface **10** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring-generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the fax machine. The fax machine answers and starts the printing process from the PC fax modem.

The switch version does not require the ## or #* or any other code, but activates the automated scanning/printing by pressing the ringer button B**2**.

The provision of the scan and print functions internal to the facsimile machine may also be accomplished by utilizing the analog output of the optical scanning circuit **75** of the facsimile machine (FIG. **2***g*). The analog signals are processed by the control/modem circuitry **76** where they are converted into a digital serial signal and then transmitted through the RS 232 sending interconnect port, the signal is then received by an RS232 connector at the PC. The aforementioned procedure utilizes unused signal lines which are available on most modem chips such as the Rockwell chip series.

A send and receive driver software package then implements the following action. The receive driver software accepts the digital image for storage or processing as appropriate. This send/receive driver communications software package also has the ability to send a digital image to the facsimile machine for printing purposes. The facsimile machine's control/modem circuitry **6** and then processed by the print driver **77** for printing. This linkage method for scanning and printing utilizing a fax machine is particularly useful for a computer without a fax modem. Any available send/receive communications software package is acceptable.

The commands of ## or #* for sending and receiving are still appropriate for this application although any other desired commands may be selected.

For the automated operation, the circuitry **10** of FIG. **1** is provided with device **25** which includes an automatic tone detector circuit for receiving a unique number dialed by either the facsimile machine or the PC modem. Upon recognition of the unique number, as set forth above or by generation using other techniques, the tone receiver operates a driver circuit **26** for operating switch SW**2** to decouple the PC and the facsimile machine from their associated telephone lines and for connecting the PC to the facsimile machine. Driver circuit **26** may be a relay or its equivalent for operating an armature (not shown) to move the switch arms between their two operating states. Driver unit **27** which likewise may be a relay or its equivalent, operates the switch SW**1** to the position energizing the ringing circuit **14**. A timer is set and when two seconds elapses, unit **27** is deenergized causing the off-hook signal to be generated by current generator circuit **12** through the release of the operating button. When printing or scanning is complete, the tone receiver unit is reset. A simplified flow diagram of the aforementioned operation is shown in FIG. **1***a*.

The circuitry of the present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of operating independently for transmission or reception to remote facsimile machines as well as functioning as a scanner or printer with a local PC. The circuitry of the present invention provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line. The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer as and when needed and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers.

Simple switching of SW**2** returns the PC and facsimile machine to normal use.

The novel ring circuit provides the required ring signal which is conventional in present-day facsimile transmission application through the employment of an inexpensive, low voltage, DC battery or 9V power source and, through the operation of two switches incorporated in the novel interface circuitry of the present invention, followed by operation of the facsimile start switch, provides an interface circuit which

is extremely easy to use and which eliminates the need for more complicated and expensive microprocessor-based devices.

A latitude of modification, change and substitution is intended in the foregoing disclosure, and in some instances, some features of the invention will be employed without a corresponding use of other features. Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the spirit and scope of the invention herein described.

What is claimed is:

**1**. A Method of using a facsimile machine to facilitate a transfer for digital image scan data or digital image print data between the facsimile machine and the computer, the method comprising:

establishing a communication path between the facsimile machine and the computer using a bidirectional passive link; and

activating the transfer in a first mode to send the digital image scan data from the facsimile machine directly to the computer, or activating the transfer in a second mode to receive digital image print data directly from the computer, the digital image scan data and the digital image print data being communicated over the bi-directional passive link, and the activating being initiated using communications software on the computer; and

in the first mode, storing the digital scan data in a computer readable medium, for use as needed, and in the second mode, printing the digital image print data using a facsimile machine printer device.

**2**. The Method of claim **1** further including, using a facsimile machine controller to facilitate the transfer of digital image scan data or digital image print data between the facsimile machine and the computer by:

activating a controller board in the first mode to send the digital image scan data from the facsimile machine directly to the computer or activating a controller board in the second mode to enable the facsimile machine to receive digital image print data directly from the computer.

**3**. The method of claim **1**, including transferring a parallel data source signal of a scanned image from said facsimile machine to said computer.



**4**. The method of claim **1**, including transferring a digital serial data source signal of a scanned image from said facsimile machine to said computer.

**5**. The method of claim **1**, including transferring scan or print image data via analog, serial or parallel transmission between said facsimile machine and said computer.

**6**. The method of claim **1** further comprising optically recognizing the scanned data within the computer and converting the scanned data into character codes within the computer, said computer being equipped with Optical Character Recognition Software.

**7**. A method of using a facsimile machine comprising:

inputting a document image;

activating the optical scanner operatively connected to said document image input of said facsimile machine configured to generate digital image data as the document image is scanned;

activating a printer operatively connected to print a document in response to receiving digital image data; and

activating a switch providing a connection to a port enabling a direct transfer of digital image scan or print data via a passive link bi-directional direct connection between the facsimile machine and the computer;

whereby, said computer being equipped with send receive driver communications software enables the transfer of digital image data between the facsimile machine and the computer through the bi-directional direct connection via the passive link.

**8**. A method of using a fax machine to transfer digital image data signals via a bi-directional passive link with a computer, for scanning or printing:

enabling said scan or print digital image data to transfer between said facsimile machine and computer via a passive link bi-directional direct connection;

said computer being equipped with send or receive communications software, such that when activated,

scanned document digital image data from the facsimile machine transfers directly to the computer, where it may be stored for use as needed; or

digital image data sent from the computer to the facsimile machine, is printed out, or stored for use as needed.

* * * * *

US008040574C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10074th)

**United States Patent** (10) **Number: US 8,040,574 C1**

**Nachman** (45) **Certificate Issued: *Mar. 17, 2014**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Gregory Nachman**, Villanova, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products, Inc.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/012,817, Mar. 22, 2013

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,040,574** |
| Issued: | **Oct. 18, 2011** |
| Appl. No.: | **12/322,908** |
| Filed: | **Feb. 9, 2009** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(60) Continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.**
USPC ........... **358/442**; 358/296; 358/468; 358/474; 379/100.01

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,817, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Mark Sager

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1** and **7-8** are determined to be patentable as amended.

Claims **2-6**, dependent on an amended claim, are determined to be patentable.

**1**. A Method of using a facsimile machine to facilitate a transfer for digital image scan data or digital image print data between the facsimile machine and the computer, the method comprising:

establishing a communication path between the facsimile machine and the computer using a bidirectional passive link; and

activating the transfer in a first mode to send the digital image scan data from the facsimile machine directly to the computer, or activating the transfer in a second mode to receive digital image print data directly from the computer, the digital image scan data and the digital image print data being communicated over the bi-directional passive link, and the activating being initiated using *generic send/receive* communications software on the computer; and



in the first mode, storing the digital scan data in a computer readable medium, for use as needed, and in the second mode, printing the digital image print data using a facsimile machine printer device.

**7**. A method of using a facsimile machine comprising:

inputting a document image;

activating the optical scanner operatively connected to said document image input of said facsimile machine configured to generate digital image data as the document image is scanned;

activating a printer operatively connected to print a document in response to receiving digital image data; and

activating a switch providing a connection to a port enabling a direct transfer of digital image scan or print data via a passive link bi-directional direct connection between the facsimile machine and the computer;

whereby, said computer being equipped with *generic* send receive driver communications software enables the transfer of digital image data between the facsimile machine and the computer through the bi-directional direct connection via the passive link.

**8**. A method of using a fax machine to transfer digital image data signals via a bi-directional passive link with a computer, for scanning or printing:

enabling said scan or print digital image data to transfer between said facsimile machine and computer via a passive link bi-directional direct connection;

said computer being equipped with *generic* send or receive communications software, such that when activated,

scanned document digital image data from the facsimile machine transfers directly to the computer, where it may be stored for use as needed; or

digital image data sent from the computer to the facsimile machine, is printed out, or stored for use as needed.

* * * * *

US008040574C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10943rd)

**United States Patent** (10) **Number: US 8,040,574 C2**

**Nachman** (45) **Certificate Issued: *Sep. 19, 2016**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE TO A PC AS A SCANNER OR PRINTER**

(75) Inventors: **Bruce Gregory Nachman**, Villanova, PA (US); **Marvin Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **INFINITY COMPUTER PRODUCTS, INC.**, Villanova, PA (US)

**Reexamination Request:**
No. 90/013,209, Apr. 10, 2014

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,040,574** |
| Issued: | **Oct. 18, 2011** |
| Appl. No.: | **12/322,908** |
| Filed: | **Feb. 9, 2009** |

Reexamination Certificate C1 8,040,574 issued Mar. 17, 2014

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(60) Continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 1/32*** | (2006.01) |
| ***H04N 1/04*** | (2006.01) |
| ***H04N 1/00*** | (2006.01) |

(52) **U.S. Cl.**
CPC ...... ***H04N 1/00238*** (2013.01); ***H04N 1/00236*** (2013.01); ***H04N 1/00241*** (2013.01); *H04N 2201/0034* (2013.01); *H04N 2201/0062* (2013.01); *H04N 2201/0093* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,209, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Michael J. Yigdall

(57) **ABSTRACT**

Apparatus for interfacing a conventional facsimile machine with a PC enabling the use of the facsimile machine as a scanner or printer. A first switch assembly selectively couples the PC modem and facsimile machine either to independent telephone lines in a normal mode or to one another in a scan print mode. A manually operated switch assembly is depressed for a brief interval sufficient to activate a ringing circuit which converts DC power from a small battery source to a 20 Hz sine wave of 90 volt amplitude and applies the sine wave signal to the PC to cause the PC or facsimile to enter into a scan or print mode, respectively. The manually operable switch is then released to apply a constant current to the facsimile machine to simulate an off-hook condition. A facsimile machine start button is then operated to start the facsimile machine which scans documents provided therein and transmits the scanned data in a conventional facsimile transmission format or activate the PC to transmit a fax in conventional facsimile transmission format to utilize the facsimile machine as a printer. The PC may be equipped with a suitable software program for converting non-graphic, i.e. such as word-type information into a binary format suitable for use in word processing applications and may store the data in a memory for subsequent use. An automatic circuit may be provided to initiate a scanning or printing mode responsive to receipt of a unique number received from either the facsimile machine or the PC, thus eliminating the need for switches.



# EX PARTE REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-8** is confirmed.

* * * * *

US008294915B2

(12) **United States Patent**
**Nachman**

(10) **Patent No.: US 8,294,915 B2**
(45) **Date of Patent: Oct. 23, 2012**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(75) Inventor: **Bruce G. Nachman**, Villanova, PA (US); **Marvin J. Nachman**, legal representative, Villanova, PA (US)

(73) Assignee: **Infinity Computer Products Inc**, Villanova, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/317,310**

(22) Filed: **Oct. 14, 2011**

(65) **Prior Publication Data**

US 2012/0127503 A1 May 24, 2012

**Related U.S. Application Data**

(60) Continuation of application No. 12/322,908, filed on Feb. 9, 2009, now Pat. No. 8,040,574, which is a continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**
***G06F 3/12*** (2006.01)
***H04N 1/32*** (2006.01)
***H04N 1/04*** (2006.01)

(52) **U.S. Cl.** ...... **358/1.13**; 358/1.15; 358/442; 358/468; 358/474; 358/296; 379/100.01

(58) **Field of Classification Search** ................. 358/1.13, 358/1.15, 442, 468, 296, 440, 434–437, 474; 379/100.01, 100.02, 100.06, 100.05, 100.13
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,802,204 A * 1/1989 Chang ...................... 379/100.15
5,218,458 A * 6/1993 Kochis et al. ................. 358/448
5,390,031 A * 2/1995 Kang et al. .................... 358/468
5,452,106 A * 9/1995 Perkins ......................... 358/468
5,608,546 A * 3/1997 Nakamura et al. ............ 358/468
6,134,017 A * 10/2000 Schlank et al. .............. 358/1.15

FOREIGN PATENT DOCUMENTS

DE 4312136 A1 * 10/1994

* cited by examiner

*Primary Examiner* — Cheukfan Lee
(74) *Attorney, Agent, or Firm* — Marvin J. Nachman

(57) **ABSTRACT**

Printing and scanning methods using a facsimile machine communicating with a computer over a bi-directional direct passive link connected between digital communication ports of the computer and facsimile machine Upon receipt of an instruction at the facsimile machine, the printing method includes receiving digital image data from the computer via the bi-directional direct passive link. The digital image data is processed substantially as it is received at the facsimile machine and printed onto media. Upon receipt of an instruction at the facsimile machine, the scanning method includes scanning content from media provided within the facsimile machine to create digital image data digital image data representative of the content, and providing the digital image data substantially as it is created to the computer via the bi-directional direct passive link. The instructions and digital image data are transmitted in a standard facsimile machine format using standard facsimile machine protocols.

**15 Claims, 12 Drawing Sheets**




9 VOLT RING GENERATOR CIRCUIT
CURRENT GENERATOR CIRCUIT
TONE RCVR
SWITCH DRIVER
POWER
+9 VOLTS
TO PC
TO FAX
FROM FAX
FROM PC
TO SW1
TO SW2
TO TLL 1
TO TLL 2
LM7555
4538
4049
4045
4047
2N4403
PN2222
1N4006
RJ11
DPST
SW4PDT

*Fig. 1*


N
NUMBER RCVD
Y
OPERATE 26
DEPRESS BUTTON (OPERATE 27)
SET TIMER
N
2 SEC ELAPSED ?
Y
DEPRESS BUTTON (DEENERGIZE 27)
THIS GENERATES OFF - HOOK COND.
N
PRINTING SCANNING COMPLETE ?
Y
RETURN

*Fig. 1a*


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
41
RJ-11 Tel Cable
Interfacing CKT 10
RJ-11 Tel Cable
RJ-11 Tel Cable
CO Tel 2
51
RJ-11 Tel Cable
Standard Fax Machine
30
CO Tel 1
50

*Fig. 2a*


PC Type Computer
Internal Fax Modem /Present Invention Card
Fax Modem Circuitry
Interfacing CKT 10
41
40
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
30
Standard Fax Machine
50
CO Tel 1

*Fig. 2b*


PC Type Computer
Internal Fax Modem
Fax Modem Circuitry
40
41
RJ-11
Tel Cable
51
CO Tel 2
RJ-11
Tel Cable
RJ-11
Tel Cable
30
Standard Fax Machine
Interfacing CKT 10
50
CO Tel 1

*Fig. 2c*


PC Type Computer
Interfacing CKT 10 On an Internal PC Card
Internal Fax Modem
To Wall Tel Line
40
41
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1
30
Standard Fax Machine

*Fig. 2d*


PC Type Computer
40
RS-232 Cable
41
External Fax Modem/
Present Invention Circuitry
Interfacing
CKT 10
Fax Modem
Circuitry
RJ-11
Tel Cable
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 2
51
CO Tel 1
50
Standard
Fax Machine
30

*Fig. 2e*


Fax Machine / Fax Modem
Present Invention Circuitry
40
PC Type Computer
RS-232 Cable
30
Standard
Fax Machine
Fax Modem
Circuitry
41
Interface
Circuit 10
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
50
CO Tel 1

*Fig. 2f*



40
PC Type Computer with Generic Send/Receive Communication Software
RS232 Cable
51
CO Tel 2
50
CO Tel 1
RJ-11
Tel Cable
RJ-11
Tel Cable
30
Standard Fax Machine
RS232 Connector
Fax Machines Optical Digital Scanning Device
75
Control Circuitry
& Line Driver
Internal to fax modem with Auto tone Detection functions
Printer Circuitry
77
76


*Fig. 2g*



40
PC Type Computer
RS 232 Cable
30
Standard Fax Machine
Interface Circuit 10
Fax Modem Circuitry
ISDN, ADSL, HDSL Interface
60
51
CO Tel 2
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 1
50


*Fig. 2h*


PC Type Computer
Internal or External
Fax Modem
Fax Modem
Circuitry
40
RS-232 when PC
does not contain
fax modem
RJ-11
Tel Cable
RJ-11
Tel Cable
51
CO Tel 2
Interface
Circuit 10
Storage Device
such as RAM or
Fixed Disk
Fax Modem
Circuitry
RJ-11
Tel Cable
CO Tel 1
70
RJ-11
Tel Cable
50
Standard Fax
Machine
30

*Fig. 2i*


PC Type Computer
Internal or External Fax Modem
Fax Modem Circuitry
40
RJ-11
Tel Cable
Interface Circuit 10
Automatic tone detection & Switching Control
CO Tel 2
51
RJ-11
Tel Cable
RJ-11
Tel Cable
CO Tel 1
50
RJ-11
Tel Cable
Standard Fax Machine
30

*Fig. 2j*

# INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/322,908, filed Feb. 9, 2009, now U.S. Pat. No. 8,040,574, which is a continuation of U.S. patent application Ser. No. 11/084,297, filed Mar. 19, 2005, now U.S. Pat. No. 7,489,423, which is a divisional of U.S. Pat. No. 08/669,056, filed Jun. 24, 1996, now U.S. Pat. No. 6,894,811, which is a continuation-in-part of U.S. patent application Ser. No. 08/226,278, filed Apr. 11, 1994, now U.S. Pat. No. 5,530,558. These applications are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to interfacing a facsimile with a PC and more particularly to an interface circuit of highly simplified design and including a novel ringing circuit capable of generating a sine wave of a given amplitude and frequency from a small, portable DC battery or 9V DC power supply.

## BACKGROUND OF THE INVENTION

As is well known in the art, a conventional facsimile scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile.

Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.

It has been recognized that conventional facsimile machines may be utilized as scanners or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

## OBJECT OF THE INVENTION

It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

## BRIEF DESCRIPTION OF THE INVENTION

The present invention achieves all of the above as well as other objectives through apparatus which is characterized by comprising first switch means capable of selectively coupling a PC modem and a facsimile modem to independent telephone lines when in a non-scanning/printing mode and for decoupling the PC and facsimile modems from the telephone lines and coupling these modems to one another when placed in a scanning/printing mode.



Second manually operable switch means activates a novel ringing circuit which generates a sine wave of appropriate amplitude and frequency and applies this ringing circuit to the PC modem, when used as a scanner or to the facsimile when being used as a printer, causing the PC or facsimile machine to respond to the simulated transmit request.

Release of the circuitry operating button causes the interface circuitry to apply an off-hook condition to the facsimile. Document scanning or printing is initiated by pressing the facsimile start button or the start button provided as part of the PC or by a program step integrated into the PC as part of a print mode (selecting the facsimile as the output device for printing). Transmitted data may be directly stored in a PC memory. Documents incorporating alphanumeric data may be converted by a software program incorporated into the PC.

The ring generating circuit responsive to pressing of the operating button generates a transmit request signal by converting the low voltage from a DC source into a 20 cycle sine wave of 90 volt amplitude through the employment of a pulse generating circuit coupled to phase delay means and applying phase delayed and undelayed pulses to a transistorized switching circuit for selectively applying positive DC voltage to opposing inputs of a step-up transformer which applies a boosted sinusoidal ring signal to the PC modem, the ring generating circuit generating a ringing signal of the appropriate amplitude and frequency in a highly simplified and inexpensive manner. Since operation of the ringing circuit is completed in less than two seconds, a battery, if used, will have an extremely long operating life. Alternatively, if a 9V DC power source is used the battery is not required at all.

The simple, straightforward operation of only three switches eliminates the need for complicated, expensive and typically microprocessor-based circuitry.

## BRIEF DESCRIPTION OF THE FIGURES

The above, as well as other objects of the present invention, will become apparent upon reading the accompanying description and drawings in which:

FIG. **1** is a circuit diagram of the interface circuitry of the present invention which enables a PC to utilize a conventional facsimile as a sophisticated scanner or printer.

FIG. **1***a* is a flow diagram of the circuitry of FIG. **1** employing the microprocessor-based tone detecting circuit of FIG. **1**.

FIGS. **2***a*-**2***j* show simplified block diagrams of various system arrangements employing the circuitry of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION AND PREFERRED EMBODIMENTS THEREOF

FIG. **1** shows an interface circuit **10** embodying the principles of the present invention and being comprised of a switch assembly SW**2** which is a four-pole double-throw switch having four movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8**, and SW**2**-**11**, each cooperating with a pair of stationary contacts, as shown. For example, and for simplicity, note that switch arms SW**2**-**2** is switchable between stationary contacts SW**2**-**1** and SW**2**-**3**.

Movable switch arms SW**2**-**2**, SW**2**-**5**, SW**2**-**8** and SW**2**-**11** are all ganged to operate in unison as shown by common operating button B**2** coupled to the switch arms through a linkage arm LA**2** shown in schematic fashion as a dotted line. The switch is designed so that the switch arms are retained in the positions to which they are moved.

The switch arms are arranged in pairs, switch arms SW**2**-**2** and SW**2**-**5** selectively coupling a modem of a PC (not shown

for purposes of simplicity) to either a first telephone line #1 through jumper JP**3** or directly to a local facsimile machine (not shown for purposes of simplicity) through a jumper terminal JP**2**.

In a similar fashion, a pair of switch arms SW**2-8** and SW**2-11** selectively couple the local facsimile machine through jumper JP**2** to either a separate telephone line #2 (through jumper JP**4**) or to the modem of the PC.

A double-pole single-throw switch SW**3** is provided to couple either the local facsimile machine or the PC modem to a single telephone line or alternatively, disconnects the PC modem and facsimile machine from the common telephone line. For example, in applications where both the local facsimile and the PC each have an independent, dedicated telephone line, switch SW**3** remains open. In applications where only a single telephone line is provided, both PC and the local facsimile may share the single telephone line by gaining access thereto in a staggered manner.

Switch SW**1** which is a three-pole, double-throw switch, comprises three movable switch arms SW**1-1**, SW**1-4** and SW**1-7**, each movable switch arm cooperating with a pair of stationary switch arms.

Movable switch arm SW**1-1** selectively couples the output terminal of the pair of secondary windings W**2** of a step-up transformer TR**1** either to stationary terminal SW**1-2**, which isolates the output of the transformer TR**1** from the operating circuitry, or stationary contact SW**1-3** which couples the secondary winding W**2** of transformer TR**1** through movable switch arm SW**1-7** and stationary contact SW**1-9** simultaneously to stationary contacts SW**2-6** and SW**2-12** of four-pole double-throw switch SW**2** for simultaneous connection to the PC modem and the local facsimile, when switch arms SW**2-5** and SW**2-11** respectively engage stationary contacts SW**2-6** and SW**2-12**.

Movable switch arm SW**1-4** selectively couples a small nine volt (9V) DC source (through jumper **15**) to either stationary switch arm SW**1-5** for coupling nine volt (9V) DC to a current generator circuit **12** or alternatively coupling nine volt (9V) DC to stationary terminal SW**1-6** which in turn provides DC power to the nine volt (9V) ring generator circuit arranged within the dotted region as shown.

Current generator circuit **12** is comprised of resistors R**1**, R**2** and R**5**, transistors Q**1** and Q**6**, diode D**2** and LED-type diode D**3** which are connected in the manner shown to provide a constant current which simulates an off-hook signal, utilized in the manner to be more fully described hereinbelow. Resistor R**2** serves as a current limiting resistor. LED D**3** lights to denote operation of the constant current generator.

Ring generator circuit **14**, which is utilized to generate a 20 Hz sine wave of a 90 volt amplitude, comprises a 555-type timing circuit **16** which, when activated by a nine volt DC input, applied to timer **16** through terminal VCC and resistor R**13**, provides a pulse train of equal width, positive-going pulses at a pulse rate of approximately 20 Hz at its output **16***a*.

The pulse train generated by the 555 timer **16** is simultaneously applied to the input of inverter U**1**A whose output is simultaneously coupled to the base electrodes of transistors Q**2** and Q**4**, through resistor R**6** and through inverter U**1**B and resistor R**9**.

The pulse train, as was set forth hereinabove, is simultaneously coupled to the –T input of a one-shot multivibrator operating as a phase delay circuit and whose Q output is coupled to the input of inverter U**1**E. The Q output of one-shot multivibrator U**2**A provides a phase delayed pulse which is coupled through the output of inverter U**1**E simultaneously to the base of transistor Q**5** through resistor R**8** and to the base of transistor Q**3** through inverter U**1**F and resistor R**7**. Transistors Q**2**-Q**5** and resistors R**6**-R**9**, together with resistor RIO, form a full bridge switching circuit which is powered by the nine volt (9V) DC source applied to the terminal VCC to provide drive current sufficient to drive transformer TR**1**, comprised of a pair of primary windings W**1** and a pair of secondary windings W**2**, to generate a sine wave output. The pair of primary windings W**1** and secondary windings W**2** are coupled in parallel and the windings are arranged to provide a step-up transformer to magnify the input voltage preferably by ten to one (10:1), generating the desired output voltage which, in the present application, is a 20 Hz output of 90 volt amplitude with 15 mils of current from a nine volt (9V) DC, 150 mils current source. If desired, the frequency, amplitude and current of the circuit can be changed by selecting different component values for the passive elements. The component values chosen in the present invention have been selected to generate a signal which reproduces a standard bell ring signal employed in a conventional transmission between remote facsimile machines. The branch circuits BC**1** and BC**2** of the bridge circuit are alternately rendered conductive to alternately apply a positive voltage to opposing inputs of the input windings W**1** for generating a sine wave from the positive-going pulses produced by timer circuit **16**. The two input windings W**1** are coupled in parallel as are the output windings W**2**.

The bell ring signal is selectively supplied through movable switch arm SW**1-1** of the three-pole, double-throw switch SW**1** described hereinabove.

The operation of the interface circuit of the present invention is as follows:

Assuming that the local facsimile is desired to be operated in combination with the PC and to function as a scanner, the switch SW**2** is moved from the normal position, in which the movable switch arms are shown in solid line fashion, to the dotted line position simultaneously disconnecting the PC modem and the local facsimile from the telephone lines and directly connecting the PC receive line, PCR**1** to ground and the PC transmit line PCT**1** directly to stationary contact SW**1-9**. The local facsimile transmit line FXT**2** is directly connected to ground and the facsimile receive line FXR**2** is connected in common with line PCT**1** to stationary contact SW**1-9** of switch SW**1**. Switch SW**3** may be either in the open or the closed position when switch SW**2** is moved to the scan mode.

Switch SW**1** is operated by pressing button B**1** which is ganged to the movable switch arms SW**1-1**, SW**1-4** and SW**1-7** by a common linkage arm represented schematically by dotted line LA**1**. A biasing member or spring SWP**1** normally biases the movable switch arms to the solid line position shown in Figure. By depressing switch button B**1**, the switch arms SW**1-1**, SW**1-4** and SW**1-7** are simultaneously moved to the dotted line positions shown in FIG. **1**. Button B**1** is maintained in the depressed position for a period preferably between one and two seconds. In the dotted line position, the nine volt (9V) DC source is coupled through switch arm SW**1-4** and stationary terminal SW**1-6** to the VCC terminals of ring generator circuit **14**, producing a 20 Hz sine wave of 90 volt amplitude and a current of 15 mils at the secondary windings W**2**, which is applied to the PC line PCT**1** through SW**1-1**, SW**1-3**, SW**1-7**, SW**1-9**, **126**, SW**2-6** and SW**2-5**, simulating what the PC believes is a request by a "remote" facsimile to transmit data thereto. The PC, which may be any type of computer (including but not limited to an Apple Macintosh, IBM PC, PCAT or PCXT) is provided with either an internal or external group III facsimile interface board, and

shifts to a receive mode for receiving what appears to the PC to be a facsimile transmission from a "remote" facsimile machine.

After holding the button B**1** depressed for a time which need not exceed approximately two seconds, button B**1** is released causing the nine volt (9V) DC source to be coupled to input **12***a* of current generator circuit **12**, which circuit applies the constant current to the facsimile receive line FXR2 to create what appears to the facsimile machine to be an off-hook condition. Simultaneously therewith, LED D**3** lights indicating that the current generator circuit is presently in operation.

The local facsimile machine recognizes the constant current as representative of an off-hook condition preparing the local facsimile machine for transmission.

Thereafter, the conventional start button of the facsimile machine (not shown for purposes of simplicity) is pressed to start communication of the data scanned by the local facsimile machine from a document (or documents) placed within the facsimile machine document input (also not shown for purposes of simplicity).

The facsimile machine may be either a group I, group II, or group III machine, although optimum document resolution can be obtained through the use of a group III facsimile machine.

The conventional PC can store the transmitted data in its memory as a "picture" the resolution of the picture being 200 by 100 pixels for old facsimile machines, 200 by 200 pixels for standard facsimile machines and 400 by 400 pixels for new facsimile machines. Alternatively, a conventional OCR software package such as, for example, a CAERE OCR program available from Bitsoftware may be employed. Many alternative OCR software packages may be utilized to convert the "picture" transmitted by the facsimile machine to binary character form for word processing use or the like.

Operation of the facsimile machine in combination with the PC wherein the facsimile machine operates as a printer is as follows:

The ring generating circuit is not required to be operated in this mode and in applications where a facsimile machine is interfaced with a PC for use only as a printer, the ring generating circuit and the cooperating spring bias switch may be eliminated.

Switch SW**2** shown in FIG. **1** is moved from the solid line to the dotted line position decoupling the PC and facsimile machine from the telephone lines and coupling the PC and facsimile machine together.

Switch SW**1** is operated to power the current generator circuit **12** causing both the PC and the facsimile machine to see an off-hook condition.

The computer (PC) is operated either by providing a switch such as a push button switch (not shown for purposes of simplicity) to enter into a standard protocol with the facsimile machine and thereafter to transmit information in standard facsimile machine format. The facsimile machine senses that it is communicating with a remote facsimile machine and creates a document in accordance with the data received from the PC in "pixel" form. The PC may be provided with a standard program having a print mode in which the facsimile machine is identified in the printing routine as the specific output device being utilized during such a print mode. Upon completion of printing mode, switch SW**2** may be returned to the solid line position decoupling the PC from the facsimile machine and recoupling the PC and facsimile modems to their associated telephone lines.

FIGS. **2***a*-**2***h* show various arrangements in which the present invention may be utilized.



Noting, for example, FIG. **2***a*, the circuitry **10** of the present invention is coupled between a standard facsimile machine **30**, a PC-type computer **40** having a facsimile modem circuitry **41** and central office telephone lines **50** and **51**. In the arrangement shown in FIG. **2***a*, the facsimile modem circuitry may be either internal or external to the PC-type computer **40**.

FIG. **2***b* shows another alternative embodiment in which the circuitry of the present invention is incorporated into the PC-type computer and may be arranged on its own printed wiring board or on a printed wiring board which is common to the circuitry **10** of the present invention and the facsimile modem circuitry **41**. The arrangement of FIG. **2***b* is otherwise the same as that shown in FIG. **2***a*. The circuit **10** shown in FIG. **2***b* is provided with three RJ-11 telephone cable connections for respective connection with the facsimile machine **30** and telephone lines **50** and **51**. If only one additional telephone cable is provided, the standard facsimile machine **40** and the internal facsimile modem **41** may share that cable.

FIG. **2***c* shows another alternative arrangement in which the circuitry **10** of the present invention is integrated into the standard facsimile machine **30**. The operation of the arrangement of FIG. **2***c* is otherwise similar to those shown in FIGS. **2***a* and **2***b*.

FIG. **2***d* shows an arrangement in which the circuitry **10** of the present invention is mounted upon its own printed wiring board and is arranged within the PC-type computer **40** and is electrically connected to the internal facsimile modem **41** by an external RJ-11 cable as shown. The operation is otherwise the same as the embodiments of FIGS. **2***a*-**2***c* described hereinabove.

The circuitry **10** of the present invention may alternatively be placed upon a printed circuit card of approximately a credit card size for insertion in a bus slot provided in present-day PCs enabling the circuit on the printed circuit card, inserted into a slot provided along the exterior of the PC, to be coupled to a PCMCIA bus which is an additional bus that may be addressed by the PC.

FIG. **2***e* shows still another arrangement in which the PC-type computer **40** is coupled to external facsimile modem circuitry **41**, for example, through an RS-232 cable. The facsimile machine interfaces to the external facsimile modem **41** through circuitry **10** by way of an RJ-11 telephone cable. When in the normal mode of operation, circuitry **10** interfaces central office telephone lines **50** and **51** through the RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50** may be shared in the manner previously described.

FIG. **2***f* shows an arrangement in which interface circuit **10** is internal to the facsimile machine. PC-type computer **40** is coupled to the facsimile modem circuitry **41** and interface circuit **10** through an RS-232 cable. When in the normal mode of operation, circuitry **10** interfaces the central office telephone lines **50** and **51** through RJ-11 telephone cables, as shown. Cable **50** may be employed for standard facsimile machine telephone communications while telephone line **51** is used for the external facsimile modem circuitry. If only one central office telephone line is available, line **50**, for example, may be shared in the manner previously described. The arrangement of FIG. **2***f* is used with PC's which do not have a fax modem installed. When interface **10** is installed internal to the facsimile, the fax modem of the fax machine incorporates many of the functions of circuit **10**, through integration of the already existing circuitry components of the fax modem.

The present invention may be employed with telephone systems having digital signal processing. FIG. **2***h*, which is similar to FIG. **2***f*, and which shows like circuits designated with like numerals, further includes an interface **60** for digital signal processing. The send and receive options required for scanning and printing are provided by interface **60**, which may, for example, be a chip set such as PEB 2091 N-V4.4 and EPB 2186 N-V4.4, manufactured by Siemens. Any other chip set having similar operating characteristics may be employed. As other digital signal formats come into use, such as ADSL (Asymmetric Digital Subscriber Line) HDSL (High Bit Rate Digital Subscriber Line), or the like, a chip set for handling such formats may be substituted for interface **60**.

As shown in FIG. **2***i*, a RAM and/or Fixed Disk **70** may be incorporated into the interface **10**, integrated with a fax modem **30** to allow for the capture of images or documents for later transfer into the PC **40** or the facsimile machine **30**, or for image enhancement within the interface configuration **10**. The addition of the data storage feature is particularly desirable for the fax machine or fax modem when they are in normal fax send or receive modes.

Optionally, the data storage feature is desirable for field application usage where information may be downloaded from a PC and stored in interface **10** for later transfer to a facsimile machine or a PC. Storage would be retained in this instance by battery backup incorporated in the RAM memory **70**. Battery backup is not necessary for fixed disk storage.

FIG. **2***j* shows an arrangement for automated scanning and printing functions between a fax modem and a fax machine.

As represented in FIGS. **2***a*-**2***f*, in order to activate an automated process for scanning or printing, the ring circuit **4** (FIG. **1**) interfaces with the Tip and Ring features of the fax modem or fax machine. This is dependent on keying in a code on the fax keypad, such as ## or #* or any other predetermined code in order to respectively identify the scanning and printing functions. Interface **10** detects the tones generated by the inserted code (at the tone receiver **25** and generates a ring signal. The ring signal is detected and interpreted by the ring detect circuit of the fax modem or the fax machine. The fax modem or fax machine then generates receive signals or tones which indicate a connection. The fax modem or fax machine commences the scanning of the fax image or print cycle.

By depressing a predetermined code such as ## on the fax machine key pad, the tone detector circuit **25** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the PC fax modem. The PC fax modem answers and starts the scanning process from the fax machine to the PC.

A communication program stored in the PC allows the code #* (for example) to be entered, generating the tone signal from the fax modem. The tone detector circuit in the interface **10** interprets this code, enabling a control circuit to activate first (**26**) and second (**27**) relay means. Relay **26** disconnects the fax machine and the fax modem (connected to the PC) from the Central Office terminal lines. Relay **27**, then connects 9V to the ring generator circuit **14** causing a sinusoidal ring signal of a predetermined frequency and amplitude to be generated to the fax machine. The fax machine answers and starts the printing process form the PC fax modem.

The switch version does not require the ## or #* or any other code, but activates the automated scanning/printing by pressing the ringer button B**2**.



The provision of the scan and print functions internal to the facsimile machine may also be accomplished by utilizing the analog output of the optical scanning circuit **75** of the facsimile machine (FIG. **2***g*). The analog signals are processed by the control/modem circuitry **76** where they are converted into a digital serial signal and then transmitted through the RS232 sending interconnect port, the signal is then received by an RS232 connector at the PC. The aforementioned procedure utilizes unused signal lines which are available on most modem chips such as the Rockwell chip series.

A send and receive driver software package then implements the following action. The receive driver software accepts the digital image for storage or processing as appropriate. This send/receive driver communications software package also has the ability to send a digital image to the facsimile machine for printing purposes. The facsimile machine's control/modem circuitry then processed by the print driver **77** for printing. This linkage method for scanning and printing utilizing a fax machine is particularly useful for a computer without a fax modem. Any available send/receive communications software package is acceptable.

The commands of ## or #* for sending and receiving are still appropriate for this application although any other desired commands may be selected.

For the automated operation, the circuitry **10** of FIG. **1** is provided with device **25** which includes an automatic tone detector circuit for receiving a unique number dialed by either the facsimile machine or the PC modem. Upon recognition of the unique number, as set forth above or by generation using other techniques, the tone receiver operates a driver circuit **26** for operating switch SW**2** to decouple the PC and the facsimile machine from their associated telephone lines and for connecting the PC to the facsimile machine. Driver circuit **26** may be a relay or its equivalent for operating an armature (not shown) to move the switch arms between their two operating states. Driver unit **27** which likewise may be a relay or its equivalent, operates the switch SW**1** to the position energizing the ringing circuit **14**. A timer is set and when two seconds elapses, unit **27** is deenergized causing the off-hook signal to be generated by current generator circuit **12** through the release of the operating button. When printing or scanning is complete, the tone receiver unit is reset. A simplified flow diagram of the aforementioned operation is shown in FIG. **1***a*.

The circuitry of the present invention is highly simplified in design and provides effective communication between the PC and local facsimile machine enabling the local facsimile machine to provide the dual functions of operating independently for transmission or reception to remote facsimile machines as well as functioning as a scanner or printer with a local PC. The circuitry of the present invention provides all the necessary signal conditions which lead the PC and local facsimile machine to believe that they are communicating with one another over a telephone line. The facsimile machine, although operating in its normal fashion, functions very effectively as a scanner or printer as and when needed and provides a scanning or printing capability at a mere fraction of the cost of conventional scanners or printers.

Simple switching of SW**2** returns the PC and facsimile machine to normal use.

The novel ring circuit provides the required ring signal which is conventional in present-day facsimile transmission application through the employment of an inexpensive, low voltage, DC battery or 9V power source and, through the operation of two switches incorporated in the novel interface circuitry of the present invention, followed by operation of the facsimile start switch, provides an interface circuit which

is extremely easy to use and which eliminates the need for more complicated and expensive microprocessor-based devices.

A latitude of modification, change and substitution is intended in the foregoing disclosure, and in some instances, some features of the invention will be employed without a corresponding use of other features. Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the spirit and scope of the invention herein described.

What is claimed:

**1**. A method of printing in a facsimile machine when the facsimile machine is connected to a computer by a bi-directional direct passive link, comprising:

providing a digital serial communications port in the facsimile machine;

receiving an instruction at the digital serial communications port from the computer to place the facsimile machine into a print mode, the instruction being received using a standard protocol of the facsimile machine;

receiving digital image data at the digital serial communications port from the computer via the bi-directional direct passive link, the digital image data being transmitted in a standard facsimile machine format and being representative of content to be printed onto media by the facsimile machine; and

processing the digital image data substantially as it is received at the digital serial communications port to print the content onto the media at the facsimile machine.

**2**. The method of claim **1**, further comprising interfacing the facsimile machine with telephone lines when the facsimile machine is in a normal mode of operation to send and receive facsimile communications.

**3**. The method of claim **2**, wherein the interfacing is performed through RJ-11 telephone cables.

**4**. The method of claim **2**, further comprising operating the facsimile machine in the normal mode of operation while performing the printing of digital image data received at the digital serial communications port.

**5**. The method of claim **1**, wherein the receiving the instruction at the digital serial communications port from the computer further comprises receiving the instruction from send/receive driver software.

**6**. The method of claim **5**, wherein the receiving digital image data at the digital serial communications port further comprises receiving the digital image data from the send/receive driver software.



**7**. The method of claim **1**, further comprising processing the digital image data at a print driver of the facsimile machine substantially as it is received at the digital serial communications port.

**8**. The method of claim **1**, further comprising initiating the printing at the facsimile machine.

**9**. A method of scanning in a facsimile machine when the facsimile machine is connected to a computer by a bi-directional direct passive link, comprising:

providing a digital serial communications port in the facsimile machine;

receiving an instruction at the digital serial communications port from the computer to place the facsimile machine into a scanning mode, the instruction being received using a standard protocol of the facsimile machine;

scanning content from media provided within the facsimile machine to create digital image data representative of the content; and

providing the digital image data substantially as it is created to the digital serial communications port for communication to the computer via the bi-directional direct passive link, the digital image data being transmitted in a standard facsimile machine format.

**10**. The method of claim **9**, further comprising interfacing the facsimile machine with telephone lines when the facsimile machine is in a normal mode of operation to send and receive facsimile communications.

**11**. The method of claim **10**, wherein the interfacing is performed through RJ-11 telephone cables.

**12**. The method of claim **10**, further comprising operating the facsimile machine in the normal mode of operation while performing the scanning of content to create the digital image data provided to the digital serial communications port.

**13**. The method of claim **9**, wherein the receiving the instruction at the digital serial communications port from the computer further comprises receiving the instruction from send/receive driver software.

**14**. The method of claim **13**, wherein the providing the digital image data to the digital serial communications port further comprises communicating the digital image data to the send/receive driver software.

**15**. The method of claim **9**, further comprising initiating the scanning at the facsimile machine.

* * * * *

US008294915C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10082nd)

# United States Patent

**Nachman**

(10) **Number: US 8,294,915 C1**
(45) **Certificate Issued: Mar. 21, 2014**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(76) Inventors: **Bruce G. Nachman**, Villanova, PA (US); **Marvin J. Nachman**, legal representative, Villanova, PA (US)

**Reexamination Request:**
No. 90/012,818, Mar. 22, 2013

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,294,915** |
| Issued: | **Oct. 23, 2012** |
| Appl. No.: | **13/317,310** |
| Filed: | **Oct. 14, 2011** |

**Related U.S. Application Data**

(60) Continuation of application No. 12/322,908, filed on Feb. 9, 2009, now Pat. No. 8,040,574, which is a continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 3/12*** | (2006.01) |
| ***H04N 1/32*** | (2006.01) |
| ***H04N 1/04*** | (2006.01) |

(52) **U.S. Cl.**
USPC ......... **358/1.13**; 358/1.15; 358/442; 358/468; 358/474; 358/296; 379/100.01

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,818, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Mark Sager

(57) **ABSTRACT**

Printing and scanning methods using a facsimile machine communicating with a computer over a bi-directional direct passive link connected between digital communication ports of the computer and facsimile machine Upon receipt of an instruction at the facsimile machine, the printing method includes receiving digital image data from the computer via the bi-directional direct passive link. The digital image data is processed substantially as it is received at the facsimile machine and printed onto media. Upon receipt of an instruction at the facsimile machine, the scanning method includes scanning content from media provided within the facsimile machine to create digital image data digital image data representative of the content, and providing the digital image data substantially as it is created to the computer via the bi-directional direct passive link. The instructions and digital image data are transmitted in a standard facsimile machine format using standard facsimile machine protocols.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **5** and **13** are cancelled.

Claims **1**, **6**, **9** and **14** are determined to be patentable as amended.

Claims **2-4**, **7-8**, **10-12** and **15**, dependent on an amended claim, are determined to be patentable.

**1**. A method of printing in a facsimile machine when the facsimile machine is connected to a computer by a bi-directional direct passive link, comprising:

providing a digital serial communications port in the facsimile machine;

receiving an instruction at the digital serial communications port from the computer to place the facsimile machine into a print mode, the instruction being received using a standard protocol of the facsimile machine; receiving digital image data at the digital serial communications port from the computer via the bi-directional direct passive link, the digital image data being transmitted in a standard facsimile machine format and being representative of content to be printed onto media by the facsimile machine; and



processing the digital image data substantially as it is received at the digital serial communications port to print the content onto the media at the facsimile machine*,*

*wherein the receiving the instruction at the digital serial communications port from the computer further comprises receiving the instruction from generic send/receive driver communications software*.

**6**. The method of claim **[5]** *1*, wherein the receiving digital image data at the digital serial communications port further comprises receiving the digital image data from the send/receive driver software.

**9**. A method of scanning in a facsimile machine when the facsimile machine is connected to a computer by a bi-directional direct passive link, comprising:

providing a digital serial communications port in the facsimile machine;

receiving an instruction at the digital serial communications port from the computer to place the facsimile machine into a scanning mode, the instruction being received using a standard protocol of the facsimile machine; scanning content from media provided within the facsimile machine to create digital image data representative of the content; and

providing the digital image data substantially as it is created to the digital serial communications port for communication to the computer via the bi-directional direct passive link, the digital image data being transmitted in a standard facsimile machine format*,*

*wherein the receiving the instruction at the digital serial communications port from the computer further comprises receiving the instruction from generic send/receive driver communications software*.

**14**. The method of claim **[13]** *9*, wherein the providing the digital image data to the digital serial communications port further comprises communicating the digital image data to the send/receive driver software.

* * * * *

US008294915C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10977th)

**United States Patent** (10) **Number: US 8,294,915 C2**

**Nachman** (45) **Certificate Issued: Oct. 25, 2016**

(54) **INTERFACE CIRCUIT FOR UTILIZING A FACSIMILE MACHINE COUPLED TO A PC AS A SCANNER OR PRINTER**

(76) Inventors: **Bruce G. Nachman**, Villanova, PA (US); **Marvin J. Nachman**, legal representative, Villanova, PA (US)

**Reexamination Request:**
No. 90/013,210, Apr. 10, 2014

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,294,915** |
| Issued: | **Oct. 23, 2012** |
| Appl. No.: | **13/317,310** |
| Filed: | **Oct. 14, 2011** |

Reexamination Certificate C1 8,294,915 issued Mar. 21, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 12/322,908, filed on Feb. 9, 2009, now Pat. No. 8,040,574, which is a continuation of application No. 11/084,297, filed on Mar. 19, 2005, now Pat. No. 7,489,423, which is a division of application No. 08/669,056, filed on Jun. 24, 1996, now Pat. No. 6,894,811, which is a continuation-in-part of application No. 08/226,278, filed on Apr. 11, 1994, now Pat. No. 5,530,558.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 3/12*** | (2006.01) |
| ***H04N 1/32*** | (2006.01) |
| ***H04N 1/04*** | (2006.01) |
| ***H04N 1/00*** | (2006.01) |

(52) **U.S. Cl.**
CPC ...... ***H04N 1/00238*** (2013.01); ***H04N 1/00236*** (2013.01); ***H04N 1/00241*** (2013.01); *H04N 2201/0034* (2013.01); *H04N 2201/0062* (2013.01); *H04N 2201/0093* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,210, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Michael J. Yigdall

(57) **ABSTRACT**

Printing and scanning methods using a facsimile machine communicating with a computer over a bi-directional direct passive link connected between digital communication ports of the computer and facsimile machine Upon receipt of an instruction at the facsimile machine, the printing method includes receiving digital image data from the computer via the bi-directional direct passive link. The digital image data is processed substantially as it is received at the facsimile machine and printed onto media. Upon receipt of an instruction at the facsimile machine, the scanning method includes scanning content from media provided within the facsimile machine to create digital image data digital image data representative of the content, and providing the digital image data substantially as it is created to the computer via the bi-directional direct passive link. The instructions and digital image data are transmitted in a standard facsimile machine format using standard facsimile machine protocols.



# EX PARTE REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-4**, **6-12**, **14** and **15** is confirmed.

Claims **5** and **13** were previously cancelled.

* * * * *

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DINOVO PRICE LLP, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On April 24, 2020, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Opening Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Marc Robert Labgold
Patrick J. Hoeffner
Marc R. Labgold, P.C.
12005 Sunrise Valley Drive
Suite 203
Reston VA 20191
703-901-8860
mlabgold@labgoldlaw.com

Jeffrey T. Castellano
Andrew E. Russell
John W. Shaw
Shaw Keller LLP
300 Delaware Avenue Suite 1120
Wilmington DE 19801
302-298-0703
jcastellano@shawkeller.co

Upon request by the Court of the e-filed document, six confidential paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 24, 2020

/s/ Robyn Cocho
Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief of Plaintiff-Appellant complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,188 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Civil Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2007 in 14-point Time New Roman.

Dated: April 24, 2020

DiNovo Price LLP
7000 N. MoPac Expressway
Suite 350
Austin, Texas 78731
Tel: 512.539.2626
Fax: 512.539.2627

By: */s/ Andrew G. DiNovo*
Andrew G. DiNovo
Attorneys for Plaintiff-Appellant