**2020-1189**

In The
# United States Court of Appeals
For The Federal Circuit

## INFINITY COMPUTER PRODUCTS, INC.,

*Plaintiff – Appellant,*

v.

## OKI DATA AMERICAS, INC.,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IN NO. 1:18-cv-00463-LPS, CHIEF JUDGE LEONARD P. STARK.**

## BRIEF OF APPELLEE

**Marc R. Labgold**
**Patrick J. Hoeffner**
**MARC R. LABGOLD, P.C.**
**12005 Sunrise Valley Drive, Suite 203**
**Reston, Virginia 20191**
**(703) 901-8860**
**mlabgold@labgoldlaw.com**
**phoeffner@labgoldlaw.com**

***Counsel for Appellee***

**John W. Shaw**
**Jeff Castellano**
**Andrew E. Russell**
**SHAW KELLER LLP**
**I.M. Pei Building**
**1105 North Market Street, 12th Floor**
**Wilmington, Delaware 19801**
**(302) 298-0700**
**jshaw@shawkeller.com**
**jcastellano@shawkeller.com**
**arussell@shawkeller.com**

***Counsel for Appellee***

THE LEX GROUP[DC] ♦ 1050 Connecticut Avenue, N.W. ♦ Suite 500, #5190 ♦ Washington, D.C. 20036
(202) 955-0001 ♦ (800) 856-4419 ♦ www.thelexgroup.com

Both Parties agree that claim 1 of the ’811 patent is representative:

> 1. A method of creating a scanning capability from a facsimile machine to a **computer**, with scanned image digital data signals transmitted through a bi-directional direct connection via a **passive link** between the facsimile machine and the **computer**, comprising the steps of:
>
> by-passing or isolating the facsimile machine and the computer from the public network telephone line;
>
> coupling the facsimile machine to the **computer**;
>
> conditioning the **computer** to receive digital facsimile signals representing data on a scanned document; and
>
> conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the **computer**, said **computer** being equipped with [generic] send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the **computer** through the bi-directional direct connection via the **passive link**, thereafter, said **computer** processing the received digital facsimile signals of the scanned document as needed.

(**Appx88** (emphasis added)).

## CERTIFICATE OF INTEREST

Counsel for Appellee, Oki Data Americas, Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

Oki Data Americas, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Oki Data Corporation.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Marc R. Labgold and Patrick J. Hoeffner from Marc R. Labgold, P.C. and John Shaw, Jeff Castellano, Andrew E. Russell and Stephanie E O'Byrne from the law offices of Shaw Keller LLP.

5. The titles and numbers of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are:

| **Case Name** | **Case No.** | **Court** |
|---|---|---|
| *Infinity Computer Products, Inc. v. Canon USA, Inc.* | 2:18-cv-01823 | EDNY |
| *Infinity Computer Products, Inc. v. Dell, Inc.* | 2:12-cv-06808 | EDPA |
| *Infinity Computer Products, Inc. v. Hewlett-Packard Company* | 2:12-cv-06805 | EDPA |
| *Infinity Computer Products, Inc. v. Konica Minolta Business Solutions, USA, Inc.* | 2:12-cv-06802 | EDPA |
| *Infinity Computer Products, Inc. v. Lexmark International, Inc.* | 5:18-cv-00198 | EDKY |
| *Infinity Computer Products, Inc. v. Ricoh USA, Inc.* | 2:12-cv-06807 | EDPA |
| *Infinity Computer Products, Inc. v. Samsung Electronics America, Inc.* | 2:12-cv-06798 | EDPA |
| *Infinity Computer Products, Inc. v. Toshiba America Business Solutions, Inc.* | 2:12-cv-06796 | EDPA |
| *Infinity Computer Products, Inc. v. Xerox Corporation* | 2:12-cv-06804 | EDPA |

Date: July 6, 2020

*/s/ Marc R. Labgold*
Signature of Counsel

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... iii

TABLE OF AUTHORITIES .......... vi

STATEMENT OF RELATED CASES .......... ix

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 1

I. THE ASSERTED PATENTS .......... 3

II. THE DISTRICT COURT'S DECISION .......... 4

III. THE PATENTS-IN-SUIT .......... 6

IV. THE PROSECUTION OF THE '811 PATENT .......... 9

A. Prosecution History of Exemplary Claim 1 .......... 9

1. The Claims Were Anticipated by Perkins .......... 10

2. The Applicant Successfully Distinguished Perkins by Adding the "Passive Link" Language .......... 15

3. In Response to Later Rejections, the Applicant Provided a "Definition" for "Passive Link" .......... 17

V. THE REEXAMINATION OF THE '811 PATENT .......... 18

SUMMARY OF ARGUMENT .......... 22

ARGUMENT .......... 24

I. STANDARD OF REVIEW ............................................................24

II. LEGAL STANDARDS ............................................................25

III. DURING PROSECUTION, THE APPLICANT DEFINED "PASSIVE LINK" AS EXTENDING TO THE I/O BUS OF THE "COMPUTER" ............................................................27

A. The Applicant Added "Passive Link" to Overcome a Rejection Based on Perkins ............................................................28

B. The New Embodiments Are the Support for the "Passive Link" ............................................................29

C. The Applicant Relied on the New Embodiments to Distinguish Perkins ............................................................30

D. The Applicant Successfully Distinguished Perkins by Adding the "Passive Link" Claim Limitation ............................................................33

E. The Applicant Disavowed Any Other Claim Scope for "Passive Link" and "Computer" ............................................................34

IV. DURING REEXAMINATION, THE PO REVERSED POSITIONS, RE-DEFINING "PASSIVE LINK" AS ENDING AT THE OUTSIDE OF THE BOX CONTAINING THE "COMPUTER" ............................................................37

A. The PO Took a Contradictory Position with Regard to the Definition of "Passive Link" (and in turn "Computer") to Antedate an Anticipatory Reference During Reexamination ............................................................37

B. The PO Reiterated Its New Claim Construction Position to the PTO Multiple Times, and Ultimately Prevailed ............................................................38

V. THE PATENT OWNER'S POSITION IN REEXAM DIRECTLY CONFLICTS WITH THE APPLICANT'S POSITION IN DISTINGUISHING PERKINS ............................................................39

A. This Court's Decision in *Teva* Required the District Court to Find "Passive Link" and "Computer" Indefinite .................. 42

B. The Appellant Made Far More Than "a Single Inconsistent Statement," But Even One Inconsistent Statement Can Render Claims Indefinite .................. 43

C. Appellant Was Unable to Explain How the Contradictory Interpretations Could be Harmonized .................. 46

VI. APPELLANT'S COUNTER-ARGUMENTS FAIL .................. 47

A. The Applicant Distinguished Perkins on the Basis of Passive Link, Not Analog Transmissions .................. 47

B. The Applicant Stated that the "Passive Link," Not Just the "Data," Extended to the I/O Bus .................. 49

C. Appellant's Chart of "Relevant PTO Communications" Does Not Resolve the Inconsistency .................. 50

D. Applicant Never Relied on a "Computer Interface" or "Card Slot Interface" to Distinguish Perkins .................. 52

E. The Appellant's Expert Testimony Should Be Disregarded .................. 54

F. The Board Did Not Address the Definiteness of "Passive Link" or "Computer" .................. 57

G. The Patentee's "Definition" of "Passive Link" Does Not Resolve the Conflict .................. 59

CONCLUSION .................. 61

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen Inc. v. Hoechst Marion Roussel*,
314 F.3d 1313 (Fed. Cir. 2003) ....................27

*Convolve, Inc. v. Compaq Comput. Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) ....................43

*Dow Chem. Co. v. Nova Chems. Corp.* (Can.),
803 F.3d 620 (Fed. Cir. 2015) ....................25

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017) ....................56

*Endo Pharm. Inc. v. Teva Pharm. United States, Inc.*,
919 F.3d 1347 (Fed. Cir. 2019) ....................3

*GPNE Corp. v. Apple Inc.*,
830 F.3d 1365 (Fed. Cir. 2016) ....................26

*Hockerson–Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*,
222 F.3d 951 (Fed. Cir.2000) ....................46

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ....................24

*In re Walter*,
698 F. App'x 1022 (Fed. Cir. 2017) ....................3, 56

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998) ....................44

*Markman v Westview Instr., Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*,
517 U.S. 370 (1996)....................25-26, 55

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ....................................................................26

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
5 F.3d 1464 (Fed. Cir. 1993) ........................................................................27

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)................................................................................ *passim*

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ....................................................................26

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2015) ......................................................................35

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ....................................................................58

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)................................. 25, 26, 55, 56

*Poly-America, L.P. v. API Industries, Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ....................................................................35

*Profectus Tech. LLC v. Huawei Tech. Co., Ltd.*,
823 F.3d 1375 (Fed. Cir. 2016) ....................................................................55

*R+L Carriers, Inc. v. Qualcomm, Inc.*,
801 F.3d 1346 (Fed. Cir. 2015) ....................................................................44

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) ....................................................................56

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003) ................................................................ 45-46

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ............................................................ *passim*

*Teva, USA, Inc. v. Sandoz*,
135 S. Ct. 831 (2015).....26

*Tinnus Enters., LLC v. Telebrands Corp.*,
733 F. App'x 1011 (Fed. Cir. 2018)..... 56, 58, 59

*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*,
887 F.3d 1117 (Fed. Cir. 2018).....3

*Wang Labs., Inc. v. Am. Online Inc.*,
197 F.3d 1377 (Fed. Cir. 1999).....26

*Wis. Alumni Research Found. v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018).....26

**STATUTES**

35 U.S.C. §102(e)..... 10, 28, 36, 53

35 U.S.C. §103.....36

35 U.S.C. §112..... 4, 20, 24

35 U.S.C. §371.....10

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellee Oki Data Americas, Inc. ("ODA") states that, to its knowledge, no other appeal in or from the same civil action in the lower court has previously been before this or any other appellate court.

The following other pending cases will be directly affected by this Court's decision in the pending appeal:

| **Case Name** | **Case No.** | **Court** |
|---|---|---|
| *Infinity Computer Products, Inc. v. Canon USA, Inc.* | 2:18-cv-01823 | EDNY |
| *Infinity Computer Products, Inc. v. Dell, Inc.* | 2:12-cv-06808 | EDPA |
| *Infinity Computer Products, Inc. v. Hewlett-Packard Company* | 2:12-cv-06805 | EDPA |
| *Infinity Computer Products, Inc. v. Konica Minolta Business Solutions, USA, Inc.* | 2:12-cv-06802 | EDPA |
| *Infinity Computer Products, Inc. v. Lexmark International, Inc.* | 5:18-cv-00198 | EDKY |
| *Infinity Computer Products, Inc. v. Ricoh USA, Inc.* | 2:12-cv-06807 | EDPA |
| *Infinity Computer Products, Inc. v. Samsung Electronics America, Inc.* | 2:12-cv-06798 | EDPA |
| *Infinity Computer Products, Inc. v. Toshiba America Business Solutions, Inc.* | 2:12-cv-06796 | EDPA |
| *Infinity Computer Products, Inc. v. Xerox Corporation* | 2:12-cv-06804 | EDPA |

Counsel for ODA is not aware of any other pending cases that will be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF THE ISSUES

Whether the District Court correctly concluded that irreconcilably inconsistent positions asserted by the patent applicant during prosecution and the patent owner during reexamination render the claim terms "passive link" and "computer" indefinite.

## STATEMENT OF THE CASE

The indefiniteness issues herein arise because the Applicant relied upon new matter added to a continuation-in-part application to avoid prior art and secure issuance of the claims, but Patent Owner ("PO") (and Appellant) later presented contradictory arguments during reexamination to benefit from the filing date of the parent application. Simply put, the Applicant and PO took opposite positions at different times in the prosecution history, in one instance to distinguish prior art and, in another instance, to antedate other prior art. In doing so, the Applicant and PO rendered the claim terms "passive link" and "computer" indefinite.

In the first instance, the Applicant distinguished the Perkins prior art by arguing that an intervening apparatus (*e.g.*, a fax modem) between the facsimile machine and "the I/O [input/output] bus of the computer," even if installed inside

the box (or case)[1] of the computer, ***is not*** a part of the computer and is instead intervening circuitry that intercepts the signal – ***precluding a passive link***.

In the second instance, to claim the benefit of an earlier-filed application during reexamination, the PO argued that an intervening apparatus (*e.g.*, a fax modem) between the facsimile machine and "the I/O bus of the computer," installed inside the box of the computer, ***is*** part of the computer – ***permitting a passive link.***

The inconsistency can be illustrated as follows:

<table>
<tr>
<td>During Prosecution</td>
<td>NOT a Passive Link<br>Because of Intervening Apparatus<br>
</td>
</tr>
<tr>
<td>During Reexamination</td>
<td>Passive Link<br>Despite Intervening Apparatus<br>
</td>
</tr>
</table>

These contradictory positions render the claim terms "passive link" and "computer" indefinite because a person of skill in the art looking at the patent,

[1] The box (or case) of the computer is sometimes referred to as the computer "chassis" in the record.

including the prosecution history, cannot be reasonably certain where the "passive link" ends and where the "computer" begins.

## I. THE ASSERTED PATENTS

Plaintiff/Appellant Infinity Computer Products, Inc. ("Appellant") accused ODA of directly infringing four related patents, each of which share a common specification:[2] U.S. Patent Nos. 6,894,811 ("the '811 patent"), 7,489,423 ("the '423 patent"), 8,040,574 ("the '574 patent"), and 8,294,915 ("the '915 patent") (collectively referred to herein as "the Patents-in-Suit").

The indefinite "passive link" and "computer" terms are present in each of the Asserted Claims. Both Parties agree that claim 1 of the '811 patent is representative:[3]

> 1. A method of creating a scanning capability from a facsimile machine to a **computer**, with scanned image digital data signals transmitted through a bi-directional direct connection via a **passive link** between the facsimile machine and the **computer**, comprising the steps of:

---

[2] All citations to the specification herein are to the '811 patent. (**Appx72-93**). The prosecution history for any one of the patents may be relevant to all of them. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, n.5 (Fed. Cir. 2015).

[3] Claim 1 of the '811 patent is identified by the Appellant as "an exemplary claim." *See* Appellant's Brief ("**App.Br.**") at 11-12. The Appellant has not separately argued the validity of the remaining claims and, as such, they rise or fall together. *Endo Pharm. Inc. v. Teva Pharm. United States, Inc.*, 919 F.3d 1347, 1353 n.3 (Fed. Cir. 2019) ("The parties did not argue the claims separately, so they rise or fall together with representative claim 1."); *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1134 n.9 (Fed. Cir. 2018) ("For purposes of validity, the parties did not argue the claims separately, so they rise or fall together."); *In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) (finding unargued claims indefinite as well) (citations omitted).

> by-passing or isolating the facsimile machine and the computer from the public network telephone line;
>
> coupling the facsimile machine to the **computer**;
>
> conditioning the **computer** to receive digital facsimile signals representing data on a scanned document; and
>
> conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the **computer**, said **computer** being equipped with [generic[4]] send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the **computer** through the bi-directional direct connection via the **passive link**, thereafter, said **computer** processing the received digital facsimile signals of the scanned document as needed.

(**Appx88** (emphasis added)).

## II. <u>THE DISTRICT COURT'S DECISION</u>

The district court held each of the asserted claims containing "passive link" or "computer" invalid as indefinite under pre-AIA 35 U.S.C. §112, second paragraph, including claims 1, 2, 3, 4 and 6 of the '423 patent; claims 1, 2, 4, 5, 7 and 8 of the '574 patent; claims 1, 6, 7, 8, 9, 14 and 15 of the '915 patent; and claims 1, 2, 4, 6, 7, 18, 19 and 20 of the '811 patent (collectively the "Asserted Claims"). (**Appx22**).

---

[4] Claim 1 was amended during the reexamination, **Appx95**, and was the subject of a later notice of correction, **Appx93**. The quoted text as modified incorporates the later changes.

In particular, the district court found the term "passive link" was indefinite because:

> *Oki Data has met its burden to show indefiniteness by clear and convincing evidence. During prosecution, the patentee distinguished prior art references by characterizing "passive link" as requiring the link to be entirely passive from the fax machine to the computer's I/O bus (in the patentee's words, "a true non-intercepted digital signal") …. Then, however, in order to claim the filing date of the '278 application, the patentee characterized "passive link" as only requiring the link to be passive from the fax machine to a port on the computer….*
>
> Under the patentee's first definition, the '278 application lacks written description for a passive link because the '278 application does not disclose a link that was passive until the computer's I/O bus. Rather, under that definition, each embodiment disclosed in the '278 application includes an intervening apparatus – a modem – between the fax machine and the I/O bus. (*See* '811 patent, Figs. 2b-2d) Conversely, the patentee's second definition, used to overcome the written description rejection, would not distinguish the Perkins patent because Perkins teaches connecting a fax machine to a computer …via an intervening device: a "facsimile device" inside the computer. (Perkins 9:24-32) The patentee's contentions regarding "passive link" have been materially inconsistent. Hence, a person of ordinary skill in the art would not be reasonably certain as to which of the patentee's two inconsistent definitions of "passive link" is used in the claims, rendering the claims indefinite. *See* [*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015)] (holding claim term indefinite where patentee used two inconsistent definitions of term during prosecution).

(**Appx38-39** (emphasis added)). Accordingly, the district court found the term "computer" indefinite:

> Given that the two definitions for "passive link" vary in their endpoint – one connects the fax machine to a port on a computer, and another connects the fax machine to the I/O bus of the computer – it follows

> that the scope of "computer" changes depending on the definition. Specifically, where the passive link ends at a computer port, the computer begins at the port, and where the passive link ends at the I/O bus, the computer begins at the I/O bus. Accordingly, a person of ordinary skill in the art would not be reasonably certain as to what the claims mean by "computer."

(**Appx40**).

## III. <u>THE PATENTS-IN-SUIT</u>

The Patents-in-Suit issued from U.S. Patent Application Serial No. 08/669,056, filed June 24, 1996 ("the CIP Application"), or as continuations thereof. The CIP Application was a continuation-in-part of U.S. Patent Application No. 08/226,278, filed April 11, 1994 ("the '278 Application").

The '278 Application disclosed a "simplified" interface circuit that allowed a computer to send and receive fax transmissions (through the interface circuit) to or from a facsimile machine on the same desk. This permitted users to "scan" by sending a fax to their computer, and "print" by sending a fax from their computer to their fax machine. (**Appx3353-Appx3401**). In the Background of Invention, the Applicant described the perceived problems to be addressed as follows:

> As is well known in the art, a conventional facsimile scans documents and transmits the scanned information through a modem in a standard facsimile format to a remote facsimile which receives the transmitted data by a modem and converts the transmitted data into a form for printing a document which is a replica of the document scanned by the transmitting facsimile.
>
> Scanning and printing devices especially adapted for use with PCs (i.e. personal computers) are relatively expensive devices typically costing

> many hundreds of dollars to as much as several thousands of dollars for applications requiring character recognition capabilities.
>
> It has been recognized that conventional facsimile machines may be utilized as scanners or printers for PCs. However, the interface devices presently available are both complicated and expensive and typically require a microprocessor which further tends to increase both cost and circuit complexity.

(**Appx3356-3357**). The Applicant identified the following as its object of the invention:

> It is, therefore, a principal object of the present invention to provide a circuit for interfacing a PC and a facsimile to enable the facsimile to be utilized as a scanner or a printer for a PC and to accomplish all of the objectives of a scanner or a printer in a simple straightforward manner through the use of a circuit of highly simplified design and low cost.

(**Appx3357**).

The "interface circuit of the present invention" (**Appx3363** at ll. 18-19) simulates elements of a telephone network between a facsimile machine and a computer on the same desk, so that they can send fax transmissions back and forth. Traditional/standard facsimile machines, by design, could only send and receive fax transmissions over telephone networks to remote fax machines. Accordingly, a computer and facsimile machine sitting on the same desk lacked a means for communication (except via separate lines on a telephone network) even if one tried to connect them directly via a telephone cord using the computer's fax modem. The Applicant's "interface circuit" sought to address this impediment, as had many other solutions before the '278 Application, by generating a telephone "ring" signal to the

PC, thereby "simulating what the PC believes is a request by a 'remote' facsimile [machine] to transmit data." (**Appx3364** at ll. 9-19). When that ring signal is received, the PC's fax modem "shifts to a receive mode for receiving what appears to the PC to be a facsimile transmission from a 'remote' facsimile machine." (***Id.***, ll. 19-25). Simulating the ring signal and other telephone network functionalities allowed the facsimile machine to communicate with a computer via the fax modem in each device, as if the computer were at a "remote" location. (**Appx3364-3365**).

The '278 Application disclosed only embodiments where the computer used its *own* fax modem[5] to communicate with the *facsimile machine's* modem, wherein the computer's fax modem and the claimed circuitry were positioned either ***inside or outside of the computer's case***. (**Appx3366-3368**; **Appx3390-3394**). It did not disclose any embodiments that enabled the facsimile machine and computer to communicate without using fax modems at each end, or without the "interface circuit" to simulate the telephone network.

---

[5] Appellants incorrectly describe Figure 2e as lacking "modulation," without citation. (**App.Br.** at 10). Figure 2e, however, discloses the use of facsimile modem circuitry "41" between the computer and the facsimile device. (**Appx3394**; *see* **Appx3366-3368** (stating that "facsimile modem circuitry 41" is the computer's modem); **Appx3282** (the Board noting that Figure 2e discloses a modem, and rejecting the idea that it discloses a passive link)).

## IV. THE PROSECUTION OF THE '811 PATENT

During prosecution of the '278 Application, the Applicant filed the co-pending CIP Application (Serial No. 08/669,056; filed June 24, 1996). (**Appx5015-5055**). The CIP Application gave rise to all four Patents-in-Suit.

The new matter added in the CIP Application includes, *inter alia*, three new embodiments shown in Figures 2f-2h (the "New Embodiments"). (**Appx80-82** at Figs. 2f-2h; **Appx86-87**). The New Embodiments purported to permit the facsimile machine and computer to communicate directly, via an RS-232 cable, without the use of a modem at the PC end.[6] (*See* **Appx110-112** (Figs. 2f-2h showing no modem at the PC end); *see also, e.g.*, **Appx117** at 6:47-63 ("FIG. 2f is used with PC's which do not have a fax modem installed.").

### A. Prosecution History of Exemplary Claim 1

Exemplary claim 1 of the '811 patent was originally claim 27 of the first CIP Application. The history of claim 1 provides necessary context for the present dispute about the indefiniteness of the terms "passive link" and "computer."

The Applicant added new claim 27 on September 2, 1998 (**Appx1288-1291**), and amended it one week later (**Appx4185-4189**) to read:

---

[6] The CIP Application also added two new embodiments, shown in Figures 2i and 2j, which did use a fax modem in the computer. (**Appx83** (showing a modem in the computer, with the option to use RS232 "when [the computer] does not contain [a] fax modem"), **Appx91** (showing a modem in the computer, and an interface circuit that uses "Automatic tone detection & Switching Control")).

> 27. The use of facsimile machines, and/or facsimile modems internal to an office product, to create a scanning capability from a facsimile machine to a component; with data transferred in a conventional way, and without manipulation, or modification of the original signals, said devices being directly connected and isolated from a connection <u>with</u> [to] a telephone <u>line</u>.

(**Appx4185**).

### 1. The Claims Were Anticipated by Perkins

The Examiner initially rejected claim 27 as anticipated by U.S. Patent No. 5,452,106 to Perkins[7] ("Perkins") in an Office Action dated July 20, 1999 (**Appx2124-2132**).[8] According to the Examiner, "Perkins disclose[d] a system and a method of a computer using a facsimile machine as a scanner or a printer," similar to that of the Patents-in-Suit. (**Appx2130-2131**). Perkins relied on a "facsimile device 3" ("Device 3") which included a modem and other circuitry, to allow the computer and facsimile machine to send fax transmissions directly to each other, rather than through a phone network. (**Appx2199-2201**; *see* **Appx2696** at [57]). Device 3 could be installed in the computer or positioned externally between the

---

[7] A copy of the Perkins prior art reference is appended as **Appx2696-2710**. Perkins issued as U.S. Patent No. 5,452,106 on September 9, 1995 and has §371 and §102(e) dates of December 30, 1993; prior to the earliest claimed filing date for the '278 Application (*i.e.*, April 11, 1994).

[8] Then-pending claims 28-31, 35-37, 43, 44, 47, and 49-53 were similarly rejected as anticipated by Perkins for the same reasons. *See, e.g.*, **Appx4201-4202** ("Regarding claim 43 and 51-53, see Perkins discussed above [regarding claim 27].").

computer and the facsimile machine. (**Appx2199-2201**; **Appx2696** at [57]; **Appx2708** at 9:29-33).

In an effort to overcome the rejection over Perkins, the Applicant amended claim 27 to require the facsimile machine be connected to a "computer" rather than to a "component" like Perkins' Device 3:

> 27. (Amendment 2)…. The use of facsimile machines [and/or [] facsimile modems internal to an office product], to create a scanning capability from a facsimile machine to a [component] <u>computer</u>; with data transferred [in a conventional way], <u>between the facsimile machine and the computer</u>, [and] without interruption, [manipulation or modification of the original signals] said facsimile machine and computer [devices] being directly connected <u>to each other</u>, and isolated from a connection with a <u>public network</u> telephone line.

(**Appx1226-1236** at **Appx1227**). The Applicant traversed the rejection on the ground that Perkins required the use of Device 3 (**Appx1232-1233**). The Applicant argued that the claimed invention was distinguished because it did not provide or require any of the "device 3 components and software". (*Id.*). Instead, the Applicant cited his New Embodiments and asserted that he had eliminated the need for such components:

> recognized and used the available serial port connector of a computer to enable the transfer of digital data for scanning and printing to and from a facsimile machine equipped with a serial port connector, **without requiring the need for a computer facsimile modem**, as shown in the Applicants, *(sic)* Patent Application, Figures F, G, and H, and described in the body of the Specification ….

(**Appx1233** (emphasis original)).

The Applicant emphasized the significance of the lack of "intervening circuitry":

> Unlike Perkins, the Applicant allows for the uninterrupted transfer of scanning or printing signals between the fax machine and the computer without the use of **intervening circuitry**, and does not intercept the signals for demodulation as Perkins does with device 3.

(**Appx1234** (emphasis added)). The Applicant repeated and emphasized this throughout the response including, *inter alia*:

> … the Applicant does not manipulate, modulate, demodulate, or interrupt, the transfer of the signals, between the facsimile machine and the computer, as is required by Perkins. …
>
> At the risk of being repetitive, I again emphasize, the Applicant does not require a microprocessor or **any circuitry or software to interrupt and intercept** the signals which occur in transmissions between a fax machine and a computer, and does not, manipulate, said signals in any way as Perkins does with device 3. Further, the Applicant enables a transmission to occur **between** the fax machine and a computer, by establishing an uninterrupted data transfer connection between the two devices….
>
> The Applicant also shows that a computer **fax modem is not needed** in Figures 2F, 2G and 2H, which Perkins does not consider in any of his applications.

(**Appx1234-1235** (emphasis original)).

The Examiner maintained the rejection (**Appx3440-3445** (January 19, 2000 Office Action)), explaining that, because Perkins uses an *internal* card yielding a

direct connection between the facsimile machine and the computer, the Applicant could not distinguish it as lacking a direct connection:

> Regarding claim 27, Perkins discloses using a facsimile machine (transceiver 1) as a scanner or a printer for a computer (2). Perkins clearly states at col. 9, lines 29-33 that the facsimile device may be provided on **a card for location in the computer**. The card would have connector for the facsimile transceiver to **connect the computer directly to the facsimile transceiver**. **Because the fax card is internal to the computer** and the connection between the facsimile transceiver and the computer is a **direct connection**, the signal or data transfer between the facsimile transceiver and the computer is **interpreted to be non-interrupted or uninterrupted, or without manipulation or modification of the scanned document image signals from the facsimile transceiver or the data from the computer to be printed**. The direction connection of the facsimile transceiver (1) and the computer (2) is isolated from the telephone line.

(**Appx3443** (emphasis added)).

In response (**Appx2146-2164**), the Applicant again amended claim 27 to require "***digital facsimile signals being received directly at the computer interface without prior circuit interception***"**.** (**Appx2149** (bold emphasis added)). The Applicant further distinguished Perkins on the ground that even though Perkins' Device 3 card was placed ***internal*** to the computer's case, it was nonetheless an intervening device that ***processed the data prior to the signal reaching the computer's I/O bus***:

> It is therefore evident that Perkins' device 3 intercepts the flow of data before it is transmitted to the computer circuits, in order to achieve the proper digital signal format acceptable to the computer. ***Hence, even though circuitry of device 3 is placed in a card within the box containing the computer it should be regarded as a peripheral device***

> ***to the computer which processes data before it is transmitted to the I/O bus of the computer***.
>
> ***Contrary to the above, when the Applicant transfers digital data from the facsimile transceiver*** for scanning to the computer, ***the data enters through the RS232 type connector port of the computer and passes directly to the I/O Bus*** and is processed by the receiving circuits (*i.e*. UART, CPU) of the computer, providing a true non intercepted signal between the facsimile transceiver and the computer.
>
> In effect, ***the Applicant's method does not use intermediary circuitry for signal demodulation or modulation such as is required by Perkins with his card or device 3.***

(**Appx2160** (emphasis added)).

Applicant was notified on October 24, 2001 that the response to the Office Action was rejected as non-responsive. (**Appx5056**). Subsequently, on November 23, 2001, the Applicant filed a "second" response to the January 19, 2000 Office Action (**Appx1293-1313**) wherein the Applicant once again stressed that, unlike Perkins, the signal in the claimed method ***was not intercepted between the facsimile machine and the computer***. (**Appx1306-1309**). The November 23, 2001 response was also rejected as non-compliant. (**Appx5057-5062**).

The Applicant submitted a revised response on May 25, 2002, with the Applicant maintaining all of his arguments regarding Perkins. (**Appx2213-2234**). At that point, claim 27 still reflected the prior amendment with respect to the "***said digital facsimile signals being received directly at the computer interface without prior circuit interception***" language. (**Appx2229**).

### 2. The Applicant Successfully Distinguished Perkins by Adding the "Passive Link" Language

The resubmitted May 25, 2002 response apparently never made it to the Examiner. On September 9, 2002, the Applicant "resubmitted" his May 25, 2002 response. (**Appx2188-2211**). However, he did not resubmit the same document. Instead, he once again amended the claim, this time adding the "passive link" language as follows (only then-current amendments are reflected below):

> Claim 27. (Amendment 3) – A method of creating a scanning capability from a facsimile machine to a computer; with scanned image digital signals transferred <u>through a passive link</u>, without interception from the facsimile machine to the computer, comprising the steps of:
>
> …
>
> conditioning the facsimile machine to transmit digital signals representing data on a scanned document to the computer, said computer being equipped with send/receive driver communications software enabling the reception of scanned image signals from the facsimile machine, said transmitted digital facsimile signals being received directly into the computer interface [without prior circuit interception] <u>through the passive link</u>, thereafter, said computer processing the received digital facsimile signals of the scanned document as needed.

(**Appx2206**). In his "remarks/argument", the Applicant responded to the rejection of claim 27 over Perkins by equating his prior arguments concerning a lack of intervening circuitry with the new "passive link" language:

> The Applicant creates a ***passive link*** between the facsimile machine and the computer in order to accommodate the signal transfer for printing or scanning. ***Therefore, the Applicant does not require any intervening apparatus as does Perkins***.

(**Appx2196** (emphasis added)). The Applicant emphasized that, in contrast to Perkins, the claimed subject matter ***did not*** include a modem at the computer interface, specifically referencing the New Embodiment shown in "Fig. 2G":

> In addition, ***Perkins' device 3 or card design requires a modem to be integrated into it*** in order to transfer signals for scanning or printing as part of his computer and facsimile transceiver interface. ***In contrast, the Applicant can transfer digital signals between the facsimile transceiver and the computer without the need for a modem at the computer interface, in accordance with*** the following quotation from the Applicants' Patent Application, page 16, lines 22 through page 17; line l4, and **Fig 2G**.

(**Appx2196-2197** (emphasis added)). The Applicant again clearly asserted the passive link excluded any intervening device between the fax modem and the I/O bus of the computer:

> It is therefore evident that Perkins' device 3 intercepts the flow of data before it is transmitted to the computer circuits, in order to convert the analog signal into a digital signal format acceptable to the computer. Hence, ***even though circuitry of device 3 is placed in a card within the box containing the computer it should be regarded as a peripheral device to the computer which processes data before it is transmitted to the I/O bus of the computer***.
>
> ***Contrary to the above, when the Applicant transfers digital data*** from the facsimile transceiver through a passive link for scanning to the computer, the non-intercepted data enters ***through the RS232 type connector port of the computer and, passes directly to I/O Bus*** and is processed by the receiving circuits (i.e. UART, CPU) of the computer, providing a true non intercepted digital signal between the facsimile transceiver and the computer.

(**Appx2201** (emphasis added)).

After the Applicant added the "passive link" language and explained that Perkins' Device 3 "intercepts" the data on the relevant path between the computer and the facsimile machine, the Examiner withdrew the rejection over Perkins. (**Appx4223-4235**).

### 3. In Response to Later Rejections, the Applicant Provided a "Definition" for "Passive Link"

The prosecution continued, with additional rejections based on other references, including at least one that resulted in further discussion of the "passive link" term. In an Office Action mailed on January 29, 2004 (**Appx4223-4235**), the Examiner rejected the same claims as anticipated by Nakamura *et al.* stating:

> Regarding claim 27, Nakamura et al. discloses a method of using a facsimile apparatus (FAX1) as scanner and a printer for a personal computer (PC) …. In the PC-FAX mode, data is directly transferred or transferred through a passive link from FAX1 to PC. Here, 'a passive link' is interpreted to means a communication link without the involvement of a communications network.

(**Appx4230**).

In his response mailed on April 29, 2004 (**Appx1767-1792**), the Applicant provided his "definition" of the claim term "passive link" as follows:

> The Applicant's definition of a 'passive link' is one where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine, for purposes of providing both scanning or printing data.

(**Appx1784**).

The Applicant distinguished Nakamura, just as he had Perkins, on the ground that it did not teach a "passive link" because Nakamura's expansion board was ***in between*** the fax machine and the computer:

> As noted, the prior art did not provide a 'passive link' between the PC / FAX, as defined by the Applicant herein, ***but had an expansion board provided with an internal register located in between the PC / FAX***. As previously stated, the expansion board was necessary and integrated with the data flow between the PC / FAX, therefore, data was not directly transferred or transferred through a passive link as suggested by the Examiner.

(*Id.*; emphasis added).

A Notice of Allowability ultimately issued on January 14, 2005. (**Appx4262-4274**), with pending claim 27 issuing as Claim 1 of the '811 patent.

## V. <u>THE REEXAMINATION OF THE '811 PATENT</u>

In 2014, nine years after issuing the '811 patent, the PTO granted a request for *ex parte* reexamination. (**Appx4275-4720**; **Appx3200-3289**). The PTO found a substantial new question of patentability as to claim 1 (previous claim 27) and other

claims based on anticipation and obviousness by U.S. Patent No. 5,900,947 to Toshio Kenmochi *et al*. ("Kenmochi"). (**Appx3217-3218**; **Appx3222-3225**).

In the First Office Action, the Examiner rejected all challenged claims as, i*nter alia*, anticipated by Kenmochi. (**Appx2304-2366**). The effective filing date of Kenmochi falls between the filing date of the '278 Application and the CIP Application. (*See* **Appx2685**). Because the claims of the '811 patent were entitled only to the CIP Application filing date, Kenmochi was available as prior art. (**Appx3219**).

In an Examiner interview conducted on October 10, 2014 (**Appx2500-2503**), the PO sought to antedate Kenmochi, arguing the claims were entitled to the benefit of the '278 Application (which issued as U.S. Patent No. 5,530,558). The PO asserted Figures 2b, 2c, and 2d of the '278 Application disclosed the "passive link" limitation. (**Appx2500**). Each of the embodiments shown in those figures, however, includes a fax modem installed in the computer, and two of the figures further include the signal processing "interfacing circuit 10" in the computer, all of which process the signal prior to it reaching the I/O bus like Perkins' Device 3. (**Appx76-78**).

Following the interview, the PO submitted a response to the Office Action, asserting the claims were entitled to the benefit of the original '278 Application filing date and arguing Kenmochi was not prior art. (**Appx2371-2463** at **Appx2373-**

**2379**). While the PO admitted the term "passive link" does not appear in the '278 specification, it asserted that Figures 2b-2d disclosed a "passive link," where "after the initiation of the data flow is activated, the RJ 11 telephone cable connects the fax machine 30 to the PC computer 40 such that there is 'no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection between the PC and the facsimile machine.'" (**Appx2377-2378**).

PO submitted a declaration from Dr. Marc Levitt, the same expert Appellant relied upon in the district court, who likewise cited Figures 2b-2d and opined the modulation procedure performed by the modem "within the PC" does not preclude a passive link, thereby arguing the claims do not exclude a modem at the computer interface. Thus, under Dr. Levitt's view, the "passive link" no longer extended to the computer's I/O bus, but instead extended only to the RJ-11 cable port of the computer. (**Appx2374** (referring to Levitt declaration); **Appx1974-1984** at **Appx1980** ¶30 (Levitt declaration)).

A Final Office Action issued on February 11, 2015 (**Appx2505-2588**), in which the Examiner concluded the '278 Application provided §112 support for the claimed "passive link." (**Appx2527**). The Examiner further concluded,

> the facts would lead an ordinary artisan to conclude that the claimed 'passive link', analogous to a 'direct connection', constitutes the <u>direct physical connection between the facsimile machine and the computer, regardless of whether the PC included an internal modem</u>.

(**Appx2528-2529** (emphasis original)).

The Examiner did not address the inconsistency of the Applicant's prior statements during prosecution concerning the *exclusion* of a modem at the computer interface, as taught by Perkins. Accordingly, the Examiner determined that "with respect to the 'passive link' limitation, the independent claims of the '811 patent are entitled to the April 11, 1994 filing date of the '278 Application." (**Appx2529**). With Kenmochi antedated, the rejection of claims 12, 15, and 17 were withdrawn. The rejection of the remaining claims, however, was maintained. (**Appx2583-2584**).

In an April 13, 2015 response, PO argued that all rejections based on Kenmochi were improper because all of the claims were entitled to the benefit of the '278 Application filing date. (**Appx4932-4949** at **Appx4947-4949**).

The Examiner then issued an *Ex Parte* Reexamination Advisory Action dated May 7, 2015, (**Appx3231-3248**), which maintained the rejection as to certain claims, because the Examiner determined the '278 Application did not disclose, *inter alia*, "digital" transmission of data. (**Appx3245**). After an interview on July 30, 2015, the Examiner issued an Advisory Action (**Appx4950-4975**) concluding that "there is no written description support in the '278 Application for ***digital transmissions*** to

and from the facsimile machine," as required by the claims. (**Appx4972** (emphasis added)).

On September 14, 2015, PO appealed the rejections to the Patent Trial and Appeal Board ("Board") (**Appx3475-3516**). The issue was whether the '278 Application supported digital transmission (**Appx2781**), although in the course of the appeal, PO asserted once again that Figures 2b, 2c, and 2d of the '278 Application disclose a passive link.[9] (**Appx3480**). In a July 19, 2016 decision (**Appx2775-2789**), the Board concluded the '278 Application disclosed digital transmission and that Kenmochi did not qualify as prior art. (**Appx2788**).

The Board ***did not address the Patentee's inconsistent positions*** regarding the end point of the "link" that must be "passive." A reexamination certificate issued on September 20, 2016. (**Appx99-100**).

## SUMMARY OF ARGUMENT

The district court properly concluded the Appellant took irreconcilably conflicting positions regarding the end-points of the claimed "passive link," rendering the claim terms "passive link" and "computer" indefinite.

---

9 The PO also argued, without explanation, that Figures 2a and 2e of the '278 Application disclose a passive link. (**Appx3480**). Those figures show an intervening device along the communication path, outside of either the facsimile machine or the computer. (*See* **Appx75**; **Appx79**; **Appx3855-3856** at 61:19-62:17 (Appellant later admitting Figure 2e shows an "intervening" apparatus with an "active" circuit)).

During prosecution, to overcome the rejection over Perkins, the Applicant argued the claimed subject matter distinguished over Perkins because the "passive link" of the claims extends from the facsimile machine to the ***I/O bus of the computer***—not the outside of the box containing the computer—without any "intervening apparatus," such as a modem, along its path. That position allowed the Applicant to successfully argue that Perkins' card comprising a fax modem was an "intervening apparatus," even though the card was installed ***inside*** the box containing the computer. The Applicant supported this argument by relying on his New Embodiments added in Figures 2f, 2g and 2h of the CIP Application, which had no fax modem or intervening circuitry inside the box containing the computer, or anywhere else between the facsimile machine and the I/O bus of the computer.

Nine years later, the PO reversed the Applicant's position. During *ex parte* reexamination, PO asserted that each of the embodiments shown in Figures 2b, 2c and 2d of the '278 Application disclosed a "passive link" to antedate an anticipatory reference. Each of those embodiments, however, include fax modems and/or other circuitry between the facsimile machine and the I/O bus of the computer.

To rely on those embodiments, PO argued the "passive link" ***ends*** at the port on the outside of the box containing the computer, rather than extending to the computer's I/O bus inside the box. That argument was wholly inconsistent with the position the Applicant took during prosecution to successfully distinguish Perkins.

As the district court found, the claims could not have issued over Perkins if the "passive link" and "computer" were defined as they were during reexamination.

These conflicting positions cannot be reconciled; the claims when "read in light of the specification and the prosecution history … fail[] to inform, with *reasonable certainty*, those skilled in the art about the scope of the invention." *Teva*, 789 F.3d at 1345 (emphasis in original); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). It is impossible for one of ordinary skill in the art to discern with reasonable certainty where the "passive link" ends and the "computer" begins. There is simply no way to harmonize the conflicting positions.

Accordingly, the district court did not err by holding the claim terms "passive link" and "computer" indefinite and the Asserted Claims invalid under 35 U.S.C. §112, second paragraph (pre-AIA).

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews indefiniteness determinations *de novo*, except that subsidiary fact findings based on extrinsic evidence are reviewed for clear error. *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019).

## II. LEGAL STANDARDS

The Supreme Court has articulated the legal standard with respect to indefiniteness, holding that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.

Before *Nautilus*, a claim was not indefinite if a skilled artisan could arrive at some method of measuring and practicing practice it. *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 634 (Fed. Cir. 2015) (citation omitted). But "this is no longer sufficient," as *Nautilus* requires "the patent and prosecution history [to] disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select," "[p]articularly … where different approaches to measurement are involved." *Dow*, 803 F.3d at 630, 634.

This Court has held that a claim term should be defined and interpreted in light of its prosecution. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*) ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be"); *see also Markman v Westview Instr.,*

*Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*) (the prosecution history "is of primary significance in understanding the claims."), *aff'd* 517 U.S. 370 (1996). Where, as here, a patentee "repeatedly and consistently" characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization. *Cf. Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018) (quoting *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016)) (construing claim term in accordance with its consistent use throughout the specification). Indeed, claim terms must be defined consistently in related patents/applications. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (statements by the patentee in the prosecution of sibling patent relevant even when the statement is made in the context of a later-prosecuted application); *Wang Labs., Inc. v. Am. Online Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999) ("[T]his subject matter is common to the continuation-in-part application, and argument concerning the [prior art] reference was correctly viewed as applying to the common subject matter."). Statements made during prosecution are relevant to claim construction and indefiniteness. *See Teva*, 789 F.3d at 1343 (citing *Teva, USA, Inc. v. Sandoz*, 135 S. Ct. 831, 841 (2015)); *see also Nautilus*, 572 U.S. at 908; *Phillips*, 415 F.3d at 1317.

Where the applicant relies upon two inconsistent definitions of a claim term during prosecution, the term is indefinite. *See Teva*, 789 F.3d at 1345. This aligns with the definiteness requirement's "public-notice function," *Nautilus*, 572 U.S. at 911, which focuses on whether claims are "precise" enough to allow a "'potential competitor to determine whether or not he is infringing,'" before he has even designed a product. *Amgen Inc. v. Hoechst Marion Roussel*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (quoting *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470, 1195 (Fed. Cir. 1993)).

## III. DURING PROSECUTION, THE APPLICANT DEFINED "PASSIVE LINK" AS EXTENDING TO THE I/O BUS OF THE "COMPUTER"

The claim term "passive link" is not defined—or even recited—in the specification of the Patents-in-Suit. The Applicant added the term to the Asserted Claims to overcome the Examiner's repeated rejections over Perkins, relying on the New Embodiments the Applicant added in the CIP Application. (**Appx2206**). Through a series of arguments presented during the prosecution of the '811 patent, the Applicant made clear the passive link extends from the facsimile machine to the computer's I/O bus. Doing so allowed the Applicant to distinguish Perkins as including an "intervening apparatus," even though that apparatus was on a card installed ***inside*** the box containing the computer. Necessarily, and as the Applicant stated, the only way the presence of that internal card was an intervening apparatus

between the facsimile machine and the computer was because the passive link ended and the computer started at the computer's I/O bus.

Appellant asserts the district court erred in finding that the Applicant stated "the claimed passive link extends to the I/O bus." (*See, e.g.*, **App.Br.** at 16). However, the prosecution history proves the district court's finding is correct and must be upheld.

### A. The Applicant Added "Passive Link" to Overcome a Rejection Based on Perkins

During prosecution of the CIP Application, claim 27 (later issued as claim 1 of the '811 patent)[10] was repeatedly rejected as anticipated under 35 U.S.C. §102(e) by Perkins. (*See, e.g.*, **Appx4195-4203**; **Appx3440-3445**; **Appx4223-4235**). Over the course of five and one half years, and six amendments and responses to official actions,[11] the Applicant consistently argued the claimed subject matter was distinguishable from Perkins and other prior art because the claimed subject matter of the CIP Application requires a "passive link," which excludes use of an intervening device between the facsimile machine and the computer's I/O bus.

---

10 Infinity's refrain that claim 27 "never issued" is wrong. Indeed, application claim 27 issued as claim 1 of the '811 patent.

11 *See* **Appx1226-1236**; **Appx4204-4222**; **Appx1293-1313**; **Appx2188-2211**; **Appx1767-1792**.

### B. The New Embodiments Are the Support for the "Passive Link"

It is critical to recognize that representative claim 1 (former claim 27) of the '811 patent issued from the CIP Application in which the Applicant added, *inter alia*, the New Embodiments depicted in Figures 2f, 2g and 2h. (**Appx72** at [63]; **Appx84** at 1:5-7). Unlike the originally-filed embodiments shown in Figures 2a-e, these New Embodiments have no intervening circuitry or apparatus between the facsimile machine and the computer. Instead, the "interface circuitry of the present invention" and fax modem reside in the facsimile machine. (**Appx84** at 2:30-32; **Appx80-82**; **Appx86** ("FIG.2f shows an arrangement in which interface circuit 10 is internal to the facsimile machine.")). Thus, the embodiments depicted in Figures 2f-2h use a "passive link". (**Appx4253**). Figure 2f is representative. (**Appx80**):




Fig. 2f

### C. The Applicant Relied on the New Embodiments to Distinguish Perkins

Central to this appeal are the Applicant's arguments made during prosecution to distinguish the Perkins reference. It is undisputed that Perkins describes a card comprising a fax modem that is mountable ***inside*** a computer. (**Appx2708** at 9:29-33 ("the facsimile device may be provided on a card for location in the computer")). The Applicant was unequivocal that the pending claims were directed to the New Embodiments (*i.e.*, Figs. 2f, 2g and 2h), which ***do not*** include a fax modem inside the computer.

For example, in distinguishing Perkins in response to the July 20, 1999 Office Action, the Applicant stated:

> Unlike Perkins, the Applicant allows for the uninterrupted transfer of scanning or printing signals between the fax machine and the computer without the use of intervening circuitry, and does not intercept the signals for demodulation as Perkins does with device 3.

(**Appx1234**). The Applicant repeated and emphasized this throughout his response including, *inter alia*:

> At the risk of being repetitive, I again emphasize, the Applicant does not require a microprocessor or **any circuitry or software to interrupt and intercept** …

> The Applicant also shows that a computer **fax modem is not needed** in Figures 2F, 2G and 2H, which Perkins does not consider in any of his applications.

(**Appx1234-1235** (emphasis original)).[12]

When the Examiner maintained the rejection on the ground that Perkins' "fax card is internal to the computer and the connection between the facsimile transceiver and the computer is a direct connection" (**Appx3443**), the Applicant initially amended claim 27 to require that data is transferred "directly between the facsimile machine and the computer" and "received directly at the computer interface[13] without prior circuit interception." (*Id.*) And once again, the Applicant's remarks accompanying the amendment confirmed the claims were directed to the New Embodiments "***as delineated in Figures 2F, 2G, and 2H***." (**Appx2156** (emphasis added)).

It was in this response that the Applicant first made clear the computer end of the link between the fax machine and the computer ended not at a port on the

[12] The Applicant also discussed embodiments of Figures 2i and 2j, which used modems at the computer end. These embodiments were covered by different claims, such as then-claim 28, where the facsimile machine was directly connected to the computer's "modem" rather than to the computer itself. (**Appx1227-1228**).

[13] At the time, claim 27 was the only claim that included the "interface" language. (**Appx2149-2155**). None of Patentee's arguments placed any significance on that language, and the Applicant incorporated those same arguments as to the claims lacking it. (*See, e.g.*, **Appx2183-2185** (incorporating the same arguments as to at least claims 36-38, 40, 43, 47, 52, and 53, all of which lack the "interface" language)).

computer's case, but instead at the computer's I/O bus. The Applicant unequivocally distinguished Perkins on the ground that even though the card containing "device 3" is placed ***internal*** to the computer, it was nonetheless an ***intervening device that processed the data prior to the signal reaching the computer's I/O bus***:

> When Perkins places his device 3 on a ***card internal to the computer***, the same process noted above occurs. In this internal configuration, facsimile transmission ***data never enters the computer I/O Bus until after it is processed by the device 3 card circuits*** into digital data, thereafter, the flow of data transfers to the I/O Bus and is processed by the computer circuitry.
>
> It is therefore evident that Perkins' device 3 intercepts the flow of data before it is transmitted to the computer circuits, in order to achieve the proper digital signal format acceptable to the computer. ***Hence, even though circuitry of device 3 is placed in a card within the box containing the computer it should be regarded as a peripheral device to the computer which processes data before it is transmitted to the I/O bus of the computer***.

(**Appx2159-2160** (emphasis added)). To avoid any confusion, the Applicant expressly disclaimed any such intermediary circuitry between the facsimile machine and the computer's I/O bus.

> ***Contrary to the above***, ***when the Applicant transfers digital data*** from the facsimile transceiver for scanning to the computer, ***the data enters through the RS232 type connector port of the computer and passes directly to the I/O Bus*** and is processed by the receiving circuits (*i.e.* UART, CPU) of the computer, ***providing a true non intercepted signal between the facsimile transceiver and the computer***.

> In effect, the ***Applicant's method does not use intermediary circuitry*** for signal demodulation or modulation such as is required by Perkins with his card or device 3.

(**Appx2160** (emphasis added)).

### D. The Applicant Successfully Distinguished Perkins by Adding the "Passive Link" Claim Limitation

The Applicant introduced "passive link" language by way of his fourth response submitted on September 9, 2002, in a refinement of its attempts to distinguish Perkins. (**Appx2206**). The Applicant amended claim 27, for example, to require:

- "scanned image digital signals transferred through a **passive link**, without interception from the facsimile machine to the computer"; and
- "transmitted digital facsimile signals being received directly into the computer interface through the **passive link**."

(**Appx2206** (emphasis added)). The Applicant once again repeated his earlier arguments, this time in the context of a so-called "passive link," confirming the claim term "passive link" meant there was ***no intervening signal processing circuitry, including no "modem at the computer interface"*** as depicted in "Figures 2F, 2G, and 2H," *i.e.*, in the New Embodiments. (**Appx2196-2197**).

Most significantly, the Applicant was again unequivocal in defining the computer-end of the claimed "passive link" as the I/O bus of the computer:

> … even though circuitry of device 3 is placed in a card ***within the box containing the computer*** it should be regarded as ***a peripheral device to the computer*** which processes data before it is transmitted to ***the I/O bus of the computer***.

(**Appx2201** ( emphasis added)). The addition of the "passive link" language, and the Patentee's accompanying explanation of the endpoints of the "passive link," resulted in the withdrawal of the Perkins rejection. (*See* **Appx4230**).

The Applicant's arguments provided unequivocal notice to the public that the computer's I/O bus was the end point of the "passive link," as that term was defined by the Applicant. That definition was necessary to distinguish the claims of the CIP Application over the Perkins reference. The Applicant was unequivocal in his intent to exclude from his definition of "passive link" the presence of any intervening circuitry between the facsimile machine on the one end and the computer's I/O bus on the other.

### E. The Applicant Disavowed Any Other Claim Scope for "Passive Link" and "Computer"

The Supreme Court has made clear that indefiniteness is to be determined in light of the patent specification and prosecution history. *Nautilus*, 572 U.S. at 908. This is consistent with the unwavering precedent that claim terms are to be construed in accordance with their ordinary meaning except in instances where a patentee acts as his own lexicographer or where the patentee disavows the full scope of the claim

term in the specification or during prosecution. *See, e.g.*, *Poly-America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

The term "passive link" is not a term of art and has no recognized plain and ordinary meaning. Nor is the term used, much less defined, in the specification. Rather, it was introduced into the claims during prosecution. (**Appx2188-2211**). The Applicant's arguments made in conjunction with the introduction of the "passive link" claim language clearly disavowed the presence of any signal processing circuitry in the link between the facsimile machine and the I/O bus of the computer, including, *inter alia*, the presence of a fax modem installed in the computer. This Court has made clear that statements distinguishing or disparaging prior art on the absence of a specific feature works to disavow claim coverage of such feature. (*Id*. (citing *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513-514 (Fed. Cir. 2015)).

In the present case, a finding of disavowal is not required because the conflicting positions regarding "passive link" and "computer" preclude a person of skill in the art from being reasonably certain of their meaning. *See Teva*, 789 F.3d at 1343-45). Nonetheless, the standard for disavowal is met.

The Applicant was unequivocal that the "passive link" extends between the facsimile machine and the I/O bus of the computer, disavowing the presence of any intervening circuitry including, *inter alia*, a fax modem:

> When Perkins places his ***device 3 on a card internal to the computer***, the same process noted above occurs. In this internal configuration, ***facsimile transmission data never enters the computer I/O Bus until after it is processed by the device 3 card*** circuits into digital data, thereafter, the flow of data transfers to the I/O Bus and is processed by the computer circuitry.
>
> ***It is therefore evident that Perkins' device 3 intercepts the flow of data before it is transmitted to the computer circuits***, in order to achieve the proper digital signal format acceptable to the computer. Hence, ***even though circuitry of device 3 is placed in a card within the box containing the computer*** it should be regarded as a peripheral device to the computer which ***processes data before it is transmitted to the I/O bus of the computer***.
>
> ***Contrary to the above, when the Applicant transfers digital data from the facsimile transceiver through a passive link*** for scanning to the computer, the non-intercepted ***data enters through the RS232 type connector port of the computer and, passes directly to I/O Bus*** and is processed by the receiving circuits (i.e. UART, CPU) of the computer, ***providing a true non intercepted digital signal between the facsimile transceiver and the computer***.
>
> In effect, the ***Applicant's method does not use intermediary circuitry for signal demodulation or modulation such as is required by Perkins with his card or device 3***.
>
> Consequently, the ***Applicant's claims 27 -29, 32 – 48, and 52 – 54 are different than the prior art*** as required by 35 U.S.C. §102(e). ***Not only is the Applicant's invention different***, but his invention is not obvious, in keeping with the requirement of 35 U.S.C. §103.

(**Appx2201** (emphasis added)).

Accordingly, the district court did not err in finding that, during prosecution, the Patentee defined the claimed "passive link" as extending to the I/O bus of the

computer and, in turn, the "computer" at the end of the passive link began at the I/O bus and not the connectors outside the box containing the computer.

## IV. DURING REEXAMINATION, THE PO REVERSED POSITIONS, RE-DEFINING "PASSIVE LINK" AS ENDING AT THE OUTSIDE OF THE BOX CONTAINING THE "COMPUTER"

Despite having unequivocally distinguished the Perkins reference by arguing the claims of the '811 patent (i) exclude any intervening circuitry (including a fax modem) between the fax machine and the I/O bus of the computer, and (ii) are directed to the New Embodiments depicted in Figures 2f-2h, the PO argued the diametrically opposite position in order to antedate anticipatory prior art during reexamination.

### A. The PO Took a Contradictory Position with Regard to the Definition of "Passive Link" (and in turn "Computer") to Antedate an Anticipatory Reference During Reexamination

Specifically, during an examiner interview, the "Patent Owner stated the RJ-11 telephone cable shown in figs. 2b, 2c and 2d of the '588 patent is a 'direct' and 'passive link.'" (**Appx4721**). However, each of the embodiments depicted in Figures 2b, 2c and 2d include a fax modem and two of them (2b and 2d) include the "interfacing circuit 10" ***inside the case of the computer***; ***hence, between the facsimile machine and the I/O bus of the computer***.



Fig. 2b



Fig. 2c



Fig. 2d

### B. The PO Reiterated Its New Claim Construction Position to the PTO Multiple Times, and Ultimately Prevailed

While Figures 2f-2h were helpful in distinguishing Perkins, these Figures were not disclosed in the '278 Application so Applicant could not use them to antedate Kenmochi. Rather, Applicant needed the benefit of the filing date of the '278 Application in order to do that. Now Applicant had to rely on Figures 2b-2d to be accorded the benefit of the earlier filing date of the '278 Application.

PO reiterated this new definition of "passive link" in its written response to the Office Action rejecting its claims. It stated that "Figures 2b-2d," as opposed to Figures 2f-2h, disclose support for "passive link." (**Appx2377-2378**). It specifically pointed to "the RJ 11 telephone cable [that] connects the fax machine 30 to the PC computer 40" as constituting the passive link.

PO further submitted an expert declaration by Dr. Marc Levitt, which again asserted the embodiments shown in Figures 2b, 2c, and 2d provide support for the "passive link" term. (**Appx1980** at ¶29). Dr. Levitt's declaration likewise pointed to "the cable between the PC's RJ-11 and the fax's RJ-11 [port]" as constituting the "path" of the "passive link," and stated that "the use of a modulation procedure within the PC and facsimile machine as shown in the figures does not insert an intervening apparatus or processing element along [that] path." (*Id.* at ¶30). Dr. Levitt placed no significance on those embodiments' use of internal modems.

## V. THE PATENT OWNER'S POSITION IN REEXAM DIRECTLY CONFLICTS WITH THE APPLICANT'S POSITION IN DISTINGUISHING PERKINS

The two opposing positions cannot be reconciled. As detailed *supra*, Perkins taught the method of allowing a computer to use the scanning and printing functions of a facsimile machine, through the installation of the Device 3 card comprising a fax modem and other circuitry ***in the computer***. The Applicant argued that even though the card was installed inside the case of the computer – just as is shown in Applicant's own Figures 2b, 2c and 2d – it was nonetheless between the fax machine and the I/O bus and therefore ***not*** a passive link. This irreconcilable inconsistency is shown in the following depiction:

<table>
<tr>
<td>

**During Prosecution**

Applicant: Perkins' internal configuration ***does not disclose*** a passive link.

(**Appx2196**; **Appx2201**)

</td>
<td>




</td>
</tr>
<tr>
<td>

**During Reexamination**

Patent Owner: The ***same configuration does disclose*** a passive link.

(*See, e.g.*, **Appx2377-2378**; **Appx1980** at ¶¶29-30).

</td>
<td>




</td>
</tr>
</table>

Thus, the Applicant took diametrically opposite positions concerning the end points of the "passive link" and—correspondingly—the start point of the "computer." By doing so, the Applicant successfully overcame the Perkins rejection based on the first definition of "passive link," while also successfully antedating Kenmochi during reexam using the second definition.

PO created the indefiniteness that renders the claims invalid. It is clear from the pre-reexam prosecution history that the claimed "passive link" extends from the facsimile machine on one end, to the I/O bus of the computer on the other end. Simply put, if the "passive link" did not extend from the facsimile machine to the I/O bus in the computer, the claims would not have issued over Perkins' teaching of "device 3" that included a fax modem and signal processing circuitry installed on a card inside the computer's case before the I/O bus. (**Appx2201**).

The end point of the "passive link" distinguishing Perkins could not be exterior of the computer's case, or at a port on that case, since Perkins' "device 3" was inside the case, and the RJ-11 connection to "device 3" terminated at a port on that device. Thus the "computer" started at the I/O bus, as the Applicant expressly argued. Yet, the PO argued during the reexam the embodiments of Figures 2b, 2c and 2d included a "passive link" even though they, like Perkins, had a modem and signal processing circuitry installed between the fax machine and the computer's I/O bus. (**Appx270** at 6:31-33 ("The circuitry 10 of the present invention may alternatively be placed upon a printed circuit card of approximately a credit card size for insertion in a bus slot")).

The district court properly concluded there is no way to harmonize these two contradictory definitions of "passive link," which it accurately summed up as follows:

> Under the patentee's first definition, the '278 application lacks written description for a passive link because the '278 application does not disclose a link that was passive until the computer's I/O bus. Rather, under that definition, each embodiment disclosed in the '278 application includes an intervening apparatus - a modem - between the fax machine and the I/O bus. (*See* '811 patent, Figs. 2b-2d) Conversely, the patentee's second definition, used to overcome the written description rejection, would not distinguish the Perkins patent because Perkins teaches connecting a fax machine to a computer a via an intervening device: a 'facsimile device' inside the computer. (Perkins 9:24-32) The patentee's contentions regarding 'passive link' have been materially inconsistent. Hence, a person of ordinary skill in the art would not be reasonably certain as to which of the patentee's two inconsistent definitions of 'passive link' is used in the claims, rendering

> the claims indefinite. *See Teva*, 789 F.3d at 1345 (holding claim term indefinite where patentee used two inconsistent definitions of term during prosecution).

(**Appx38-39**).

### A. This Court's Decision in *Teva* Required the District Court to Find "Passive Link" and "Computer" Indefinite

This Court's decision in *Teva* is particularly on point, and the Appellant's attempts to distinguish the present case lack merit. In *Teva*, the representative claim included the term "molecular weight." 789 F.3d at 1338. However, in the context of the claimed protein molecules, there were three distinct possible definitions: peak average molecular weight ($M_p$), number average molecular weight ($M_n$), and weight average molecular weight ($M_w$), each of which is calculated in a different manner and yield different values. *Teva*, 789 F.3d at 1338. In response to an indefiniteness rejection in an earlier filed application, the applicants "argued that the term 'molecular weight' was not indefinite because '[o]ne of ordinary skill in the art could understand that kilodalton units implies a weight average molecular weight', i.e., $M_w$." *Id*. at 1343.

However, in response to a "nearly identical indefiniteness rejection" in a later filed continuation application, the applicants argued that "a person 'of ordinary skill in the art, upon reviewing the specification, would understand that 'average molecular weight' refers to the molecular weight at the peak of the molecular distribution curve in Figure 1,' i.e., $M_p$." *Id*. at 1344. In other words, the Applicant

took two conflicting positions: that "average molecular weight" means both "$M_w$" and "$M_p$." On that record, this Court held that as a result of the two inconsistent positions with respect to the same claim term, because "read in light of the specification and the prosecution history, the patentee has failed to inform with *reasonable certainty* those skilled in the art about the scope of the invention." (*Id.* at 1345 (emphasis in original)). "On this record, there is not reasonable certainty that molecular weight should be measured using Mp." (*Id.*) The same result is compelled here.

### B. The Appellant Made Far More Than "a Single Inconsistent Statement," But Even One Inconsistent Statement Can Render Claims Indefinite

The Appellant's recurring argument that "a single inconsistent statement does not mandate indefiniteness" (**App.Br.** at 50-53) fails on both factual and legal grounds.

*First*, as shown in detail *supra*, the indefiniteness was not created by a single statement. To the contrary, the Applicant consistently and repeatedly distinguished Perkins as lacking a "passive link" because it disclosed an intervening apparatus, even though that apparatus was installed inside the computer between the exterior port and the I/O bus. The Examiner only withdrew the rejection over Perkins after the claims were limited to the "passive link" so defined. *See Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1322-23 (Fed. Cir. 2016) (noting that, in

construing the claims, the Court pays "particular attention to the 'examiner's focus in allowing the claims' after amendment" (quoting *R+L Carriers, Inc. v. Qualcomm, Inc.*, 801 F.3d 1346, 1351 (Fed. Cir. 2015)); *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998) (stating that when "the addition of the … limitation … resulted in the allowance of claims that had been rejected," it "is a highly influential piece of prosecution history").

Yet in order to antedate an anticipatory reference during an *ex parte* reexamination, PO took the diametrically opposite position before the Examiner and the Board, arguing that Figures 2b-2d of the '278 Application disclosed a "passive link" even though, like Perkins, they included an intervening fax modem installed inside the computer between the exterior port and the I/O bus. It did this first in an October 10, 2014 interview where it cited Figures 2b, 2c and 2d as disclosing a "passive link." (**Appx2500**). Then it did it again in an Office Action response making the same argument. (**Appx2377-2378**). It did it yet again in an expert declaration submitted in support of its effort to antedate Kenmochi. (**Appx1980**). It

made the same argument yet ***again*** in appealing the Examiner's rejection of its claims to the Board.[14]

The inconsistencies cannot be harmonized. One of ordinary skill in the art is unable to determine whether, *inter alia*, the "passive link" excludes a fax modem installed in the computer or not. Reading the file history of the prosecution, the "passive link" extends inside the computer case to reach the computer's I/O bus, thereby distinguishing Perkins' use of a fax modem installed inside the computer case before the I/O bus. Reading the reexam file history, the opposite is true: the "passive link" ***ends*** at the port on the outside of the computer case, allowing the presence of a fax modem installed inside the computer case before the I/O bus. Under *Teva*, this inconsistency renders the claims indefinite.

<u>Second</u>, even if *arguendo* it was only one statement, this Court's precedent still requires a finding of indefiniteness. *Teva*, 789 F.3d at 1344 ('"The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent[,]'" even if erroneous (quoting *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995-96 (Fed. Cir.

[14] Appellant's contention that its statements to distinguish Perkins can be disregarded because they merely reflect an ongoing "negotiation" with the PTO fails. The Applicant took a clear position during the original examination of the '811 patent to overcome prior art rejections. Many years later, before different reexamination examiners and in a different context, the PO took a different position for a different purpose. There was no ongoing "negotiation" between Infinity and the PTO.

2003))); *see also Hockerson–Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) (rejecting patentee's "request for a mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning[]" despite patentee's argument that a person of ordinary skill would have understood the statement during prosecution to be erroneous).

Accordingly, the Asserted Claims are invalid as a matter of law.

### C. Appellant Was Unable to Explain How the Contradictory Interpretations Could be Harmonized

During oral argument regarding claim construction on February 4, 2019, PO's counsel agreed that for the claims to be definite, one of ordinary skill in the art had to be "reasonably certain where the passive link ends and the computer begins." (**Appx3855** at 61:19-24). The district court then asked "will you show me how that would be then?" (*Id.*) However, instead of providing a straightforward answer, counsel went on at length about the proceeding before the Board, without providing any explanation as to how one of ordinary skill could determine with reasonable certainty where the passive link ends and the computer begins. (**Appx3885-3860**). The district court then followed up on counsel's answer, asking whether "any of the Examiners in connection with the reexam considered this proposed contradiction, or alleged contradiction." (**Appx3860-3861** at 66:17-67:9). Counsel was unable to identify any citation in the record. Still seeking an answer, the district court again asked: "you still agree a person of skill in the art looking at this patent, including

the prosecution history, has to be reasonably certain where the passive link begins and ends and where your computer begins and ends." (**Appx3863** at 70:1-16). Counsel, however, simply referred to the expert's declaration (filed in a different case) without any further explanation how one of ordinary skill in the relevant art could determine with reasonable certainty where the "passive link" ends and where the "computer" begins. (**Appx3864** at 70:1-16).

## VI. APPELLANT'S COUNTER-ARGUMENTS FAIL

Appellant presents several themes and counter-arguments in an attempt to reconcile its conflicting positions regarding "passive link" and "computer," none of which have any merit.

### A. The Applicant Distinguished Perkins on the Basis of Passive Link, Not Analog Transmissions

Appellant repeatedly asserts the Applicant did not distinguish Perkins as lacking a "passive link," and instead distinguished it because it used analog rather than digital transmission. (*See, e.g.*, **App.Br.** at 24-25, 28, 52; *Id.* at 54).

This is demonstrably false. The Appellant explained during reexam that its arguments that Perkins "can only transfer an analog signal (not a digital signal)" were "***not found to be persuasive by the examiner at the time***, but that rejections based on Perkins were eventually overcome on different grounds (e.g., ***based on the 'passive link' limitation***)." (**Appx1991-1992** at **Appx1992** (Examiner record of interview with PO) (emphasis added)).

PO also stated during the reexam that "[t]he term 'passive link' was first introduced in an amendment filed on September 26, 2002 ***to distinguish the invention of the 056 application from Perkins***…." (**Appx2377** (emphasis added)). The PO explained that "[t]he [Applicant] argued that the Perkins device 3 intercepts the flow of data before it is transmitted to the computer circuits," and that he later also "distinguish[ed] the invention of the [']056 application from yet other prior art … that ***intercepted data like Perkins***." (**Appx2377**). This is consistent with Appellant's own expert declaration in this action, in which Dr. Levitt states that "processing by device 3" along the path of the passive link "is ***clearly*** the reason [the Applicant] argued that the Patent Examiner's position [regarding Perkins] was incorrect." (**Appx2979** (emphasis added)).

Moreover, the Applicant could not have distinguished either embodiment of Perkins as lacking digital transmission, because multiple claims at issue in the relevant Office Action did not require digital transmission. Claims 43, 52, and 53, for example, encompassed ***analog*** transmission like that of Perkins.[15] (**Appx2193-2195**). Yet those claims were distinguished from Perkins using the same arguments – *i.e.*, that Perkins lacked a "passive link." (*See* **Appx2201** (stating, immediately following the discussion of "passive link," that "[c]onsequently, the Applicant's

---

[15] Likewise, as-issued Claims 6, 12, and 18 of the '811 patent do not require digital connections. (**Appx88-89**).

claim[] 52 [is] different than the prior art…"); **Appx2204** ("Regarding claim[] 52…, see the discussion herein in paragraph 4, with respect to Perkins, and the inventive differences stated by the Applicant.")).

Appellant is incorrect that the Applicant distinguished either embodiment of Perkins based on analog versus digital transmission rather than the "passive link" limitation.

### B. The Applicant Stated that the "Passive Link," Not Just the "Data," Extended to the I/O Bus

Appellant attempts to characterize the Applicant's statements during prosecution as describing the "flow" of the "non-intercepted data" rather than the end point of the passive link. (*See, e.g.*, **App.Br.** at 22-23). But the context shows that the Applicant was referring to the "passive link":

> "Contrary to [Perkins], when the Applicant transfers digital data from the facsimile transceiver through a ***passive link*** for scanning to the computer, the non intercepted data enters through the RS 232 type connector port of the computer and ***passes directly to the I/O Bus***."

(**Appx2201** (emphasis added)). The Applicant specifically distinguished Perkins as lacking a "passive link," due to the presence of its internal Device 3:

> The Applicant creates a ***passive link*** between the facsimile machine and the computer in order to accommodate the signal transfer for printing or scanning. ***Therefore, the Applicant does not require any intervening apparatus as does Perkins***.

(**Appx2196** (emphasis added)). As the Applicant later stated, the "passive link" language concerned the path of the "data flow," (**Appx4253**), and was the basis of the Perkins distinction, (*see* **Appx1992**; **Appx2377**).

### C. Appellant's Chart of "Relevant PTO Communications" Does Not Resolve the Inconsistency

Appellant's four-page chart of so-called "Relevant PTO Communications" fails to show the Applicant "consistently characterized the passive link ending/the computer beginning at the computer's port or interface" during prosecution. (**App.Br.** at 40-44). The chart instead shows the Applicant consistently described the path of the passive link as extending "through" the ports on the outside of the box containing the computer and "to" the I/O bus of the computer. (*See, e.g.*, **Appx2159-2160** ("the data enters ***through the*** RS 232 type ***connector port*** of the computer and ***passes directly to the I/O Bus***" (emphasis added)); **Appx2201** (same); **Appx2223-2226** (same)).

The Applicant likewise distinguished Perkins' internal embodiment as lacking a passive link because the data passes "***through*** the PSTN [Public Switched Telephone Network] type connector" but is "intercept[ed]" by an internal card before it is "transmitted ***to*** the I/O bus of the computer." (**Appx2200-2201** (emphasis added)). Thus, the Applicant made clear that the RS-232 and PTSN ports on the outside of the box containing the computer were not the end point of the

passive link's path; rather the passive link extends "through" those ports until reaching the computer's I/O bus.[16]

Appellant's table of citations shows the Applicant consistently distinguished Perkins, including its internal embodiment, as an intervening apparatus that intercepts data along the path of the passive link, even if installed in the box containing the computer.[17] (*See, e.g.*, **Appx2142-2143** (distinguishing Perkins as intercepting signals); **Appx2158** (distinguishing Perkins' internal embodiment as requiring "intervening circuitry"); **Appx2178-2180** (same); **Appx2159-2160** (distinguishing Perkins' "internal configuration" as a "peripheral device")).

Appellant wrongly states that some of its citations refer to a "card slot connector." (**App.Br.** at 43). None do. (*See, e.g.*, **Appx2224** (not referring to any "card slot" or "connector," but distinguishing Perkins' "internal configuration" because it "intercepts the flow of data" after it enters "through the PSTN type

---

[16] Appellant also cites to the Applicant's statement that "it would have been obvious and common knowledge . . . to use other 'digital connector ports'[] and interfaces such as . . . RS 232, or IEEE1284, between a GIII facsimile machine and a computer." (*Id.*; **Appx2250**). This, however, is consistent with Applicant's other statements that the path of the link must pass uninterrupted "through" the RS-232 port and "to" the I/O bus.

[17] Appellant cites to early statements where the Applicant did not mention the computer's I/O bus in distinguishing Perkins. (**App.Br.** at 41-42). These statements were directed towards Perkins' external embodiment. The I/O bus distinction was consistently raised in response to the rejections over Perkins' internal embodiment. (*See, e.g.*, **Appx3443** (examiner noting Perkins' internal embodiment); **Appx4217-4218** (Applicant's immediate response, citing the I/O bus as the endpoint of the connection).

connector" and before it reaches "the I/O Bus"); **Appx2225-2226** (discussing only that Perkins' internal embodiment receives data "through a PSTN type connector" to which the facsimile machine is connected).[18]

Finally, Appellant's chart expressly admits that "Perkins [was] described as having a modem contained on the card ***in the path of the link between the fax machine and the computer***." (**App.Br.** at 43 (emphasis added)).

### D. Applicant Never Relied on a "Computer Interface" or "Card Slot Interface" to Distinguish Perkins

Appellant now suggests the claimed endpoint of the passive link at the time was the "computer's card slot interface"—or simply its "interface"—rather than the computer's I/O bus, relying in part on the "computer interface" language of claim 27. (*See, e.g.*, **App.Br.** at 43, 51). This argument fails.

First, the "computer interface" language Applicant relies on does not describe the endpoints of the passive link. Rather, it is clear from the prosecution history that the passive link extends to the I/O bus. (*See, e.g.*, **Appx2159-2160**; **Appx2201**; **Appx270**).

---

[18] To the extent Appellant seeks to imply that a "PSTN type connector" is a computer's "card slot connector," that too is incorrect. (*See, e.g.*, **Appx2198** (characterizing Perkins' PSTN connector as a "PSTN (Public Switch Telephone Network)-[]type analog connection to the facsimile transceiver," not a connection to the computer)).

Second, the Applicant's arguments encompassed multiple claims other than claim 27, and those claims lacked the "computer interface" limitation. Immediately following the relevant discussion of "passive link," the Patentee concluded as follows: "Consequently, the ***Applicant's claims 27 - 29, 32 - 48, and 52 - 54*** are different than the prior art as required by 35 U.S.C. §102(e)." (**Appx2201** (emphasis added); **Appx2202-2204** (distinguishing Perkins as to the other claims by explicitly referring back to the earlier "paragraph 4" discussion of claim 27); *see also* **Appx2197** (noting the Applicant's argument applied to the "Applicant's Patent Application," not just claim 27)). The absence of the "computer interface" language from the other claims defeats this argument.

Third, the phrase "computer interface" is not mentioned or discussed anywhere in the relevant portions of the September 2002 response, unlike "passive link." (**Appx2196**; **Appx2201**). The only mention of "computer interface" is in a different context, analog versus digital signals, and the applicant used that phrase interchangeably with the word "computer" itself. (*Compare* **Appx2197** ("the Applicant can transfer [data] without the need for a modem at the ***computer interface***") with **Appx2198** (stating claim 27 "do[es] not require a fax modem at the ***computer***") (emphasis added)).

Nor was there any discussion of a "card slot," "slot," or "interface" with regard to Perkins. According to the Applicant, Perkins' device was simply "placed

on a card internal to the computer," without any mention of how it was installed.[19] (**Appx2201**). Nor did Appellant or Applicant offer expert testimony that Perkins involved any kind of "card slot."

Finally, Appellant has offered nothing to suggest the internal "interface" of Figures 2b, 2c and 2d of the facsimile modem shown in the '278 Application would be any different than that of Perkins. Appellant cannot reconcile the position it took during prosecution, that Perkins' "internal" "device 3" ***is*** part of the path of the "passive link," with the position it took during re-examination, the corresponding internal fax modem 41 and interfacing circuitry 10 of embodiments 2b-2d ***is not*** part of the path of the "passive link."

### E. The Appellant's Expert Testimony Should Be Disregarded

Appellant's heavy reliance upon the expert testimony of Dr. Marc Levitt and its assertion that the district court failed to give this testimony its appropriate weight are both misplaced and wholly lacking in merit. Notably, Appellant offered an expert report from another action, which was drafted to respond to a declaration by

---

[19] Nothing in Perkins describes the method of its internal installation—the full extent of Perkins' disclosure is "the facsimile device may be provided on a card for location in the computer." (**Appx2708** at 9:29-33).

a different expert who never appeared in this case.[20] As such, it makes no mention of the I/O bus with respect to the "passive link." (**Appx2957-2995**).

Whether a district court chooses to consult extrinsic evidence is within its discretion. *Markman*, 52 F.3d at 980-81. Extrinsic evidence like Dr. Levitt's new declaration is "less significant than the intrinsic record" and inherently "less reliable than the patent and its prosecution history in determining how to read claim terms[.]" *Phillips*, 415 F.3d at 1317-1318 (quotation marks and citation omitted). Under no circumstance can extrinsic evidence be used to contradict the intrinsic record. *Profectus Tech. LLC v. Huawei Tech. Co., Ltd.*, 823 F.3d 1375, 1379 (Fed. Cir. 2016) (citation omitted).

Equally important is the fact that Dr. Levitt offers no relevant "plain and ordinary meaning" for the term "passive link." He states only that "this term needs no construction as this is well understood by those skilled in the art as a connection which is not active." (**Appx2975** at ¶56). But that conclusory interpretation is unsupported and does not address where the "passive link" ends and where the "computer" begins. Dr. Levitt likewise provides only conclusory and unsupported statements about how a person of skill would apply the definition of "passive link" set forth by the Patentee, or that the path of the passive link is limited to the RJ-11

---

[20] Because Dr. Levitt's declaration was used without modification from a different action, it is primarily directed to issues that were not raised in this action. (*See, e.g.*, **Appx2979-2995**, ¶¶72-133).

cable, without ever addressing the statements made during prosecution. (**Appx2975-2976**).

Dr. Levitt's conclusory opinions should be disregarded. *Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."); *see also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) ("Without a more detailed explanation of how [the expert] formed his conclusions and why they conflict with the plain language of the specification, we must agree with the district court that [the] testimony deserves no weight."); *In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) (affirming indefiniteness holding, and giving "no weight" to an opinion where the expert "d[id] not support his opinion with evidence or analysis").

The remainder of Dr. Levitt's declaration as to "passive link" restates the declaration he offered to the PTO during reexamination – statements that were relied upon in creating the inconsistencies in the first instance. (*Compare e.g.*, **Appx1980** at ¶30 *with* **Appx2976** at ¶59).

Because the district court correctly afforded Dr. Levitt's declaration no weight, Appellants' citations to *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1371 (Fed. Cir. 2017) and *Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1011 (Fed. Cir. 2018), are inapposite. (**App.Br.** at 31, 49-50).

Appellants did not offer expert testimony sufficient to show that "passive link" had a plain meaning to one of skill in the art in this context.

Thus, the district court did not err; this Court should disregard Dr. Levitt's conclusory opinions offered to contradict the prosecution history.

### F. The Board Did Not Address the Definiteness of "Passive Link" or "Computer"

Appellant falsely states, without citation, that the "[Board] repeatedly concluded that 'passive link' and 'computer' were definite, rather than indefinite" and "agreed with Infinity's definition of 'passive link' and 'computer.'" (**App.Br.** at 34). The Board ***never*** addressed the definiteness of "passive link" or "computer," ***never*** addressed the conflict raised here, ***did not*** adopt Appellant's construction of "passive link,"[21] and ***did not*** construe the term "computer" at all. (**App.Br.** at 33-40, 53; *see* **Appx2680-2694**). [22]

Because the Board neither addressed indefiniteness nor the relevant conflict between the positions taken by the Applicant and PO, the district court correctly held that "[t]he [Board]'s conclusion is not relevant to the question before this Court:

---

[21] The Board's construction of "passive link" differs from Appellant's. Appellant asserts that passive link needs no construction—but the Board construed it. (**Opening Br.** at 14; **Appx2686**). Moreover, Appellant's alternate construction differs from the construction the Board adopted, adding the final clause and making other wording changes. (*Compare* **Opening Br.** at 14 *with* **Appx2686**).

[22] Appellant likewise offers no citations to support its claim that the "PTO … repeatedly rejected the current invalidity positions." (**App.Br.** at 58).

whether the patentee took inconsistent positions with respect to the ***endpoint*** of the passive link." (**Appx39** (emphasis in original)). And it correctly noted (and Appellant agrees (**App.Br.** at 38; **Appx39**)) that, regardless, "[t]he [Board]'s construction of a claim term is not binding on a district court," citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007).

Appellant offers no citation to the Board's opinion where the Board construes "computer," addresses the indefiniteness of "passive link" or "computer," or discusses the conflict between the Patentee's position regarding the endpoint of the passive link during prosecution as compared to the reexam. The district court was correct.

Appellant's reliance on *Tinnus* to argue that the district court should have deferred to the PTO is misplaced. (*See, e.g.*, **App.Br.** at 34). In *Tinnus*, the Board's indefiniteness finding was reversed, in part because the language at issue was added by the *examiner*, not the applicant. 733 F. App'x at 1019-20 (**App.Br.** at 33-34). The Court in *Tinnus* stated that "we presume that an ***examiner*** would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance." (*Id.* at 1020

(emphasis added)). *Tinnus* is not relevant here, because the "passive link" language was added by the Applicant, not the examiner.[23]

### G. The Patentee's "Definition" of "Passive Link" Does Not Resolve the Conflict

Even if it were adopted, the explicit "definition" of "passive link" set forth by the Applicant does not address the endpoints of the passive link—it merely substitutes "PC" for "computer":

> The Applicant's definition of a 'passive link' is one where the initiation of data flow is activated from a set-up procedure within the PC and/or the facsimile machine, and said data is transferred, with no intervening apparatus or signal interception by a processing element or any active component, along the path of an unbroken direct connection **between the PC and the facsimile machine**, for purposes of providing both scanning or printing data.

(**Appx4253** (emphasis added)).

Indeed, the "definition" is not of "passive link," but rather of "passive." It begins "[t]he Applicant's definition of a 'passive link' is ***one*** [***a link***] where …," leaving "link" undefined. This link resides "between the PC and the facsimile machine," but the "definition" fails to provide any clarification of where the link ends and the PC begins. As such a person of skill in the art applying the Applicant's

---

23 Moreover, Appellant cites *Tinnus* to argue the Court should defer to a purported finding by the Board, (**App.Br.** at 34), but *Tinnus* itself reversed a finding by the Board, 733 F. App'x at 1022.

"definition" would remain uncertain as to whether the "passive link" terminates at the I/O bus or at the perimeter of the box containing the PC/computer.

Moreover, it is essentially undisputed that the Applicant's "definition" is itself indefinite, and neither party proposes that it be adopted verbatim. (**Appx4253**). As Appellant's own expert recognized, the last clause of the Applicant's language "creates both redundancy and uncertainty within the claim." (**Appx2976** at ¶62).

Finally, in its brief, Appellant quotes a paraphrasing of a portion of this definition, and falsely states that "the [Board] and parties agree, Infinity's expert agrees, and the Claim Construction Order expresses no evident disagreement, regarding what it means for a link to be 'passive.'" (**App.Br.** at 31). This is simply not true. None of the parties agree; nor did the Board. Appellee's alternative construction included wording changes and omitted the final clause. (**App.Br.** at 14). Appellant's expert stated that "this term ***needs no construction*** as this is well understood by those skilled in the art as a connection which is ***not active***." (**Appx2975** (emphasis added)). The Board applied a different construction, omitting the last clause. (**Appx2686**). Even Appellant contends, earlier in its brief, that "passive link" needs no construction. (**App.Br.** at 14). Thus, contrary to Appellant's representation, the parties do not agree on the meaning of "passive."

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Dated: July 6, 2020

/s/ Marc R. Labgold
Marc R. Labgold, Ph.D.
Patrick J. Hoeffner
MARC R. LABGOLD, P.C.
12005 Sunrise Valley Drive
Suite 203
Reston, VA 20191
(703) 901-8860
mlabgold@labgoldlaw.com
phoeffner@labgoldlaw.com

John W. Shaw
Jeff Castellano
Andrew E. Russell
SHAW KELLER LLP
I.M. Pei Building
1105 N. Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com

*Counsel for Defendant-Appellee Oki Data Americas, Inc.*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 6th day of July, 2020, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Andrew DiNovo
Nicole E. Glauser
DINOVO, PRICE, ELLWANGER & HARDY LLP
7000 North MoPac Expressway, Suite 350
Austin, Texas 78731
(512) 539-2626
adinovo@dinovoprice.com
nglauser@dinovoprice.com

*Counsel for Appellant*

/s/ Marc R. Labgold
*Counsel for Appellee*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*13,931*] words.

   [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: July 6, 2020

/s/ Marc R. Labgold
*Counsel for Appellee*